IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **National Railroad Passenger Corporation,**<br>60 Massachusetts Avenue, N.E.<br>Washington, D.C. 20002<br>　　　　Plaintiff,<br>v.<br>**Veolia Transportation Services, Inc.,**<br>8757 Georgia Avenue, Suite 1300,<br>Silver Spring, MD 20910, and<br>**Veolia Transportation, Inc.,**<br>2015 Spring Road, #750<br>Oak Brook, IL 60523<br>　　　　Defendants. | Case Number _____<br><br>**Complaint**<br><br><br>**JURY DEMAND** |

## COMPLAINT

Plaintiff National Railroad Passenger Corporation ("Amtrak") alleges as follows:

### INTRODUCTION

Amtrak brings this case to recover damages for intentional tortious conduct by Defendant Veolia in connection with Veolia's efforts to beat out Amtrak for a lucrative commuter rail operations contract in South Florida. Despite knowing full well that its actions amounted to tortious conduct rather than competitive business behavior, Veolia unduly advantaged its own bid, and disadvantaged Amtrak's bid, by soliciting and obtaining commitments from three senior Amtrak operations managers (1) to support Veolia's bid and to assume key operational roles with Veolia in the event Veolia was the winning bidder; and (2) to agree that they would not support Amtrak's competing bid. As a direct consequence of its tortious conduct, Veolia succeeded in

–2–

formulating and submitting a bid that appeared to satisfy the owner's criteria, and Veolia, rather than Amtrak, ultimately was awarded the operations contract. Veolia's tortious conduct thereby caused Amtrak millions of dollars in damages, for which Amtrak seeks redress in this lawsuit.

### PARTIES, JURISDICTION AND VENUE

1. Plaintiff Amtrak is a corporation organized under the Rail Passenger Service Act, 49 U.S.C. § 24301, and the laws of the District of Columbia, with its principal place of business at 60 Massachusetts Avenue, N.E., Washington, D.C. 20002.

2. On information and belief, defendant Veolia Transportation Services, Inc. is a Maryland corporation with its principal place of business at 8757 Georgia Avenue, Suite 1300, Silver Spring, MD 20910.

3. On information and belief, defendant Veolia Transportation, Inc. is an Illinois corporation with its principal place of business at 2015 Spring Road, #750, Oak Brook, IL 60523.

4. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs, and pursuant to 28 U.S.C. §§ 1331 and 1349 because Amtrak was incorporated under an Act of Congress and the United States owns more than one-half of its capital stock.

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because (1) a substantial part of the events or omissions giving rise to the claims herein took part in the District; and (2) the defendants have minimum contacts with the District and are, therefore, subject to personal jurisdiction in the District.

**THE TRI-RAIL COMMUTER RAIL OPERATIONS CONTRACT**

6. Plaintiff Amtrak and Defendant Veolia are providers of transportation services, including operations services for commuter rail systems.

7. Amtrak is the industry leader. It operates more than 300 intercity passenger trains daily and in fiscal year 2006 exceeded a record-breaking 25 million passengers. According to an April 2006 study by the U.S. Government Accountability Office (GAO, 06-470), the majority of commuter rail agencies in America rely on Amtrak for some level of access to infrastructure or services, including maintenance of way, maintenance of equipment, train operations, access to rights-of-way, police and security, ticketing, traction power, stations and platforms, and dispatching.

8. By virtue of its leadership in the industry, Amtrak possesses an unmatched pool of experienced managers and other personnel. Nationwide, Amtrak employs more than 19,000 highly skilled and continuously trained railroad professionals.

9. The South Florida Regional Transportation Authority ("SFRTA") was created in 2003 pursuant to legislation, signed into law by Governor Jeb Bush, that was passed for the express purpose of enhancing public transportation in Southern Florida by "coordinat[ing], develop[ing], and operat[ing] a regional transportation system." On or about October 3, 2006, SFRTA issued Request for Proposal No. 06-112 ("the Operations RFP"), which sought a contractor to provide Operator Services for SFRTA's Tri-Rail Commuter Rail System in Florida ("the Operations Contract").

