# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**National Railroad Passenger Corporation,**

Plaintiff,

v.

**Veolia Transportation Services, Inc., and**

**Veolia Transportation, Inc.,**

Defendants.

**Civil Action No. 1:07-cv-01263-RBW**

## PLAINTIFF NATIONAL RAILROAD PASSENGER CORPORATION'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### INTRODUCTION

Defendants Veolia Transportation Services, Inc. and Veolia Transportation, Inc. (collectively "Veolia") induced three National Railroad Passenger Corporation ("Amtrak") employees to help Veolia beat out Amtrak—their own employer—for a lucrative railroad operating contract. At the same time, Veolia secured promises from the three Amtrak employees that they would refuse to assist Amtrak in its competing bid for the business. In exchange for the commitments they made to Veolia, Veolia promised to hire each of them on favorable terms if their efforts to help Veolia win the contract were successful. As alleged in the Complaint, Veolia's conduct amounts to aiding and abetting the Amtrak employees' breach of their fiduciary duties to Amtrak (Count I), and tortious interference with Amtrak's economic advantage (Count II), which caused Amtrak millions of dollars in damages.

Veolia's motion to dismiss ("Veolia Br.") consists of a series of attacks on a dramatic mischaracterization of the Complaint ("Cplt."). According to Veolia, the thrust of Amtrak's claim is that at-will employees should be prohibited from "seeking better opportunities" (Veolia

Br. 9), and that willing employers are likewise prohibited from "recruiting at-will employees from a competitor" (*id.* at 7). Ignoring what the Complaint *actually* alleges, Veolia proceeds to cite case law for the unremarkable proposition that neither of these practices is a tort. In addition, by wishing away the relevant allegations in the Complaint, Veolia contends that Amtrak fails to allege that the misconduct at issue caused Amtrak's damages.

Veolia makes four main arguments, each of which is utterly meritless. First, Veolia claims that its improper business conduct could not have caused Amtrak to lose out on the contract because (it argues) the effect of the conduct on the judges' scoring was small. But Amtrak alleges that Veolia's conduct made the difference; indeed, Amtrak claims that Veolia could not have submitted a qualifying bid *at all* without committing tortious conduct.

Second, Veolia says that the three Amtrak employees did not violate any duty of loyalty to Amtrak because at-will employees always are free to switch employers for any reason, and competitors are free to recruit them. But that ignores Amtrak's allegation that Veolia induced the Amtrak employees to assist Veolia, and to undermine Amtrak, while they still were employed by Amtrak.

Third, Veolia contends that it could not have tortiously interfered with Amtrak's economic advantage because Amtrak had no legally cognizable right or expectation that it would be awarded the contract. That argument misconstrues the applicable legal standard and is contradicted by the Complaint and the record.

Finally, Veolia contends that its tortious conduct is consistent with public policy that favors "free competition." Apparently, Veolia believes that the public interest will be served if corporations are free to induce their competitor's employees to undermine their own employer's

interests *while they remain on their employer's payroll*.  The Court should accept none of this.  Veolia's motion should be denied.

## BACKGROUND

In October 2006, the South Florida Regional Transportation Authority ("SFRTA") issued a Request for Proposal ("RFP"), seeking a contractor to provide operator services for the SFRTA's Tri-rail Commuter Rail System in Florida.  Cplt. ¶ 9.  Among other requirements, the RFP called for each bidder to list four members of a proposed "Key Management Team" that would implement and manage the services to be provided.  *Id*. ¶ 13.  The RFP imposed strict requirements as to the qualifications of the Key Management Team members.  *Id*. ¶ 14.  Of the more than 150 contractors that received direct notice of the RFP, eight purchased the application, and only two – Amtrak and Veolia – submitted proposals.  *Id*. ¶ 17.

At the time of the bidding, Veolia did not have available personnel with the qualifications that the SFRTA demanded. *Id*. ¶ 19.  Accordingly, Veolia decided to identify *Amtrak* operations personnel who *did* have the requisite qualifications, and then contacted them and induced them to sign Veolia's bid submission as proposed members of Veolia's Key Management Team.  *Id*. ¶ 21.  Veolia promised each of them employment with Veolia on favorable terms if Veolia were selected as the winning bidder.  *Id*. ¶ 21.  The three Amtrak employees who signed Veolia's bid were (1) Douglas Stencil (proposed Safety and Training Manager); (2) Victor Salemme (Veolia's proposed Superintendent of Transportation); and (3) Gary Mauck (Veolia's proposed Communications Manager).  *Id.* ¶ 22.  At the same, Veolia demanded that these Amtrak employees agree not to allow Amtrak to list them as members of Amtrak's proposed Key Management Team.  *Id.* ¶ 21.

Veolia knew full well that Stencil, Salemme, and Mauck were employed by Amtrak, and knew that they had fiduciary obligations to Amtrak not to assist Amtrak's competitor. *Id.* ¶¶ 34, 35.  Indeed, Veolia's *own* Conflict of Interest Policy provides that "no employee may appropriate or divert to any other person or entity a business or financial opportunity that the employee learns of or develops in the course of employment and knows or should know [Veolia] wants to pursue." *Id.* ¶ 35.  Veolia went ahead with its plan nonetheless, because its ability to submit a qualifying proposal depended on its staffing its Key Management Team with these Amtrak employees. *Id.* ¶ 30.

On January 24, 2007, the SFRTA informed Amtrak that Veolia had prevailed by a score of 85 to 62.3.  Veolia's total included a score of 28.0 for "Qualifications and Experience," whereas Amtrak's score in that category was 27.3. *Id.* ¶¶ 46, 47.  On January 26, 2007, Amtrak learned that Veolia had induced Stencil, Salemme and Mauck to support Veolia's competing bid, and that Veolia had extracted promises from each of them not to support Amtrak's bid. *Id.* ¶ 52.  Amtrak then brought the present action.