10. The Tri-Rail System is integral to Florida's overarching goal of expanding access to safe and reliable public transportation services. It is a 72-mile commuter railroad serving

Miami-Dade, Broward, and Palm Beach Counties. That area contains approximately 5 million people—more than one-third of Florida's population.

11. The Operations RFP requested proposals to provide operations service for the Tri-Rail System's 48 weekday, 16 Saturday, and 14 Sunday and Holiday revenue trains. The contractor selected for the bid would be required to work closely with SFRTA's Rail Fleet Maintenance contractor to ensure a reliable, efficient, and safe passenger train service for the Tri-Rail System. The term of the agreement was to be seven years with one three-year option period.

12. The Operations RFP directed bidders to submit proposals, on or before January 11, 2007, describing methods and costs for providing operations services to the Tri-Rail System.

13. Of the several requirements of the Operations RFP, among the most crucial was the composition of the "Key Management Team" that would be charged with implementing and managing the services to be provided. In its submission, each bidder was required to list, by name, the proposed Key Management Team members who would be responsible for the following critical functions: (i) Transportation; (ii) Safety; (iii) Human Resources/Labor Relations; and (iv) Communications (Operations Center).

14. The Operations RFP set forth strict requirements concerning the qualifications of the Key Management Team members. Each Team member was required to "possess a minimum of 3 years of recent experience . . . as the operator of a passenger railroad service." The Team as a whole also was required to "demonstrate relevant experience with the key railroad functions required by this RFP, including . . . [t]rain operations in a multiple user environment[;] . . . [c]rew management; . . . [c]ustomer service[;] . . . [r]ailroad employee training and certification;

[r]ail operations interface management with maintenance and new construction; [f]inancial management and reporting of rail operations[;] . . . [and] [r]ailroad safety program management."

15. SFRTA provided direct notice of the Operations RFP to 87 contractors. Advance notice was sent to nine firms from SFRTA's vendor database list, and 78 firms received notice via Demandstar, an online bidding system.

16. In addition to the direct notice provided to 87 contractors, SFRTA also publicly advertised the Operations RFP in three local newspapers, the *Florida Administrative Weekly*, and *Passenger Transport* (the American Public Transportation Association's weekly newspaper).

17. Eight firms purchased the Operations RFP document. Of those, only two—Amtrak and Veolia—submitted proposals by the January 11, 2007 deadline.

### VEOLIA'S RECRUITMENT OF AMTRAK EMPLOYEES
### FOR VEOLIA'S KEY MANAGEMENT TEAM

18. In its proposal, Veolia stated that its Key Management Team would be headed up by proposed General Manager Sidney N. Birckett. Birckett had worked for Amtrak for approximately 30 years before joining Veolia in July 2006, a few months before Veolia submitted its proposal responding to the Operations RFP. According to Veolia's proposal, Birckett was recruited from Amtrak specifically for the Operations RFP.

19. Veolia and General Manager Birckett understood, however, that Veolia did not have within its employ at the time available personnel with the requisite qualifications to staff up the Key Management Team positions. Indeed, only a small number of rail transportation managers possess the stringent qualifications demanded by the SFRTA Operations RFP, and the vast majority of those who do were occupied on other projects. Veolia therefore was at risk of being unable to submit a qualifying proposal to SRFTA.

20. To overcome this substantial obstacle, once Birckett was in Veolia's employ, he and Veolia set about to recruit Veolia's proposed Key Management Team from among the ranks of Birckett's former colleagues at Amtrak.