## ARGUMENT

Veolia's motion to dismiss must be denied if Amtrak's "[f]actual allegations [are] enough to raise a right to relief above the speculative level." *Bell Atl. Corp.* v. *Twombly*, 127 S. Ct. 1955, 1965 (2007) (citations omitted).  "The Court must treat the complaint's factual allegations—including mixed questions of law and fact—as true, drawing all reasonable inferences in the plaintiff's favor." *Lutz* v. *United States*, No. 06.-1177, 2007 WL 1954438, at *2 (D.D.C. July 5, 2007); see also *Erickson* v. *Pardus*, 127 S. Ct. 2197, 2200 (2007) (Rule 8 "requires only a short and plain statement of the claim showing that the pleader is entitled to relief.  Specific facts are not necessary; the statement need only give the defendant fair notice of

what the . . . claim is and the grounds upon which it rests.") (citations and internal quotation marks omitted). Amtrak's Complaint easily passes that threshold test of legal sufficiency.

I.    **AMTRAK SUFFICIENTLY ALLEGES THAT VEOLIA'S TORTIOUS CONDUCT CAUSED AMTRAK TO LOSE THE SFRTA OPERATIONS CONTRACT**

Amtrak alleges that but for Veolia's tortious conduct, Amtrak rather than Veolia would have won the SRFTA operations contract. Veolia argues that both of Amtrak's claims must be dismissed because Amtrak fails to allege causation as a matter of law. Here is Veolia's argument: (1) "Veolia beat Amtrak by a total score of 85 to 62.3—a difference of 22.7 points"; (2) in the Qualifications and Experience Category—the one most directly affected by Veolia's tortious conduct—"Veolia only beat Amtrak by a score of 28.0 to 27.3—a difference of just 0.7 points"; and (3) "a 0.7 point advantage could not have caused a 22.7 point loss." Veolia Br. 4.

That argument simply ignores Amtrak's allegations of fact. First, the Complaint Amtrak filed—unlike the one imagined by Veolia—alleges that "Veolia's ability to submit a qualifying proposal *at all* depended on staffing its Key Management Team with then-current Amtrak employees." Cplt. ¶ 30; *id.* ¶ 19 ("Veolia did not have within its employ at the time available personnel with the requisite qualifications to staff up the Key Management Team positions"); see also *id.* ¶¶ 20-29, 42. That is, but for its tortious conduct, Veolia would not have been in a position to receive *any* points from the judges, and Amtrak would have been the winning bidder. Veolia's argument pretends that this allegation does not exist.

In any event, Veolia's no-causation theory flunks basic arithmetic. Contrary to Veolia's argument, the fact that Veolia *outscored Amtrak* 28 points to 27.3 in the Qualifications and Experience category obviously does not mean that the effect of Veolia's tortious conduct was equivalent to Veolia's 0.7 margin of victory. If Veolia had been awarded a *total* of 0.7 points in

that category, it might be able to argue that its improper conduct in obtaining those points was less than the margin of victory. But the 28 "Qualifications" points that Veolia obtained by its illegitimate means is *greater* than Veolia's overall margin of victory. What is more, Veolia's conduct also caused Amtrak's score to be *lower* than it otherwise would have been, because Veolia made three otherwise-available Amtrak employees promise not to "permit Amtrak to include them as proposed members of Amtrak's Key Management Team in the bid Amtrak was preparing." Cplt. ¶ 38; see also *id.* ¶ 49.b.[1]

Veolia also badly misses the point in its argument that regardless of the egregiousness of Veolia's conduct, this Court is powerless to "enjoin the [SFRTA] from awarding the contract at issue" to Veolia. See Veolia Br. 4-5. That is true, but irrelevant. Unlike all of the cases Veolia cites for this proposition, this is not a suit to "enjoin governmental action" (*id.* at 5, citing *Dep't of Gen. Servs.* v. *Willis*, 344 So. 2d 580, 590 (Fla. 1st Dist. Ct. App. 1977)), and it therefore makes no difference whether Amtrak might also have filed a separate bid-protest action against the SFRTA under the Florida Administrative Procedures Act. There is no state law "exhaustion" requirement that Amtrak must satisfy before suing Veolia in tort; to the contrary, Florida's Administrative Procedure Act does not authorize Florida agencies to adjudicate tort claims between private parties. See Fla. Stat. Ann. § 120.57(3) (West 2007).[2]

---

[1] Veolia also suggests that Amtrak's claims should be dismissed because proof of causation would require the parties "to pry open the Florida process" in discovery, which Veolia suggests is not permitted under Florida law. That is wrong. Veolia Br. 4. To the extent such discovery may be required here, it is permitted if it is "necessary, relevant, and unavailable from other sources." *Horne* v. *Sch. Bd. of Miami-Dade County*, 901 So. 2d 238, 241 (Fla. 1st Dist. Ct. App. 2005); see *States, Dep't of Agric. and Consumer Servs.* v. *Broward County*, 810 So. 2d 1056, 1058 (Fla. 1st Dist. Ct. App. 2002) (same); *State, Dep't of Health and Rehab. Servs.* v. *Brooke*, 573 So. 2d 363, 371 (Fla. 1st Dist. Ct. App. 1991) (same).

[2] Indeed, Florida law does not even require private litigants to exhaust administrative remedies before pursuing monetary damages claims against *governmental* entities—much less claims against private parties. See, e.g., *Tytler* v. *Palm Beach County Sch. Bd.*, 743 So. 2d 1209, 1210 (Fla. 4th Dist. Ct. App. 1999) ("[T]he administrative process could not provide appellant with the remedy sought in the complaint, money damages."); *Berkowitz* v. *City of Tamarac*, 654 So. 2d 982, 983 (Fla. 4th Dist. Ct. App. 1995) ("We conclude that because appellant is seeking money damages and rescission, which could not be obtained in an administrative proceeding, he

## II.    AMTRAK SUFFICIENTLY ALLEGES THAT VEOLIA AIDED AND ABETTED THE AMTRAK EMPLOYEES' BREACH OF THEIR FIDUCIARY DUTIES TO AMTRAK