21. Veolia proceeded to identify senior Amtrak operations personnel whose qualifications made them well suited to serve as members of the Key Management Team on the SFRTA project. Then, unbeknownst to Amtrak, Veolia contacted the Amtrak employees it had selected and attempted to induce them to sign Veolia's submission to SFRTA as proposed members of the Key Management Team. In order to convince these Amtrak employees to support Veolia's bid, Veolia promised each of them that, if Veolia were selected as the winning bidder, each of them would be offered employment with Veolia on favorable terms, and would be assigned to Key Management Team positions on the SFRTA Operations contract. At the same time, and in exchange for the benefits that Veolia offered these Amtrak employees, Veolia demanded that they agree not to allow Amtrak to list them as members of Amtrak's proposed Key Management Team.

22. Although Veolia did not successfully entice all of the Amtrak employees it targeted—Amtrak's proposed General Manager Joseph Yannuzzi, for example, resisted Veolia's recruitment efforts—Veolia ultimately succeeded in inducing three Amtrak employees to accept its entreaties. Veolia's bid listed each of those employees as proposed members of Veolia's Key Management Team, namely: (1) Douglas Stencil, Veolia's proposed Safety and Training Manager; (2) Victor Salemme, Veolia's proposed Superintendent of Transportation; and (3) Gary Mauck, Veolia's proposed Communications Manager. The fourth and final member of Veolia's proposed Key Management Team, Robert Meizinger (Veolia's proposed Human Resources and Labor Relations Manager), was a former Amtrak employee.

23. Stencil, Salemme, and Mauck all were Amtrak employees at the time they were recruited by Veolia and at the time Veolia submitted its proposal to SFRTA.

24. Stencil joined Amtrak in 1986. At the time of Veolia's proposal, he was Senior Analyst – Operating Practices for Amtrak's Southern Division, a position he had held since 2001. At that time, Stencil possessed an uncommon skill set. His expertise spanned not only safety and training but also regulatory standards relevant to the Operations RFP. Stencil was also certified as a locomotive engineer, conductor, yard master, and train master. Finally, Stencil's position with Amtrak was based in Florida. Stencil's combination of qualifications, therefore, could not have been found easily, if at all, among other potential candidates for the Key Management Team.

25. Salemme joined Amtrak in 1987. At the time of Veolia's proposal, he was Assistant Superintendent for Amtrak's Downeaster Passenger Service, a position he had held since 1998.

26. Mauck joined Amtrak in 1973. At the time of Veolia's proposal, he was Amtrak's District Manager – Station Operations, Southwest, a position he had held since 2005.

27. Veolia's Key Management Team submission described the crucial functions that Stencil, Salemme, and Mauck would be required to perform for Veolia. As Safety and Training Manager, Stencil would "be in charge of all aspects of Safety and [would] oversee training to ensure the implementation of a safety culture throughout all levels of the organization." As Superintendent of Transportation, Salemme would "oversee all aspects of this project to ensure the daily on-time delivery of the service and adherence to all operational procedures." As Communications Manager, Mauck would "be responsible for all information received and distributed from the Operation Center."

28. Veolia represented that Stencil, Salemme, and Mauck were "highly qualified" to perform these essential functions because of their vast experience in the industry. Veolia lauded Stencil's "deep understanding" of the industry due to his 31 years at Amtrak; Salemme's "long and rich" operations background; and Mauck's "seasoned leader[ship]." In the cover letter to its proposal, Veolia boasted that the members of its proposed Key Management Team possessed a combined 130 years of railroad experience. At that time, however, approximately 110 of those years were with Amtrak.

29. Similarly, Veolia stressed that its team members had "built their reputations on delivering the best," and had "worked together before and ha[d] already established solid working relationships with one another." Once again, those reputations were built, and those solid working relationships established, at Amtrak.

30. Veolia's inclusion of Stencil, Salemme, and Mauck as members of its proposed Key Management Team was vital to Veolia's proposal. As alleged above, had Birckett and Veolia not been able to recruit current Amtrak employees for Veolia's Key Management Team, Veolia's proposal would have been severely compromised. In fact, Veolia's ability to submit a qualifying proposal *at all* depended on staffing its Key Management Team with then-current Amtrak employees.