The law in every jurisdiction in the country holds that an employee owes his employer a strict duty not to compete with his employer for business opportunities "[t]hroughout the duration of [the] relationship."  RESTATEMENT (THIRD) OF AGENCY § 8.04 (2006).  The same duty prohibits an employee "from taking action on behalf of or otherwise assisting the [employer's] competitors."  *Id.*; see *Mercer Mgmt. Consulting, Inc.* v. *Wilde*, 920 F. Supp. 219, 234 (D.D.C. 1996) ("Prior to termination of employment, an officer . . . must refrain from actively and directly competing with the employer for customers and employees, and must continue to exert his or her best efforts on behalf of the employer."); *New World Fashions, Inc.* v. *Lieberman*, 429 So. 2d 1276, 1277 (Fla. 1st Dist. Ct. App. 1983) (same); *Dirigo Hous. Assocs.* v. *Crowley*, No. CV-03-156, 2003 WL 22309103, at *5 (Me. Super. Ct. Sept. 24, 2003) ("[A]n employee who is making preparations to compete after termination of his employment" cannot "solicit customers or do other acts in direct competition with his employer even though upon termination, he or she can immediately engage in competition."); *Jet Courier Serv., Inc.* v. *Mulei*, 771 P.2d 486, 493 (Colo. 1989) (a company's employees are "not 'entitled to solicit customers for [a competitor] before the end of [their] employment.'").  It is equally well settled that "those who knowingly participate as an aider and abettor" of an agent's breach of a fiduciary duty "are liable to [the agent's] principal."  *Nerbonne, N.V.* v. *Lake Bryan Int'l Props.*, 689 So.

is not required to exhaust administrative remedies."); *Hambley* v. *State, Dep't of Natural Res.*, 459 So. 2d 408, 410 n.4 (Fla. 1st Dist. Ct. App. 1984) ("We disagree with appellees that Hambley could have pursued his remedy for his economic loss in this tort action through chapter 120, Florida's Administrative Procedure Act.").  Likewise, procurement law—including the very authorities Veolia cites (at 11-12)—favors resolving disputes between bid competitors in court, rather than through protests to administrative agencies.  See, *e.g.*, *Automated Servs., Inc.*, B-221906, 86-1 CPD ¶ 470, 1986 WL 63521, at *2 (Comp. Gen. May 19, 1986) ("At best, ASI's allegation involves a question of improper business practices by Downes, not by the government, As such, it is a dispute between private parties, which we will not consider under our Bid Protest Regulations."); *Gem Servs., Inc.*, B-217038, 85-1 CPD ¶ 159, 1985 WL 52298, at *1 (Comp. Gen. Feb. 7, 1985) (same).

2d 322, 325 (Fla. 5th Dist. Ct. App. 1997); see RESTATEMENT (SECOND) OF TORTS § 876(b) (1979); RESTATEMENT (THIRD) AGENCY § 8.01 cmt. b (2006) (same).

That is precisely what Amtrak alleges in Count I.  While still Amtrak employees, Messrs. Stencil, Salemme and Mauck violated their fiduciary duties of loyalty to Amtrak by (1) supporting Veolia's competing bid for the SFRTA contract (Cplt. ¶ 31-32), and (2) refusing, at Veolia's behest, to support their own employer's bid (*id*. ¶ 38).  Veolia purposefully (and effectively) induced each of these breaches by the Amtrak employees.  *Id.* ¶¶ 56-59.

Veolia argues that the conduct of the Amtrak employees was perfectly innocuous—even laudable—because "[i]t is the basic right of an employee to seek better opportunities and a better job with another employer."  Veolia Br. 7.  On the same theory, Veolia says that it cannot be sued for its *own* conduct, because "there is nothing actionable about recruiting a competitor's employees," so long as they are at-will and not subject to any non-compete agreement.  *Id.* at 6.  According to Veolia, Amtrak's claim is an affront to "free competition" and the "fundamental rights of employees."  *Id.*

That is errant nonsense.  Amtrak has not sued Veolia for enticing some of Amtrak's employees to switch jobs; Amtrak has sued Veolia because Veolia induced three Amtrak employees to breach their duties of loyalty to Amtrak *while they were still employed* at Amtrak.  See *Las Luminarias of the New Mexico Council of the Blind* v. *Isengard*, 587 P.2d 444, 450 (N.M. Ct. App. 1978) (employees who worked on a "competitive proposal" for business sought by their employer, and "made it . . . known" that they "would seek employment" with the competitor if it won the business, but would under no circumstances be available to work on the project on their then-current employer's behalf, "breach[ed] . . . their duty of loyalty" to their employer).  Nowhere in Veolia's brief is there the slightest support for the proposition that such

–8–

actions are a protected form of "competition in the labor market."  Veolia Br. 6.  As long as they remained Amtrak employees, Stencil, Salemme, and Mauck "ha[d] a duty to refrain from competing with [Amtrak] and from taking action on behalf of or otherwise assisting [Veolia]." RESTATEMENT (THIRD) OF AGENCY § 8.04 (2006).

It is therefore wholly irrelevant that Messrs. Stencil, Salemme, and Mauck were at-will employees (Veolia Br. 9), or that their activities after they left Amtrak were not restricted by a "non-compete" clause (*id.* at 8).  *All* Amtrak employees—indeed, all employees anywhere—are prohibited from "usurp[ing] [their] 'employer's business opportunit[ies]'" during the course of their employment. *Gov't Relations Inc.* v. *Howe*, No. 05-1081, 2007 U.S. Dist. LEXIS 4952, at *37 (D.D.C. Jan. 24, 2007) (quoting *Sci. Accessories Corp.* v. *Summagraphics Corp.*, 425 A.2d 957, 965 (Del. 1980)).