31. Each member of Veolia's Key Management Team—including the three members who were then-Amtrak employees—signed "Key Employee Certifications" that were submitted to SFRTA by Veolia as a part of Veolia's bid package. The purpose of the Key Employee Certifications was to assure SFRTA that all of the Key Management Team members that Veolia proposed to use on the project would in fact work on the project if Veolia was awarded the contract. Accordingly, Stencil, Salemme and Mauck each represented, on behalf of Veolia, that

they "agree[d] to work for Veolia Transp. Services, Inc., on the South Florida Regional Transportation Authority Project, should the firm be awarded the contract as a result of this RFP."

32. Stencil and Salemme both executed the Key Employee Certification on November 3, 2006, and Mauck executed the Key Employee Certification on November 12, 2006. On those dates of execution, Stencil, Salemme, and Mauck were employed by Amtrak.

33. As Amtrak employees, Stencil, Salemme and Mauck owed Amtrak fiduciary duties of care, undivided loyalty, and obedience. Those duties prohibited Stencil, Salemme and Mauck from, among other things, actively and directly competing with Amtrak with respect to a potential business opportunity, and required each of them, at all times, to exert their best efforts on behalf of Amtrak, their employer.

34. For its part, Veolia knew that Stencil, Salemme, and Mauck were employed by Amtrak at the time Veolia submitted its proposal and at the time it solicited their signatures on the Key Employee Certifications. Veolia's proposal included resumes clearly showing that Stencil, Salemme, and Mauck were "[p]resent[ly]" employed by Amtrak.

35. Veolia also knew that, as Amtrak employees, Stencil, Salemme and Mauck owed a duty of loyalty to Amtrak, which precluded them from assisting Veolia to compete for business with Amtrak. Indeed, Veolia's own Conflict of Interest Policy, posted on its web site, expressly provides that "no employee may appropriate or divert to any other person or entity a business or financial opportunity that the employee learns of or develops in the course of employment and knows or should know [Veolia] wants to pursue."

36. Notwithstanding its knowledge of Stencil's, Salemme's and Mauck's employment with Amtrak, and their duties to Amtrak in that regard, Veolia represented in its

proposal that all the members of its Key Management Team—including the three members who were then Amtrak employees—were "ready to come on board immediately."

37. At the same time, whereas Veolia's proposal listed Mr. Stencil as a member of Veolia's Key Management Team and identified his responsibility—safety—as "the most crucial attribute of rail transportation," Amtrak's proposal listed Mr. Stencil as a member of *Amtrak*'s Key Management Team. Specifically, Mr. Stencil was slated to be Amtrak's Principal for Safety/Training.

38. Unbeknownst to Amtrak, Veolia insisted that, in exchange for Veolia's promises of employment to Stencil, Salemme, and Mauck, each of them was required to promise, in return, that they would not permit Amtrak to include them as proposed members of Amtrak's Key Management Team in the bid Amtrak was preparing for the SRFTA Operations Contract.

39. Stencil, Salemme and Mauck each advised Veolia that they agreed to these terms.

40. Veolia sought this additional commitment from Stencil, Salemme, and Mauck because Veolia knew that it would be competing against Amtrak for the SRFTA Operations Contract and that Amtrak was putting together a Key Management Team for its proposal.

41. Stencil evidently violated his agreement with Veolia by agreeing to be named in Amtrak's proposal as a member of Amtrak's Key Management Team. Salemme and Mauck, however, kept their promises to Veolia. In fact, Amtrak's proposed General Manager on the project approached Salemme to request that Salemme agree to be interviewed for a position on Amtrak's proposed Key Management Team. Salemme refused, however, advising Amtrak that he planned to leave Amtrak to pursue other opportunities.

42. Thus, not only did Veolia's solicitation of Stencil, Salemme, and Mauck make Veolia's bid possible, that conduct made Veolia's proposal more attractive relative to Amtrak's

bid by increasing the experience of Veolia's Key Management Team and decreasing the pool of Amtrak employees available to serve on Amtrak's Key Management Team.