Finally, it is also irrelevant (Veolia Br. 9) whether the SFRTA contract that was up for bid was "within the existing scope of any of the three men's employment or duties."  The SFRTA contract was within *nobody's* scope of employment or duties at the time of Veolia's conduct, since it had not yet been awarded.  That is precisely why Amtrak's employees were under a duty of loyalty not to help Amtrak's competitor win that contract.  In any event, an employee's fiduciary duty to his employer has never been limited to the specific tasks that he may be assigned to at any given time; the duty broadly applies "regardless of the nature of an agent's duties or position or the relative status that an agent or other employee occupies within an organization."  RESTATEMENT (THIRD) OF AGENCY § 8.04 cmt. b (2006); cf. *Eckard Brandes, Inc.* v. *Riley*, 338 F.3d 1082, 1086 (9th Cir. 2003) (employees who solicited employer's customer for a competitive venture breached fiduciary duty to employer, despite that "they were only low-level employees"); *Eaton Corp.* v. *Giere*, 971 F.2d 136, 141 (8th Cir. 1992) (concluding that a

product engineer breached his duty of loyalty by soliciting his employer's customers for himself).[3]

## III.    AMTRAK SUFFICIENTLY ALLEGES THAT VEOLIA TORTIOUSLY INTERFERED WITH AMTRAK'S BUSINESS EXPECTANCY

Besides aiding and abetting the Amtrak employees' breach of their duties to Amtrak, Veolia's conduct amounts to tortious interference with Amtrak's economic advantage. Cplt., Count II. Amtrak alleges that it had a legitimate expectation of winning the SFRTA operations contract, and in fact *would* have won it but for Veolia's intentional and egregious actions. Veolia induced Amtrak's own employees to support Veolia'*s* submission to the SFRTA in exchange for Veolia's promises of employment if the Amtrak employees' efforts to help Veolia win the contract were successful. *Id.* ¶ 21. And to leave nothing to chance, Veolia also extracted promises from the Amtrak employees not to support their *own* employer's competing bid on the same project. *Id.* But for Veolia's tortious acts, Amtrak—not Veolia—would have won the bid. *Id.* ¶ 65; see Point I, *supra*. These allegations state all the elements of the common law tort. See *Bennett Enters.* v. *Domino's Pizza, Inc.*, 45 F.3d 493, 499 (D.C. Cir. 1995) ("To establish a claim for tortious interference with economic advantage under District of Columbia law, the evidence must show: (1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach of termination of the relationship or expectancy, and (4) resultant damage.").

1. Veolia says the claim should be dismissed because Amtrak's allegation that Veolia's misdeeds actually cost Amtrak the contract is "uncertain and speculative." Veolia Br. 10. It argues that Amtrak was merely one "participant in a bidding competition" that anybody could

---

[3] Veolia's reliance on *Productive Automated Sys. Corp.* v. *CPI Sys., Inc.*, 61 F.3d 620 (8th Cir. 1995) (Veolia Br. 9) is misplaced. That case does not involve an employer-employee or other agency relationship, which was a "fundamental reason" why the court found no fiduciary duty existed. 61 F.3d at 623.

have won. *Id.* Indeed, it is even possible (Veolia suggests) that the SFRTA "could have rejected *any and all* of the bids" had it not chosen Veolia. *Id.* (emphasis in original). Because Amtrak "had absolutely no reason to expect it would win," Veolia claims, there was no business relationship or expectancy that Veolia could have interfered with. *Id.* at 11.

That argument misstates the law and (again) ignores Amtrak's allegations. Unlike a claim for tortious interference with *contract*, the tort of interference with an advantageous business relationship does not require the existence of a legally enforceable agreement. *PRN of Denver, Inc.* v. *Arthur J. Gallagher & Co.*, 531 So. 2d 1001, 1003 (Fla. 3d Dist. Ct. App. 1988). Rather, to state a claim, the plaintiff must allege only "*a reasonable likelihood or probability that, but for the alleged interference by [the defendant], a contract would have resulted.*" *Oceanic Exploration Co.* v. *ConocoPhillips, Inc.*, No. 04-332, 2006 U.S. Dist. LEXIS 72231, *71-72 (D.D.C. Sept. 21, 2006) (emphasis added) (plaintiff sufficiently alleged a prospective business relationship where it claimed to have "invested a significant amount of research and resources" toward obtaining the sought-after contract); see also *Sarkis* v. *Pafford Oil Co., Inc.*, 697 So. 2d 524, 526 (Fla. 1st Dist. Ct. App. 1997) (a business relationship can be evidenced by circumstances that "in all probability" would have resulted in a contractual relationship (quoting *Ethan Allen Inc.* v. *Georgetown Manor Inc.*, 647 So. 2d 812 (Fla. 1994))).[4] It therefore does not matter that "Amtrak does not allege any contracts or other agreements with SFRTA" (Veolia Br. 10), just as it is beside the point that Veolia can imagine a scenario in which Amtrak would not have won the contract even if Veolia had obeyed the law.

---

[4] Washington, D.C. law governs Amtrak's tortious interference claim because that is where Amtrak is located and sustained damages. See, *e.g.*, *Nnadili v. Chevron U.S.A. Inc.*, 435 F. Supp. 2d 93, 98 (D.D.C. 2006) (D.C. law applied to a tort action where "all of the alleged injuries were sustained in the District of Columbia, and the overwhelming majority of plaintiffs still reside in the District of Columbia"). But the law is not materially different in either jurisdiction.

Nor can Amtrak's claim that it would otherwise have won the bid be dismissed as an idle "[a]ssertion[] or boast[.]" Veolia Br. 11. Veolia's motion to dismiss cannot overcome Amtrak's *factual* allegations simply by referring to them pejoratively—particularly since the Complaint explains precisely why Amtrak would have won the bid. Amtrak was not (as Veolia suggests, *id.* at 10) merely one "participant" in the bidding process; it was *the only bidder in the competition other than Veolia*. Cplt. ¶ 17.[5] And Veolia would not have been able to formulate a qualifying bid in the first place but for its tortious dealings with Amtrak's employees. *Id.* ¶¶ 30, 42. Veolia certainly is free to try to defend this case on the theory that Veolia still would have won the bidding even *without* the help of Amtrak's employees, but that is no basis for dismissing the Complaint.

2. Veolia also argues that, regardless of Amtrak's business expectation, Veolia's conduct was not tortious because "there is nothing improper or unlawful" in "recruit[ing] and hir[ing]" a competitor's personnel. Veolia Br. 11. That is generally correct, but irrelevant. Amtrak is not suing Veolia merely for "recruiting" its personnel; it is suing Veolia for inducing Amtrak's own employees to assist a direct competitor, and to refuse to assist the employer who was paying their salaries.