## THE EVALUATION PROCESS: VEOLIA CAPITALIZES ON ITS SELECTION OF THEN-CURRENT AMTRAK EMPLOYEES

43. The Amtrak and Veolia proposals were evaluated by a scoring system designed to identify the "responsive and responsible" contractor whose proposal was "most advantageous to SFRTA." To that end, proposals were reviewed by an Evaluation and Selection Committee ("Evaluation Committee") and assigned a score out of a maximum of 100 points.

44. The scores were based on four criteria: (1) Price; (2) Technical Approach; (3) Operating Plans; and (4) Qualifications and Experience. Qualifications and Experience was given the most weight in SFRTA's scoring system; it accounted for 35 percent of a proposal's total score. Moreover, as evidenced by comments provided by members of the Evaluation Committee, management and experience issues also played some role in the scores for other criteria.

45. Whereas a proposal's Price score was based upon a mathematical formula, scores for Technical Approach, Operating Plans, and Qualifications and Experience were based on the Evaluation Committee's judgment. The Evaluation Committee consisted of five SFRTA employees: Brad Barkman, Director of Operations; Ed Byers, Operations Manager; Ed Woods, Director of Finance and Information Technology; Bonnie Arnold, Director of Marketing and Customer Service; and Dan Mazza, Director of Engineering and Construction.

46. The Evaluation Committee met on January 24, 2007, to evaluate the Amtrak and Veolia proposals, and issued a memorandum to Joseph Guilietti, Executive Director of SFRTA, to describe its evaluation.

47. The Evaluation Committee's memorandum recommended that Veolia be awarded the Tri-Rail System contract. It reported that Veolia received a total score of 85, whereas Amtrak received a total score of 62.3. Veolia's total score included a score of 28.0 for Qualifications and Experience. Amtrak's score for that category was 27.3

48. The Evaluation Committee's memorandum also listed perceived strengths of the Veolia proposal, including that its Key Management Team possessed "[s]*trong qualifications*"; that Veolia was an "[e]*xperienced* company with worldwide resources;" that it "[p]ossess[ed] U.S. Commuter Rail *experience*"; and that it possessed "[k]*nowledge* of shared rail corridors" (emphasis added).

49. The Evaluation Committee's positive outlook on Veolia's knowledge and experience also was reflected in the comments provided by individual committee members on the Amtrak and Veolia proposals.

    a. Evaluation Committee member Ed Byers singled out for praise Veolia's "Qualified Key Management team."

    b. Evaluation Committee member Ed Woods gave Veolia's proposal scores of 9 for Technical Approach and Qualifications and Experience. Although Mr. Woods also scored Amtrak's proposal a 9 for Qualifications and Experience, he gave a score of 7 for Technical Approach based on criticism that Amtrak had named the "same person as Veolia for safety [Douglas Stencil]," and that Amtrak would evidently be required to "hir[e] more personnel which could drive up costs."

    c. Evaluation Committee member Dan Mazza complimented Veolia's "experienced team."

  d. Evaluation Committee member Bonnie Arnold cited Veolia's "experienced Key team" as a strength of its proposal.

50. Based on the Evaluation Committee's memorandum and recommendation, the Tri-Rail System operations contract was awarded to Veolia.

51. SFRTA informed Amtrak of the decision to award the contract to Veolia by letter dated January 24, 2007.

52. On January 26, 2007, Amtrak learned that Veolia had induced Stencil, Salemme and Mauck to support Veolia's competing bid, and also learned that Veolia had extracted promises from each of them not to support Amtrak's bid.