The distinction is confirmed by the very cases Veolia cites (at 11-12). Although it may be common for a bidder who *has been awarded* a contract to recruit employees from a competitor, such efforts are permissible precisely because the "prospective business advantage" is no longer up for grabs. See, *e.g.*, *Consol. Eng'g Servs.* v. *United States*, 64 Fed. Cl. 617, 634

---

[5] While it is true (as Veolia speculates) that the SFRTA "could have rejected" Amtrak's bid regardless of Veolia's submission (Veolia Br. 10), it is highly implausible, to say the least. The SFRTA's evaluation committee explained in its recommendation to the SFRTA's Executive Director (attached as Exhibit A) that Amtrak's bid "met the submission requirements for RFP 06-112." And at the same meeting in which the SFRTA awarded the operations contract to Veolia, it also awarded *Amtrak* a five-year, $15.8 million contract for transition, dispatching, train control, and yard services for the South Florida Rail Corridor. See Exhibit B (the SFRTA's agenda for its public meeting on held on January 26, 2007, referenced in paragraph 52 of the Complaint and available through the SFRTA's governmental web site (at http://www.sfrta.fl.gov/meetings/index.html)).

(2005) ("[W]e note that 'it is neither unusual [nor] inherently improper for an *awardee* to recruit and hire personnel employed by an incumbent contractor.'") (emphasis added); *Logicon RDA*, B-252031, 93-2 CPD ¶ 179, 1993 WL 384833, at *8 (Comp. Gen. Sept. 20, 1993) ("Initially, we note that it is [n]either unusual nor inherently improper for an *awardee* to recruit and hire personnel *previously employed* by an incumbent[] contractor.") (emphasis added). By the same token, inducing the competition's staff to devote their efforts *against* the interest of their employer is a tort. *Furash & Co.* v. *McClave*, 130 F. Supp. 2d 48, 56 (D.D.C. 2001). Veolia's motion to dismiss Count II should be denied

## IV.    POLICY CONCERNS FAVOR HOLDING VEOLIA TO ACCOUNT FOR ITS TORTIOUS CONDUCT

In the last section of its brief, Veolia argues that prohibiting at-will employees from "seeking better opportunities" is contrary to "principles underlying free competition." Veolia Br. 13. But Veolia's policy argument—like the rest of its brief—is largely irrelevant, since it fails to take account of what the case is about.

Amtrak's Complaint has nothing to do with whether at-will employees are free to change jobs or whether competitors are free to recruit them. Amtrak seeks instead the benefit of its right to receive the best, good-faith efforts of its employees for the full duration of their employment. Likewise, Amtrak seeks the benefit of its right to fair competition for contracts—without having to worry which of its employees are really on Amtrak's side.

An employer's effort to prohibit employees from assisting competitors implicates policy concerns only when the employer seeks to impose that burden "upon *former* employees." *Flammer* v. *Patton*, 245 So. 2d 854, 857 (Fla. 1971) (emphasis added). Thus, "[t]he pertinent question is whether [the employer] in effect impedes or restrains a former employee from exercising his lawful profession, trade or business." *Id.* at 858; see also *Ellis* v. J*ames V. Hurson*

–13–

*Assocs., Inc.*, 565 A.2d 615 (D.C. 1989) (examining policy concerns relevant to former employer's efforts to enforce a covenant with its former employee). Amtrak's Complaint is about what Veolia induced its employees to do *while* they were working at Amtrak.

The relevant public policy concerns here cut sharply *against* Veolia. If (as Veolia claims), a company's employees are free to undermine their employer's interests, and if competitors are free to induce them to do so, the nature of the employment relationship will be radically changed. What company would *ever* hire an at-will employee if the employee were free to decide whether to serve his employer's (as opposed to a competitor's) interest while on the payroll? Certainly not Veolia: its own employees are prohibited from doing precisely what Veolia induced Stencil, Salemme, and Mauck to do. Cplt. ¶ 35. The "free competition" envisioned by Veolia's motion (Veolia Br. 13) therefore would make it significantly harder, not easier, for workers to find "new opportunities." *Id.* at 12. That is why the law prohibits the tortious conduct that Veolia employed to win the SFRTA contract.

## CONCLUSION

For the foregoing reasons, Veolia's motion to dismiss should be denied.

Dated: August 20, 2007                    Respectfully submitted,


                                          _____*/s/ Gary A. Orseck*_____
                                          Gary A. Orseck (D.C. Bar No. 433788)
                                          Matthew R. Segal (D.C. Bar No. 483486)
                                          ROBBINS, RUSSELL, ENGLERT,
                                            ORSECK & UNTEREINER, LLP
                                          1801 K Street, NW, Suite 411-L
                                          Washington, D.C.  20006
                                          (202) 775-4500

                                          Attorneys for National Railroad Passenger
                                          Corporation



| Date: | January 24, 2007 |
|---|---|
| To: | Joseph Giulietti, Executive Director |
| From: | Evaluation and Selection Committee |
| Subject: | RFP 06-112 for "Commuter Rail Operations for SFRTA's Commuter Rail System" |

The purpose of this memorandum is to present to the Executive Director for approval Veolia Transportation Services, Inc. as the Evaluation and Selection Committee's recommended firm for the subject solicitation. Upon the Executive Director's concurrence with the Evaluation and Selection Committee's recommendation, this recommendation shall be presented to the SFRTA Board for approval.

### Nature of Procurement

The purpose of this Request for Proposal (RFP) is to enter into an Agreement with a qualified Contractor to provide Operator Services for SFRTA's Tri-Rail Commuter Rail System. At commencement of the Agreement service is projected to consist of forty-eight (48) weekday, sixteen (16) Saturday and fourteen (14) Sunday and Holiday revenue trains. The selected Contractor shall be required to work closely with SFRTA's Rail Fleet Maintenance contractor to ensure a reliable, efficient and safe passenger revenue train service for SFRTA's Tri-Rail System. The term of the Agreement will be seven (7) years with one (1) three (3) year option period.