## COUNT I

### (Aiding and Abetting—Breach of Fiduciary Duty)

53. The allegations of paragraphs 1 through 52 are incorporated here by reference as though set forth fully here.

54. As employees of and managers for Amtrak, Stencil, Salemme, and Mauck were under fiduciary duties of care, undivided loyalty and obedience, and other legal obligations to Amtrak, including, without limitation, a duty not to compete with Amtrak, or to assist others in competing with Amtrak for business.

55. As a direct and proximate cause of their acts and omissions in connection with the Operations RFP, Stencil, Salemme, and Mauck breached their duties and obligations to Amtrak.

56. Veolia knowingly and substantially induced and assisted in the breaches of fiduciary duties by Stencil, Salemme, and Mauck.

57. Veolia reasonably should have known, and in fact did know at the time, that the conduct of Stencil, Salemme and Mauck described above constituted a breach of the fiduciary duties they owed to Amtrak.

58.     But for Veolia's Stencil, Salemme, and Mauck's breaches of their fiduciary duties, and but for Veolia's knowing and substantial inducement and assistance of these breaches, Amtrak would have been awarded the SFRTA Operations Contract.

59.     By reason of Veolia's aiding and abetting the breach of fiduciary duties by Amtrak employees, Amtrak has suffered millions of dollars in damages, to be proven at trial.

## COUNT II

### (Tortious Interference with Economic Advantage)

60.     The allegations of paragraphs 1 through 52 are incorporated here by reference as though set forth fully here.

61.     Amtrak possessed a valid business relationship or expectancy in the SFRTA Operations Contract.

62.     Veolia knew of Amtrak's valid business relationship or expectancy in the SFRTA Operations Contract.

63.     Veolia intentionally interfered with Amtrak's business relationship or expectancy in the SRFTA Operations Contract.

64.     Veolia's conduct was egregious, and not simply competitive.

65.     Veolia's intentional interference caused the termination of Amtrak's business relationship or expectancy.

66.     By reason of Veolia's conduct, Amtrak has suffered millions of dollars in damages, to be proven at trial.

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

    (a)    Actual damages sustained by Plaintiffs;

    (b)    Punitive damages;

    (c)    Attorneys' fees and costs;

    (d)    Prejudgment and post-judgment interest; and

    (e)    Such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand trial of this matter by a jury.

Dated: July 16, 2007

Respectfully submitted,

_____
Gary A. Orseck (D.C. Bar No. 433788)
Matthew R. Segal (D.C. Bar No. 483486)
ROBBINS, RUSSELL, ENGLERT,
  ORSECK & UNTEREINER, LLP
1801 K Street, NW, Suite 411-L
Washington, D.C. 20006
(202) 775-4500

Attorneys for National Railroad Passenger Corporation

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| National Railroad Passenger Corporation | Veolia Transportation Services, Inc., and Veolia Transportation, Inc. |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  District of Columbia
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Gary A. Orseck
Robbins Russell Englert Orseck & Untereiner LLP
1801 K St NW Ste 411-L, Washington, DC 20006
(202) 775-4500

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 2 U.S. Government Defendant
○ 3 Federal Question (U.S. Government Not a Party)
● 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ● 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ● 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**
☐ 410 Antitrust

○ **B. Personal Injury/Malpractice**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**
☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

● **E. General Civil (Other)**   OR   ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☒ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant)
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

## V. ORIGIN

- ⦿ 1 Original Proceeding
- ○ 2 Removed from State Court
- ○ 3 Remanded from Appellate Court
- ○ 4 Reinstated or Reopened
- ○ 5 Transferred from another district (specify)
- ○ 6 Multi district Litigation
- ○ 7 Appeal to District Judge from Mag. Judge

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Aiding and abetting a breach of fiduciary duty, tortious interference with economic advantage

## VII. REQUESTED IN COMPLAINT
CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 ☐
DEMAND $ more than $75,000    Check YES only if demanded in complaint
JURY DEMAND:    YES ☒    NO ☐

## VIII. RELATED CASE(S) IF ANY
(See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE July 16, 2007    SIGNATURE OF ATTORNEY OF RECORD [signature]

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form