### Procurement History

SFRTA began advertising this Request for Proposal (RFP) on October 2, 2006. Advance notice was sent to 9 firms from SFRTA's vendor database/referral list and 78 firms received notice via Demandstar. The RFP was also publicly advertised in three local newspapers, the Florida Administrative Weekly, and APTA Passenger Transport. Eight (8) firms purchased the RFP document and two (2) proposals were received on January 11, 2007.

The proposals were submitted to SFRTA by:

- National Railroad Passenger Corporation (AMTRAK)
- Veolia Transportation Services, Inc.

During the initial responsiveness check of proposals by the Procurement Department, both AMTRAK and Veolia met the submission requirements for RFP 06-112.

**Exhibit A
Page 1 of 4**

An Evaluation and Selection Committee was established by the SFRTA Board at the October 27, 2006 meeting and consisted of the following members:

> Brad Barkman, Director of Operations SFRTA
> Ed Byers, Operations Manager SFRTA
> Ed Woods, Director of Finance and Information Technology SFRTA
> Bonnie Arnold, Director of Marketing and Customer Service SFRTA
> Dan Mazza, Director of Engineering and Construction SFRTA

After the Evaluation and Selection Committee's individual review of the two proposals, the Committee met on January 24, 2007 to perform the evaluation.

The evaluation of the proposals was conducted in accordance with the criteria listed in the RFP:

1. Price  (Maximum 15 points)
2. Technical Approach  (Maximum 25 points)
3. Operating Plans  (Maximum 25 points)
4. Qualifications and Experience  (Maximum 35 points)

**Analysis**

The Committee initially discussed the financial capacity for each proposer and SFRTA's Director of Finance and Information Technology presented his analysis.  The financial statements for Veolia showed that the firm is financially stable and the firm was also determined by the Committee to be responsible and responsive to the requirements of the RFP.  The Committee then discussed the proposal strengths and weaknesses for each criteria and Veolia Transportation, Inc. was found to be technically qualified by the Evaluation and Selection Committee as listed below:

1. Experienced company with worldwide resources;
2. Possess U.S. Commuter Rail experience;
3. Knowledge of shared rail corridors;
4. Proposed emphasis on customer service;
5. Strong qualifications for Key Management Team;
6. Proposed innovations for service improvements;
7. Detailed Mobilization Plan and Schedule.

Out of a maximum 85 points for the technical evaluation, Veolia received a score of 70 and AMTRAK received a score of 62.3. The Committee unanimously determined that the submittals of both proposers were technically sound and proceeded with the opening of the price proposals. AMTRAK's price proposal was $162,639,724 for the full ten year term and Veolia's price proposal was $97,155,187 for the full ten year term.  Both price proposals included $2,500,000 in potential incentives and additional services.  After combining the technical and price evaluation scores, AMTRAK's total score was 62.3 and Veolia's total score was 85.  Based on the final evaluation scores and ranking, the Committee unanimously approved the recommendation of Veolia for contract award.

**Exhibit A**
**Page 2 of 4**

Determination

For the reasons set forth above, the Evaluation and Selection Committee has determined that RFP No. 06-112 for "Commuter Rail Operations for SFRTA's Commuter Rail System" should be awarded to Veolia Transportation, Inc.

Approved by:

_____
Brad Barkman, Director
Operations

_____
Chris Bross, Director
Procurement

**Exhibit A**
**Page 3 of 4**

**RFP 06-112**
**OPERATING SERVICES**
**EVALUATION COMMITTEE RANKINGS**

| PROPOSER | EVALUATION COMMITTEE MEMBERS | | | | | WEIGHT | TOTALS |
|---|---|---|---|---|---|---|---|
| | BA | BB | DM | EB | EW | | |
| VEOLIA | | | | | | | |
| Criteria # 1 Price | 15 | 15 | 15 | 15 | 15 | .1.0 | 15.0 |
| Criteria # 2 Technical Approach | 8 | 8 | 9 | 9 | 9 | 2.5 | 21.5 |
| Criteria # 3 Operating Plans | 8 | 8 | 8 | 9 | 8 | 2.5 | 20.5 |
| Criteria # 4 Qualifications/Experience | 8 | 7 | 8 | 8 | 9 | 3.5 | 28.0 |
| WEIGHTED TOTAL TOTAL AND AVG TOTAL | 83 | 80 | 86 | 88 | 89 | 425 | 85.0 |
| AMTRAK | | | | | | | |
| Criteria # 1 Price | 0 | 0 | 0 | 0 | 0 | 1.0 | 0.0 |
| Criteria # 2 Technical Approach | 7 | 7 | 8 | 7 | 7 | 2.5 | 18.0 |
| Criteria # 3 Operating Plans | 7 | 8 | 7 | 6 | 6 | 2.5 | 17.0 |
| Criteria # 4 Qualifications/Experience | 7 | 8 | 8 | 7 | 9 | 3.5 | 27.3 |
| WEIGHTED TOTAL TOTAL AND AVG TOTAL | 60 | 66 | 66 | 57 | 64 | 311.5 | 62.3 |

**Exhibit A**
**Page 4 of 4**

# SOUTH FLORIDA REGIONAL TRANSPORTATION AUTHORITY

## GOVERNING BOARD

## REGULAR MEETING AGENDA
## JANUARY 26, 2007
## 10:00 a.m.

South Florida Regional Transportation Authority
Board Room
800 NW 33rd Street
Suite 100
Pompano Beach, FL 33064

SFRTA BOARD MEETINGS ARE SCHEDULED ON THE FOURTH FRIDAY OF EACH
MONTH AT 9:30 A.M.  FOR FURTHER INFORMATION CALL (954)942-RAIL (7245).  TIME
OF MEETINGS SUBJECT TO CHANGE.

**SFRTA Board Members**

| | | |
|---|---|---|
| Commissioner Bruno Barreiro, Chair | Marie Horenburger | John Martinez |
| James A. Cummings | Neisen Kasdin | George Morgan, Jr. |
| Mayor Josephus Eggelletion, Vice-Chair | Commissioner Jeff Koons | Bill T. Smith |

**Executive Director**

Joseph Giulietti

<u>**GOVERNING BOARD REGULAR MEETING**</u>
<u>**OF JANUARY 26, 2007**</u>

The meeting will convene at 10:00 a.m., and will be held in the Board Room of the South Florida Regional Transportation Authority, Administrative Offices, 800 NW 33rd Street, Suite 100, Pompano Beach, Florida 33064.

<u>**CALL TO ORDER**</u>

<u>**PLEDGE OF ALLEGIANCE**</u>

<u>**AGENDA APPROVAL**</u> – Additions, Deletions, Revisions

<u>**DISCUSSION ITEMS**</u>

<u>**MATTERS BY THE PUBLIC**</u> – Persons wishing to address the Board are requested to complete an "Appearance Card" and will be limited to three (3) minutes.  Please see the Minutes Clerk prior to the meeting.

| CONSENT AGENDA |
|---|
| Those matters included under the Consent Agenda are self-explanatory and are not expected to require review or discussion.  Items will be enacted by one motion in the form listed below.  If discussion is desired by any Board Member, however, that item may be removed from the Consent Agenda and considered separately. |

C1.  <u>MOTION TO APPROVE</u>:  Minutes of Governing Board's Regular Meeting of December 8, 2006.

| REGULAR AGENDA |
|---|
| Those matters included under the Regular Agenda differ from the Consent Agenda in that items will be voted on individually.  In addition, presentations will be made on each motion, if so desired. |

**R1.**  <u>MOTION TO APPROVE</u>:  The following business travel for the Governing Board and/or the Executive Director for calendar year 2007:

|  |  |
|---|---|
|  | Meeting with Insurance Underwriters (May) – Location TBD |
| APTA Conferences: | Transit CEO's Seminar (January) |
|  | Legislative Conference (March) |
|  | Commuter Rail/Rail Transit Conference (June) |
|  | Annual Meeting (October) |
| FPTA: | Florida Public Transportation Association's Annual Conference (November) |

<u>Department:</u>   Executive          <u>Department Director:</u>  Joseph Giulietti
<u>Project Manager:</u>      N/A          <u>Procurement Director:</u>      N/A

**Exhibit B**
**Page 2 of 6**

**R2.**  <u>MOTION TO APPROVE:</u> The Revised Fare and Service Change Policy of the South Florida Regional Transportation Authority.

<u>Department:</u>   Administration              <u>Department Director:</u> Diane Hernandez Del Calvo
<u>Project Manager:</u> Marie Jarman            <u>Procurement Director:</u>  Chris Bross

**R3.**  <u>MOTION TO APPROVE:</u>  Multi-Year Joint Participation Agreement (JPA) Notification of Funding, FM #417983-1-84-01 Contract No. AOC41 between the South Florida Regional Transportation Authority (SFRTA) and the Florida Department of Transportation (FDOT) District IV Office for State Transit Block Grant funds to offset the operating cost of providing feeder bus services, in the amount of $487,918.

<u>Department:</u>      Planning & Capital Development       <u>Department Director:</u>  Jack Stephens
<u>Project Manager:</u>  Marie Suzie Papillon           <u>Procurement Director:</u> Chris Bross

**R4.**  <u>MOTION TO APPROVE:</u>  Grant Agreement between the South Florida Regional Transportation Authority (SFRTA) and the State of Florida Department of Community Affairs (DCA) Division of Emergency Management for financial assistance for the Transit Security Grant Program (TSGP) in the amount of $342,944.

<u>Department:</u>   Planning & Capital Development        <u>Department Director:</u>  Jack Stephens
<u>Project Manager:</u> Bradley Barkman              <u>Contracts Director:</u>  Chris Bross

**R5.**  <u>REQUESTED ACTION:</u>

<u>(A)</u>    <u>MOTION TO APPROVE:</u>  Request for Proposal (RFP) No. 07-723 for Auditing Services to conduct South Florida Regional Transportation Authority's (SFRTA's) fiscal year end audits.

<u>(B)</u>    <u>MOTION TO APPROVE:</u>    Selection and Evaluation committee for the analysis and scoring of proposals for auditing services.  The members include SFRTA's staff as follows:  Edward T. Woods Jr., CPA – Director of Finance and Administration; Laura Thezine, CPA – Accounting Manager; Elizabeth Walter – Budget and Grants Manager; and Joseph Khouzami - Accountant.  The results of this selection process will be presented to SFRTA's Governing Board.

<u>Department:</u> Finance & Information Technology        <u>Department Director:</u> Edward Woods
<u>Project Manager:</u> Laura Thezine              <u>Procurement Director:</u> Chris Bross

**R6.**  <u>MOTION TO APPROVE:</u> The second of two (2), one (1) year renewal options to Agreement No. 05-721 between the South Florida Regional Transportation Authority (SFRTA) and ACS Transport Solutions, Inc. (formerly Ascom Automation, Inc.) in the amount of $153,720, for TVM software maintenance and support services.

<u>Department:</u>   Finance & Information Technology       <u>Department Director:</u>  Edward Woods
<u>Project Manager:</u>  Michael H. Kanefsky          <u>Procurement Director:</u>  Chris Bross

**Exhibit B**
**Page 3 of 6**

**R7.** <u>MOTION TO APPROVE:</u>   Agreement No. 06-621, between the South Florida Regional Transportation Authority (SFRTA) and C2 Group, LLC, for Federal Legislative Consultant Services, for a period of two (2) years in the firm fixed amount of $120,000 per year with three (3) one (1) year options, in the firm fixed amount of $120,000 for option year one (1) and $144,000 per year for option years two (2) and three (3).

<u>Department:</u>   Planning & Capital Development          <u>Department Director:</u> Jack Stephens
<u>Project Manager</u>: Cheryl Clark Naft                              <u>Procurement Director:</u> Chris Bross

**R8.** <u>MOTION TO APPROVE:</u> Modification to Purchase Order No. 05-000380 between South Florida Regional Transportation Authority (SFRTA) and Holland & Knight, LLP for Special Legal Services related to the Boca Raton Phase II Joint Development Project in the not-to exceed amount of $16,818.36.

<u>Department:</u>   Planning & Capital Development          <u>Department Director:</u> Jack Stephens
<u>Project Manager</u>: Loraine Kelly-Cargill                        <u>Procurement Director:</u> Chris Bross

**R9.** <u>MOTION TO APPROVE:</u> Implementation Plan for Tri-Rail Boca Raton Station Phase II Joint Development Project.

<u>Department:</u>   Planning & Capital Development          <u>Department Director:</u> Jack Stephens
<u>Project Manager</u>: Loraine Kelly-Cargill                        <u>Procurement Director:</u> Chris Bross

**R10.** <u>MOTION TO APPROVE:</u> Agreement No. 06-101, between the South Florida Regional Transportation Authority (SFRTA) and National Railroad Passenger Corporation (AMTRAK) for Transition, Dispatching, Train Control and Yard Services for the South Florida Rail Corridor for a period of five years with five one-year option periods, in the maximum not-to-exceed amount of $15,809,293.00 for the initial five year term.

<u>Department:</u>   Operations                                          <u>Department Director:</u> Bradley Barkman
<u>Project Manager</u>: Bradley Barkman                            <u>Procurement Director:</u> Chris Bross

**R11.** <u>MOTION TO APPROVE:</u> Supplemental Joint Participation Agreement (JPA) No.1, between the South Florida Regional Transportation Authority and the Florida Department of Transportation (FDOT), for additional funding for Transition, Dispatching, Train Control and Yard Services associated with the New River Bridge Carve Out for the remainder of the current fiscal year, increasing the amount of the existing JPA by $86,000.00, for a revised total JPA amount of $1,386,000.

<u>Department:</u>   Operations                                          <u>Department Director:</u> Bradley Barkman
<u>Project Manager</u>: Bradley Barkman                            <u>Procurement Director:</u> Chris Bross

**Exhibit B**
**Page 4 of 6**

**R12.**   <u>MOTION TO APPROVE</u> Agreement No. 06-112, between the South Florida Regional Transportation Authority and Veolia Transportation Services, Inc., for the Operations of SFRTA's Commuter Rail System, for a period of seven (7) years, in the not-to-exceed amount of $64,154,026 (which includes a combined maximum incentive and estimated additional services amount of $250,000.00 per year), with a one (1) three (3) year option period in the not-to-exceed amount of $33,001,791.

<u>Department:</u>   Operations               <u>Department Director:</u>  Bradley Barkman
<u>Project Manager</u>: Edward Byers          <u>Procurement Director:</u>  Christopher Bross

---

## COMMITTEE REPORTS / MINUTES

Action not required, provided for information purposes only.  If discussion is desired by any Board Member, however, that item may be considered separately.

A.   PROPERTY COMMITTEE
B.   CONSTRUCTION OVERSIGHT COMMITTEE
C.   PLANNING TECHNICAL ADVISORY COMMITTEE
D.   MARKETING COMMITTEE
E.   OPERATIONS TECHNICAL COMMITTEE
F.   CITIZENS ADVISORY COMMITTEE
G.   AUDIT COMMITTEE
H.   LEGISLATIVE COMMITTEE
I.   ADVISORY COMMITTEE FOR PERSONS WITH DISABILITIES

---

## INFORMATION / PRESENTATION ITEMS

Action not required, provided for information purposes only.  If discussion is desired by any Board Member, however, that item may be considered separately.

I-1 –<u>INFORMATION </u>– Tri-Rail Golden Station ADA Assessment Report

---

## MONTHLY REPORTS

Action not required, provided for information purposes only.  If discussion is desired by any Board Member, however, that item may be considered separately.

A.   <u>ENGINEERING & CONSTRUCTION MONTHLY PROGRESS</u>
      <u>REPORTS</u> – November and December

B.   <u>RIDERSHIP GRAPHS</u> –  November and December

C.   <u>ON-TIME PERFORMANCE GRAPHS</u> – November and December

D.   <u>MARKETING MONTHLY SUMMARY</u> – November and December

E.   <u>BUDGETED INCOME STATEMENT</u> – November and December

**Exhibit B**
**Page 5 of 6**

F.   <u>PAYMENTS OVER $2,500.00</u> – November and December

G.   <u>REVENUE AND FARE EVASION REPORTS</u> – November and December

H.   <u>SOLICITATION SCHEDULE</u> – November and December

I.   <u>CONTRACT ACTIONS EXECUTED UNDER THE EXECUTIVE DIRECTOR'S AUTHORITY</u>
     - November and December

J.   <u>CONTRACT ACTIONS EXECUTED UNDER THE CONSTRUCTION OVERSIGHT</u>
     <u>COMMITTEE</u> – November and December

<u>OTHER BUSINESS</u>

<u>EXECUTIVE DIRECTOR REPORTS/COMMENTS</u>

<u>LEGAL COUNSEL COMMENTS</u>

<u>CHAIR COMMENTS</u>

<u>BOARD MEMBER COMMENTS</u>

<u>ADJOURNMENT</u>

In accordance with the Americans with Disabilities Act and Section 286.26, <u>Florida Statutes</u>, persons with disabilities needing special accommodation to participate in this proceeding, must at least <u>48 hours</u> prior to the meeting, provide a written request directed to the Executive Office at 800 NW 33rd Street, Suite 100, Pompano Beach, Florida, or telephone (954) 942-RAIL (7245) for assistance; if hearing impaired, telephone (800) 273-7545 (TTY) for assistance.

Any person who decides to appeal any decision made by the Governing Board of the South Florida Regional Transportation Authority with respect to any matter considered at this meeting or hearing, will need a record of the proceedings, and that, for such purpose, he/she may need to ensure that a verbatim record of the proceedings is made, which record includes the testimony and evidence upon which the appeal is to be based.

Persons wishing to address the Board are requested to complete an "Appearance Card" and will be limited to three (3) minutes.  Please see the Minutes Clerk prior to the meeting.

**Exhibit B**
**Page 6 of 6**