**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| National Railroad Passenger Corporation )<br><br>Plaintiff, )<br><br>v. )<br><br>Veolia Transportation Services, Inc. )<br>and )<br>Veolia Transportation, Inc. )<br><br>Defendants. ) | CIVIL ACTION NO. 1:07-cv-01263 |

**REPLY MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**
**UPON WHICH RELIEF MAY BE GRANTED**

On page nine of its Opposition to Defendants' Motion to Dismiss ("Opposition"),

plaintiff National Railroad Passenger Corporation ("Amtrak") makes a concession that is fatal to

its case: it admits that the SFRTA contract was not within the scope of Mr. Stencil, Mr.

Salemme or Mr. Mauck's employment or duties. Amtrak asserts that these men owed it a

fiduciary duty not to pursue an opportunity outside the scope of their employment. By so doing,

it adopts the untenable position that the scope of an employee's duty to his employer is

boundless. The case law, as well as common sense, tells us that so broad and vague a fiduciary

duty is no duty at all.

Amtrak's Opposition as a whole compounds this admission and demonstrates that it has

no enforceable rights or expectations with which Veolia could tortiously interfere. Primarily, its

arguments are unrealistic and unsupported by fact or law. Dogmatic assertions of boundless duty

are joined to a fatal vagueness about the exact conduct that triggered it, and the Amtrak interest

that was harmed.  Amtrak accuses these three men of "supporting" Veolia's bid, "refusing . . . to support" Amtrak's bid, and "breach[ing] their duties of loyalty" to Amtrak, (Opp. at 8), but fails to explain what this means, or identify any actual conduct that would qualify as a breach of duty.  Similarly, Amtrak argues that it had a sufficient business relationship with SFRTA to merit a claim for tortious interference, but fails to explain why the simple, speculative hope of winning a public bid qualifies as the requisite "actual and identifiable" agreement that in "all probability" would have resulted in a contract.

The only thing the Opposition does convincingly is illustrate just how presumptuously anticompetitive Amtrak's claims are.  Amtrak argues:  it had preclusive rights to these employees whether it was going to use them or not.  It had a preclusive right to the SFRTA bid because Veolia could not be competitive without these three men.  Therefore, Amtrak should be allowed to restrain trade, and to forbid an at-will employee from seeking opportunities outside the scope of his employment and, indeed, his employer's existing customer base.  Neither employee rights *nor* competition have any value in this blithely entitled view of the world.  Amtrak's fury at losing the SFRTA bid does not mean that it can preclude a competitor from recruiting its at-will employees or restrict its employees' right, while still employed, to prepare to compete against Amtrak.  The conduct alleged here is pro-competitive, beneficial to the people of South Florida, and perfectly lawful.  The Opposition fails to show otherwise, and the Complaint should be dismissed.

## ARGUMENT

Where Amtrak is vague, self-contradictory or conclusory, it asserts its allegations must be taken at face value.  (*See generally* Opp. at 2-4.)  But in considering a motion to dismiss, "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the

facts set out in the complaint.  Nor must the court accept legal conclusions cast in the form of

factual allegations."  *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

Pejorative characterizations in the allegations are immaterial as a matter of law.  *Id.* at 1277.

I.      **Amtrak Identifies No Fiduciary Duty or Breach of Fiduciary Duty.**

      A.      **The Scope of an Employee's Duty is Limited.**

An at-will employee's fiduciary duty is confined to that individual's scope of

employment.  *See Productive Automated Systems Corp. v. CPI Systems, Inc.*, 61 F.3d 620, 622

(8th Cir. 1995).  This limiting concept is captured neatly in a formulation recognized by Judge

Hens Green:  "'Prior to termination of employment, an officer may not solicit for himself or

herself business *which the position requires* the employee to obtain for the employer.'"  *Mercer*

*Mgmt. Consulting, Inc. v. Wilde*, 920 F. Supp. 219, 234 (D.D.C. 1996) (emphasis added)

(citation omitted).  The essence of a fiduciary duty is that a principal or employer puts an agent

or employee in a position to act for it, that the grant of the authority to act comes with the duty to

act loyally in those premises.  *See* Restatement (Third) of Agency § 1.01 (2007); Austin W. Scott,

*The Fiduciary Principle*, 37 Cal. L. Rev. 539, 540 (1949) ("A fiduciary is a person who

undertakes to act in the interest of another person.") (attached hereto as Ex. A); *United States v.*

*Chestman*, 947 F.2d 551, 569 (2d Cir. 1991) ("A fiduciary relationship involves discretionary

authority and dependency:  One person depends on another -- the fiduciary -- to serve his

interests.").

Within the scope of an individual's employment, his employer may entrust him with

authority as well as certain valuable material and information.  *See, e.g.*, Scott, 37 Cal. L. Rev. at

540 (in establishing that a servant was in a fiduciary position, Professor Scott noted:  "The

steward was certainly in a fiduciary position.  He was entrusted with the management of his

master's property."). The common pattern is in the sales context. The employer identifies its own customers for the employee, and gives to its employee contact with and responsibility for these customers so that the employee may act on the employer's behalf. The employer provides the employee with its customer lists and other confidential material, so that the employee may further the employer's business. The employee is given the right to represent the employer and act on the employer's behalf with customers within the scope of his duties. In this way, an employee owes his employer a duty not to take these things of value, which have been entrusted to him by his employer in the scope of his employment, and use them against his employer. For the employee to do otherwise is to violate his fiduciary duty. Where, however, the employee pursues an opportunity that is outside the scope of his employment; where he does not misuse valuable contacts or information that have been given to him by his employer; and where he does not use against his employer the trust reposed in him to carry out the scope of his duties, there can be no breach of fiduciary duty. As the Second Circuit recognized in *United States v. Chestman*,

> [i]n relying on a fiduciary to act for his benefit, the beneficiary of the relation may entrust the fiduciary with custody over property of one sort or another. Because the fiduciary obtains access to this property to serve the ends of the fiduciary relationship, he becomes duty-bound not to appropriate the property for his own use. What has been said of an agent's duty of confidentiality applies with equal force to other fiduciary relations: "an agent is subject to a duty to the principal not to use or to communicate information confidentially given him by the principal or acquired by him during the course of or on account of his agency." *These characteristics represent the measure of the paradigmatic fiduciary relationship.*

947 F.2d at 569 (emphasis added) (citation omitted).

In the instant action, there was no breach of fiduciary duty because these three men had not been identified or empowered as agents of Amtrak with respect to this potential contract; they merely sought an opportunity well outside the scope of their employment. Amtrak single-

handedly defeats its case by admitting that the SFRTA contract, which these men planned to leave Amtrak to work on, was not within their scope of employment or duties.  (Opp. at 9.)  If the SFRTA job was not within the scope of these men's duties, as Amtrak admits, it entails that SFRTA was not a customer entrusted to them, and that SFRTA was not a customer dependent upon the services of these men.  In short, they were simply not "agents" in the fiduciary sense for this purpose.  In fact, Amtrak makes no allegations at all that SFRTA was or ever had been a customer of Amtrak at the time these men sought new opportunities.  Because the conduct alleged in the Complaint was outside the scope of these individual's employment, it does not and cannot give rise to a breach of fiduciary duty.

Because Amtrak cannot win on the basis of any defined scope of these men's duties or authority, it is forced to the untenable position that an employee's fiduciary duty to his employer is boundless.  It argues that these men violated a fiduciary duty by pursuing an opportunity outside the scope of their employment.  Essentially, Amtrak maintains that these men had a duty to Amtrak not to pursue employment serving a new customer that was never entrusted to them by Amtrak, and that had never depended on the services of these men while they were at Amtrak. This argument fails because there is no such thing as a limitless fiduciary duty.  *See generally* Frank H. Easterbrook and Daniel R. Fischel, *Contract and Fiduciary Duty*, 36 J.L. & Econ. 425, 436 (1993) ("Recent academic theories link the fiduciary relation to A's holding power over decisions important to B, and having discretion in the exercise of that power.  Back to principals and agents!  Agency is a necessary but not sufficient condition.  (If it were sufficient, then all business relations would be fiduciary, and the category would lose its distinctive quality.)") (attached hereto as Ex. B).

Amtrak cites to no authority in its Opposition to indicate otherwise.  It relies heavily on the Restatement and cases interpreting it for the broad assertion that "an employee owes his employer a strict duty not to compete with his employer for business opportunities."  (Opp. at 7.) It also notes the general proposition that an employee must "exert his or her best efforts on behalf of the employer."  (*Id*. at 7, 13.)

These assertions presume an agency relationship for the subject matter, however, and do not address how one decides whether matters are within the scope of responsibility the agent has taken on.  *See* Restatement (Third) of Agency § 1.01; Easterbrook and Fischel, 36 J.L. & Econ. at 432 ("That fiduciary duties deviate substantially from one agency relation to another, no one could deny."); *see also* Scott, 37 Cal. L. Rev. at 541.  All of the authorities cited by Amtrak simply stand for the proposition that an employee breaches his fiduciary duty when he is empowered as an agent to do something and he takes things of value entrusted to him within the scope of his duties and uses them against his employer.

For example, Amtrak cites cases to show that it is a breach of fiduciary duty for an employee to use the contact with existing customers that his employer has given him to attempt to take the business for himself.  *See, e.g.*, *Eaton Corp. v. Giere*, 971 F.2d 136, 141 (8th Cir. 1992) (breach found when employee had several meetings with one of his employer's "chief customers" about buying his competing device); *Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486, 490 (Colo. 1989) (duty breached when vice president met with employer's customers to inform them he would be leaving and that if they went with him, he would be able to fully serve them without any break in the service); *New World Fashions, Inc. v. Lieberman*, 429 So. 2d 1276, 1276-77 (Fla. 1st Dist. Ct. App. 1983) (sales representative breached duty when he told a

customer who called the employer's offices that he was soon going into business for himself and that the customer could enter into a contract directly with him).

Similarly, Amtrak's cases show that an employee breaches her fiduciary duty when she misuses information entrusted to her to take away her employer's existing business. *See Las Luminarias of the New Mexico Council of the Blind v. Isengard*, 587 P.2d 444, 450 (N.M. Ct. App. 1978) (breach of duty claim not dismissed when employees used their employer's records and papers to prepare their competitive proposal); *see also Dirigo Hous. Assocs., Inc v. Crowley*, No. CV-03-156, 2003 WL 22309103, at *6 (Me. Sept. 24, 2003) (concluding that the employees had the right to enter into a competing enterprise and that the violation of the duty not to compete with their employer only arose when the employees disclosed information to employer's clients that caused them to have doubts as to employer's future capabilities to perform under the contracts). Likewise, Amtrak cites a case finding a breach of fiduciary duty when an employee takes advantage of its employment and violates its employer's trust by selling items to its employer at an inflated price. *See Nerbonne, N.V. v. Lake Bryant Int'l Props.*, 689 So. 2d 322, 324 (Fla. 5th Dist. Ct. App. 1997) (agent conspired to purchase real estate at a low price and immediately sell it at a higher price to his principal, which had been set up expressly for the purpose of purchasing that real estate).[1]

The kind of acts that gave rise to the breach in the cases cited by Amtrak simply are not present here. The case at bar is not like the cases in which an employee sets out to steal his

---

[1] The only other cases Amtrak cites in its Opposition in support of its view of fiduciary duty are inapposite. The first holds that an employee may not set up a rival partnership for the purpose of submitting a competing bid against his employer. *Eckard Brandes, Inc. v. Riley*, 338 F.3d 1082 (9th Cir. 2003). The scope of agency issue was not addressed in that opinion and the facts -- accepting a job and setting up a competitor -- are distinguishable. The second notes that the applicability of agency law in corporate employment is constrained by the "policy 'recognized by the courts . . . of safeguarding society's interest in fostering free and vigorous competition in the economics sphere,'" but the court ultimately dismissed this claim for failure to allege facts in support. *Gov't Relations Inc. v. Howe*, No. 05-1081, 2007 U.S. Dist. LEXIS 4952, at *37-39 (D.D.C. Jan. 24, 2007) (citations omitted).

employer's existing customers.  None of these three men are alleged to have acted with a customer that Amtrak had identified for the employee or given to the employee to act on its behalf.  In fact, Amtrak cites no cases where the same conduct alleged here -- individuals taking a new job with a new employer, working for a customer that their previous employer did not serve, and not divulging any trade secrets or violating any restrictive covenants -- led to a finding of wrongdoing.  Veolia did not aid or abet a breach of fiduciary duty because these three men never breached such a duty.

Moreover, Veolia cannot be liable for aiding and abetting a breach without any notice to Veolia that Amtrak had made these employees agents to act for it on the South Florida opportunity, or even that it intended to use these three employees in a bid for the SFRTA contract.  The tort of aiding and abetting a breach of fiduciary duty requires knowledge of the breach on the part of the defendant, both that there was a breach of fiduciary duty and that the defendant's actions substantially assisted or encouraged the breach.  *See generally* 27 Fla. Jur. 2d *Fraud & Deceit* § 17 (2007).  There are no allegations that Veolia had any information about Amtrak's interest in SFRTA, how it planned to pursue it, or that Amtrak was selecting employees for potential unique placement in South Florida.  Although Amtrak makes the conclusory inference that Veolia "knowingly" caused a supposed breach, (Complaint ¶ 56), it lists no allegations to show that Veolia was actually on notice of Amtrak's and the individuals' intent, or that there was anything to be on notice of at the relevant time.  Veolia simply had no such notice, and thus could not have aided or abetted any breach of fiduciary duty.

**B.    The Three Individuals Had a Right to Prepare to Compete Against Amtrak While Still Employed at Amtrak.**

Even assuming that the SFRTA project were within the scope of their duties, these men were entitled to *prepare* to compete with Amtrak.  The Restatement makes clear that during

employment, "an agent may take action, not otherwise wrongful, to prepare for competition following termination of the agency relationship." Restatement (Third) of Agency § 8.04 (2006). As the comments to the Restatement illustrate, "[a]n agent who plans to compete is free to make extramural arrangements for setting up a new business, such as incorporating a new firm and arranging for space and equipment." *Id.* cmt. c. So long as an employee is not himself competing with his current employer, he may make arrangements to leave and to compete against his employer.

That is precisely the conduct that is alleged in the Complaint. The three men who were employed at Amtrak made plans to leave and to compete with Amtrak once they left. In the course of such preparations, they allowed Veolia to use their name on a bid and, according to Amtrak's unsubstantiated claim, agreed to not be a part of Amtrak's possible bid. It is crucial to note that these men did not themselves commence to compete with Amtrak while still employed. *Veolia* competed against Amtrak, as it was well within its right to do. These men had no duty to refrain from making plans to leave Amtrak or, indeed, to alert Amtrak of their plans to compete. *See Mercer Mgmt. Consulting, Inc.*, 920 F. Supp. at 234 (establishing a competing firm without alerting current employer does not constitute a breach of fiduciary duty). [2]

## II.     Amtrak Misapprehends the Scope of Tortious Interference with Economic Advantage.

Amtrak argues that its submission of a bid proposal to SFRTA constituted a valid "economic advantage" or "business expectancy." It further argues that Veolia tortiously

---

[2] Nor, in fact, did these men have a duty to give advance notice of their plans to leave Amtrak. *See Allied Supply Co. v. Brown*, 585 So. 2d 33, 35 (Ala. 1991) ("[I]t would be unjust to require an employee-at-will to give his employer advance notice of his resignation without imposing a reciprocal duty on the employer to give notice of its intent to terminate employment.").

interfered with this supposed interest by recruiting the three men to a new job at Veolia. So doing, it misapprehends the law of tortious interference by presuming too much.

Amtrak correctly noted in its Opposition that tortious interference with an economic advantage does not require the existence of a contract. It failed to note, however, that something more is required than the mere hope that a proposal might win a public bid. Courts repeatedly distinguish the situation Amtrak alleges with situations where parties had reached an "*actual and identifiable understanding or agreement* which in all probability would have been completed if the defendant had not interfered." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 815 (Fla. 1994) (emphasis added); *see also St. Johns River Water Mgmt. Dist. v. Fernberg Geological Servs., Inc.*, 784 So. 2d 500, 505 (Fla. 5th Dist. Ct. App. 2001) ("The test is whether there was 'an understanding between the parties [which] would have been completed had the defendant not interfered.'") (citations omitted); *Carr v. Brown*, 395 A.2d 79, 84 (D.C. 1978) (an expectancy predicated on government approval is too remote to support a claim of interference with prospective advantage and is distinguishable from cases in which there is a "background of business experience").

As Veolia noted in its motion to dismiss, Amtrak's connection to SFRTA is far too speculative to constitute a valid and actionable "expectancy." Amtrak does not allege that it had any prior, actual business relationship with SFRTA. The only relationship alleged is that of hopeful bidder in search of a government contract. "As both state and federal courts have recognized, no party has a right to a government contract prior to its award." *Ellsworth Assocs. v. United States*, 917 F. Supp. 841, 849 (D.D.C. 1996). The cases that Amtrak cites in its Opposition do not advance its position. In each of these cases, defendants were alleged to have interfered with a relationship between the plaintiff and an *existing* customer, with whom

10

plaintiffs had an actual business relationship. *See PRN of Denver, Inc. v. Arthur J. Gallagher & Co.*, 531 So. 2d 1001, 1001 (Fla. 3rd Dist. Ct. App. 1988); *Oceanic Exploration Co. v. ConocoPhillips, Inc.*, No. 04-332, 2006 U.S. Dist. LEXIS 72231 (D.D.C. Sept. 21, 2006).

Amtrak seeks to enhance its relationship with SFRTA by arguing that there were only two bidders and that, but for Veolia's actions, Amtrak would have won the bid. This argument is belied by Amtrak's admissions that SFRTA could have rejected either or both bids, and that SFRTA did not have to choose Amtrak should Veolia not have submitted a bid. (Opp. at 12 n.5.) Nor can Amtrak seriously argue that SFRTA would have awarded it a contract, without regard to how unreasonable or expensive its bid might have been, because Amtrak's proposal met the minimum requirements for submitting a bid. (Opp. at 12 n.5.) Amtrak has clearly failed to demonstrate that it had a sufficient "economic advantage" or "business expectancy" with SFRTA to give rise to a tortious interference claim.

Amtrak also fails to explain why Veolia's recruiting of these three men was improper or unjustified. Amtrak contends in its Opposition that a company may recruit a competitor's employees after an award is made, but that it may not do so beforehand. (Opp. at 12.) None of the cases Amtrak cites stand for this proposition. In fact, the case law on the subject directly refutes this argument. "[I]t is not inherently improper or unusual for a *prospective* awardee to recruit some number of an incumbent contractor's employees in service type contracts." *Automated Servs., Inc.*, B-221906, 86-1 CPD ¶ 470, 1986 WL 63521, at *2 (Comp. Gen. May 19, 1986) (emphasis added); *accord Gem Servs., Inc.*, B-217038, 85-1 CPD ¶ 159, 1985 WL 52298, at *1 (Comp. Gen. Feb. 7, 1985). This principle holds true even when a company proposes to use its existing competitor's employees in virtually all its key staff positions. *Automated Servs.,*

*Inc.*, 1986 WL 63521, at *2. Regardless of whether a bid has yet been awarded, competitors may recruit and employees may seek other opportunities.

Veolia cited a number of opinions of the Comptroller General in its motion to dismiss that demonstrate it is not unusual or improper for an awardee to recruit and hire personnel employed by an incumbent contractor or another competitor-bidder. (*See* Mem. in Support of Motion to Dismiss at 11.) As these cases demonstrate, it is a routine occurrence in the District of Columbia to list others' employees -- including those of a competitor -- on a government bid proposal. Amtrak cites no cases in its Opposition that contradict these opinions or that cast doubt upon such common and beneficial business practices. Amtrak should not be allowed to challenge such widely-accepted and government-recognized behavior on so thin a legal or practical justification. Amtrak's claim for tortious interference with economic advantage should be dismissed.

### III.    Amtrak Fails to Show that Veolia Caused any Alleged Harm.

In its motion to dismiss, Veolia explained how it beat Amtrak by a total score of 22.7 points on a scale of 100. In the category of "qualifications and experience," Veolia beat Amtrak by just 0.7 points. Thus, although Amtrak lost the SFRTA bid by 22.7 points, it claims that its 0.7 point loss in "qualifications and experience" -- the category in which each company's employees are evaluated -- caused it to lose the entire SFRTA operations bid.

Faced with this fact, Amtrak asks this Court to accept the unwarranted assumption that Veolia could not have earned any points at all without recruiting these particular men. This assumption makes little sense. First, as Amtrak recognizes, Veolia listed highly qualified individuals in its bid proposal in addition to Mr. Stencil, Mr. Salemme and Mr. Mauck. (*See, e.g.*, Complaint ¶ 18.) Moreover, it is reasonable to assume that SFRTA awarded Veolia points

for the *company's* top qualifications and vast experience, in addition to any points awarded for the individuals staffing the job.  (*Id*. ¶ 48.)  It is folly to suggest that *all* of points awarded to Veolia for qualifications and experience can be attributed entirely to these three men, highly qualified though they are.  Second, Veolia outscored Amtrak by a full 22 points in categories other than qualifications and experience.  Amtrak cannot simply wish away these well-deserved points -- in categories such as pricing and technical approach -- by asserting that Veolia acted wrongly and should not have submitted any bid at all.  Third, Amtrak provides no facts, beyond conclusory allegations, in support of its argument that Veolia could not have submitted a winning bid but for its alleged conduct.  As noted above, a Court need not and should not accept inferences such as these that are wholly conclusory and unsupported by facts set out in the complaint.  *See Kowal*, 16 F.3d at 1276.

Moreover, Amtrak has failed to include the necessary allegations to show that Veolia's recruiting of these men caused it any inconvenience, much less actionable injury.  Amtrak does not allege that a position on the Key Management Team was ever offered, or would have been offered, by Amtrak to Mr. Mauck.  Nor does it allege that it would have actually listed Mr. Salemme or Mr. Mauck on its bid.  Amtrak cannot claim that it would have won the bid but for Veolia's actions if it does not allege that it would have used these men to help it win the bid.  Furthermore, Amtrak does not allege that it would have given any of these three men a job on the SFRTA project had the bid been successful.  Nor does it allege that any of these men -- including Mr. Stencil, whose name Amtrak listed on the bid -- would actually have accepted a job in South Florida with Amtrak if offered and if the bid had been successful.  In short, Amtrak has failed to show that Veolia's recruiting of these three men caused Amtrak any harm.

Also, Amtrak has not shown that Veolia's acts caused the specific damages it now seeks. The Complaint demands the extravagant remedy of millions of dollars in lost profits. Amtrak cites no authorities, however, holding that a third party competitor must pay lost profits for allegedly assisting another's breach of fiduciary duty. It is one thing to seek the return of ill-gotten commissions from an employee, or to pursue an injunction prohibiting the employee from competing against his former employer. It is quite another thing to maintain that, but for the alleged wrongs, Amtrak would have absolutely gotten the business and that, therefore, Amtrak is entitled to millions of dollars in lost profits from its competitor. This simply is not the case. Amtrak has failed to demonstrate causation for its alleged injuries, and its claims should be dismissed.

## CONCLUSION

For the foregoing reasons, and those set forth in the Motion to Dismiss, Veolia respectfully requests that the Complaint be dismissed with prejudice for failure to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).

Respectfully submitted this 27th day of August, 2007.

/s/ Thomas F. Cullen, Jr.

Thomas F. Cullen, Jr. (D.C. Bar No. 224733)
Thomas M. Henry
John M. Bradley
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
Telephone: (202) 879-3939
Facsimile: (202) 626-1700

*Attorneys for Defendants*
*Veolia Transportation, Inc. and*
*Veolia Transportation Services, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| National Railroad Passenger Corporation )<br><br>Plaintiff, )<br><br>v. )<br><br>Veolia Transportation Services, Inc. )<br>and )<br><br>Veolia Transportation, Inc. )<br><br>Defendants. ) | CIVIL ACTION NO. 1:07-cv-01263 |

### CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of Defendants' Reply Memorandum in Support of their Motion to Dismiss for Failure to State a Claim Upon Which Relief May Be Granted were served upon Plaintiff's counsel electronically using the Court's Electronic Case Filing System, pursuant to Local Rule 5.4, on this 27th day of August 2007.


/s/ Thomas M. Henry



Gary A. Orseck, Esq.
Matthew R. Segal, Esq.
ROBBINS, RUSSELL, ENGLERT,
ORSECK & UNTEREINER, LLP
1801 K St., NW, Suite 411-L
Washington, D.C.  20006

EXHIBIT A

# California Law Review

VOL. 37                 DECEMBER, 1949             No. 4

## The Fiduciary Principle[†]

### *Austin W. Scott\**

A SUPPOSITITIOUS case which involves an example of crooked dealing by a fiduciary is to be found in the sixteenth chapter of the Gospel according to Saint Luke. Translated under the auspices of King James the First, it reads as follows:

> There was a certain rich man, which had a steward; and the same was accused unto him that he had wasted his goods.
> And he called him, and said unto him, How is it that I hear this of thee? give an account of thy stewardship; for thou mayest be no longer steward.
> Then the steward said within himself, What shall I do? for my lord taketh away from me the stewardship: I cannot dig; to beg I am ashamed.
> I am resolved what to do, that, when I am put out of the stewardship, they may receive me into their houses.
> So he called every one of his lord's debtors unto him, and said unto the first, How much owest thou unto my lord?
> And he said, An hundred measures of oil. And he said unto him, Take thy bill, and sit down quickly, and write fifty.
> Then said he to another, And how much owest thou? And he said, An hundred measures of wheat. And he said unto him, Take thy bill, and write fourscore.
> And the lord commended the unjust steward, because he had done wisely: for the children of this world are in their generation wiser than the children of light.[1]

I am not here concerned with the theological aspects of this situation. I am interested simply as a lawyer in appraising the conduct of the steward. My interest is much like that of Mr. Weasel in Samuel

---

[†] The Alexander F. Morrison lecture delivered at the California State Bar Convention in San Francisco on September 1, 1949.

[*] Professor of Law, Harvard University Law School.

[1] Luke 16: 1-8.

Warren's immortal legalistic romance, *Ten Thousand A-Year*. Mr. Weasel was a barrister, a character wholly devoted, at all times and in all places, to the pursuit of the law. Of him the author says that "At church the reading of the parable of the Unjust Steward set his devout, ingenious and fertile mind at work for the remainder of the service, as to the modes of stating the case, nowadays, against the offender, and whether it would be more advisable to proceed civilly or criminally; and if the former, at law, or in equity."

The steward was certainly in a fiduciary position. He was entrusted with the management of his master's property. It was his duty in dealing with his master's affairs to act solely in the interest of his master. But what did he do? He made compromises with his master's debtors, relieving them of large parts of their debts. The account is not altogether clear, but it would seem that his purpose was to confer a favor upon the debtors with the hope that they would, after his discharge, confer favors upon him. It is possible, of course, that there was no hope of collecting more than a small part of the claims due to his master, and that in making the compromises he was trying to salvage something from a lot of impecunious debtors. If so, his conduct was perfectly proper. But, if so, the story would lose all point. It is evident that his purpose was to serve his own interests and not those of his master.

If this is so, the steward was certainly guilty of a clear breach of his fiduciary duty. If he were a trustee, a court of equity would remove him. The first duty of a trustee is, as stated in the Restatement of Trusts § 170, "to administer the trust solely in the interest of the beneficiary." It is this duty of loyalty, owing from every fiduciary to his principal, which I am to discuss in this paper. Professor Josiah Royce in his book on *The Philosophy of Loyalty* defined loyalty as "The willing and practical and thorough-going devotion of a person to a cause."[2] And he says that "In loyalty, when loyalty is properly defined, is the fulfillment of the whole moral law."[3]

The question arises at the outset, Who is a fiduciary? A fiduciary is a person who undertakes to act in the interest of another person. It is immaterial whether the undertaking is in the form of a contract. It is immaterial that the undertaking is gratuitous. Indeed, in England where the courts of equity have always been strict in the enforcement of fiduciary obligations of a trustee, a trustee is ordinarily

---

[2] Royce, The Philosophy of Loyalty (1930) p. 16.

[3] *Id.* at 15.

entitled to no compensation for his services unless it is otherwise provided by the terms of the trust.

What are the usual fiduciary relations? They include the relation of trustee and beneficiary, guardian and ward, agent and principal, attorney and client, executor or administrator and legatees and next of kin of the decedent. The directors and officers of a corporation are in a fiduciary relation to the corporation, and to some extent at least to the shareholders. In a partnership each partner is in a fiduciary relation to the others, since, although he has his own interests to look after, he also has the power and the duty to look after the interests of the others. So too, as Mr. Justice Jackson pointed out in a case decided just before the close of the last term, a stockholder who brings suit on a cause of action derived from the corporation is a fiduciary, since he volunteers to sue, not for himself alone, but as representative of the corporation.[4]

Some fiduciary relationships are undoubtedly more intense than others. The greater the independent authority to be exercised by the fiduciary, the greater the scope of his fiduciary duty. Thus, a trustee is under a stricter duty of loyalty than is an agent upon whom limited authority is conferred or a corporate director who can act only as a member of the board of directors or a promoter acting for investors in a new corporation. All of these, however, are fiduciaries and are subject to the fiduciary principle of loyalty, although not to the same extent.

Let us consider the basic nature and the extent of this duty of loyalty which a fiduciary owes to his principal.

A distinction must be made at the outset between the situations where he acts with the consent of his principal and the situations where he acts without such consent.

### CONSENT OF THE PRINCIPAL

Where the fiduciary does an act which would be a breach of his duty as fiduciary if he did not have the consent of his principal, such consent will protect him only if he has in no way taken advantage of his position as fiduciary in procuring the consent. The relationship between the parties is very different from that between parties dealing with each other at arm's length. Thus in the Restatement of Trusts § 216, it is stated that the consent of a beneficiary of a trust does not preclude him from holding the trustee liable for a breach of

---

[4] Cohen v. Beneficial Industrial Loan Corp. (1949) 337 U.S. 541.

trust, if the beneficiary was under an incapacity, or did not know the facts and his legal rights, or if his consent was induced by improper conduct of the trustee, or if he was not of competent age and under-standing. Moreover, where the trustee has an adverse interest in the transaction, the consent of the beneficiary will not preclude him from holding the trustee liable for a breach of trust if the transaction was not fair and reasonable. Thus if a trustee sells trust property to him-self individually, the consent of the beneficiary to the sale will not prevent him from setting aside the sale, if he did not know all the facts and his legal rights, or if the trustee improperly induced him to consent or if the price and all other conditions of sale were not fair and reasonable. The consent of the beneficiary is indeed a slender reed upon which a trustee may lean.

Just as the consent given by the beneficiaries of a trust is not always a protection to a trustee, so the consent of the stockholders of a corporation is not always a protection to the corporate officers or directors. This was recognized by the Supreme Court of the United States in the case of *Rogers v. Guaranty Trust Company*,[5] although the majority of the court held that the action should be dismissed because it had been brought in the wrong federal district. In that case the Board of Directors of the American Tobacco Company, of whom the president and officers constituted a majority of those present, passed a resolution by which the officers were given the right to subscribe for a large number of shares of the company at about a fourth of their market value, other shares being allotted in small amounts to employees. The stockholders in the previous year had approved an employees stock subscription plan, expressed in very general terms. Mr. Justice Stone, dissenting from the view of the majority that the suit could not be entertained because it was brought in the wrong district, said:

> We need not conjecture whether, if the directors had had the hardi-hood to disclose in advance the benefits which they were to award to themselves, the stockholders would nevertheless have given their approval. Nor is it important that these directors have successfully managed the corporation and that under their direction it has earned large profits for its stockholders. Their business competence did not confer on them the privilege of making concealed or unauthorized profits or relieve them of the elementary obligation which the law imposes on all corporate directors to deal frankly and openly with

---

[5] (1933) 288 U. S. 123.

stockholders in seeking their consent to benefit personally by reason of their relationship to the corporation.[6]

## NO CONSENT OF THE PRINCIPAL

So much for the case where the action of the fiduciary is with the consent of his principal. Now let us consider the cases where he acts without such consent. Under what circumstances is he chargeable with a breach of his duty?

*Self-dealing, sale of trust property.* Perhaps the simplest instance of breach of fiduciary duty is that which occurs where one is entrusted, whether as trustee or as agent (although not as a corporation director), with property to be sold by him, and he sells it to himself. No matter how fair the price may be, the sale is voidable. The principal can set it aside if the property goes up in value; he may affirm it if the property goes down in value. If there is a profit, the principal is entitled to it; if there is a loss, it falls upon the fiduciary. This is true not only where the fiduciary fixes the price of the sale, but also where the price is not fixed by him. The sale can be set aside even though the price is fixed by disinterested co-fiduciaries; it can be set aside even though the price is fixed by competitive bidding. There are numerous cases in which a fiduciary has purchased his principal's property at a public auction, where he has outbid all others. In such a case one difficulty is that if the fiduciary himself is to bid, it is to his interest to dampen the sale, to discourage the attendance of prospective bidders, and to minimize prospective bids; whereas it is his duty to encourage the bidding. It is to his interest to have the property sold at a low figure; it is his duty to have it sold at as high a figure as is practicable. This is true even though the fiduciary himself has not brought about the sale, as in the case where the property is subject to a mortgage and the sale is brought about by the mortgagor or mortgagee.

It is immaterial whether the fiduciary purchases the property directly or indirectly. Where the purchase is made by a third person under an agreement with the fiduciary that he will resell the property to the fiduciary, the sale can be set aside. Such an agreement may be merely implied. The courts indeed have gone a step further. Even if there is no such agreement a sale by the fiduciary to his wife is no more valid than a sale to himself. Where, however, the sale is to a relative of the trustee, the sale is not necessarily invalid; its validity

---

[6] *Id.* at 143.

depends upon whether there is reason to believe that the fact that the purchaser was related to the fiduciary was an element in the transaction. Where he acts *for* his relative in the purchase of the property, the sale is clearly voidable. Thus in a case in Tennessee[7] a real estate agent was employed by the owner of land to sell it for him. The agent purchased it as trustee for his mother, without disclosing this fact to his principal. He then resold the property at a profit which was received by his mother. It was held that he was personally liable to his principal for the amount of the profit. His filial duty to his mother did not justify his breach of fiduciary duty to his principal.

In a case in New York[8] the owner of a parcel of land employed the defendants, real estate brokers, to find a buyer. They sold the property, at a price satisfactory to the owner, to a corporation of which one of the brokers was president and manager. They told the owner that they were selling the property to a client of theirs, but gave him no further information. It was held that the owner could recover from the brokers the amount of the commissions they received, and could recover from the corporation a profit which it made on a resale of the land. Judge Cardozo said:

> As broker for the seller, the duty of this fiduciary was to make the terms as favorable to his employer and the price as high as possible. As president and manager of the buyer corporation, its sole representative in the transaction, his duty was just the opposite.[9]

He further said that the conflict of interest was not sufficiently revealed when the brokers informed the seller that the sale was to be made to a client of theirs. The disclosure was too indefinite and equivocal. He said that "If dual interests are to be served, the disclosure to be effective must lay bare the truth, without ambiguity or reservation, in all its stark significance."[10]

*Self-dealing, purchase of property for the trust.* Just as a fiduciary violates his duty by selling to himself property entrusted to him for sale, so, conversely, he violates his duty when he sells his own property to himself as fiduciary. Thus if a trustee or agent is entrusted with money which it is his duty to invest, and he invests it by purchasing property from himself individually, he violates his duty. The purchase is voidable by the principal, whether or not the price

---

[7] McNeil v. Dobson-Bainbridge Realty Co. (1946) 184 Tenn. 99, 195 S. W. (2d) 626.
[8] Wendt v. Fischer (1926) 243 N. Y. 439, 154 N. E. 303.
[9] *Id.* at 443, 154 N. E. at 304.
[10] *Ibid.*

1949]     *THE FIDUCIARY PRINCIPLE*                 545

paid was a fair price. If the fiduciary made a profit through the sale, he is accountable for the profit. If a loss results to the principal, he must make good the loss. There is a breach of fiduciary duty even though the property sold was not owned entirely by the fiduciary; it is enough that he has an interest in the property of such a substantial nature that it might affect his judgment in making the purchase. The principle has been applied where the property is purchased from a partnership of which the fiduciary is a member, or from a corporation of which he is a principal officer or shareholder.

The principle is applicable to corporate fiduciaries. Thus a trust company is guilty of a breach of fiduciary duty where it purchases for a trust administered by it property owned by it in its individual capacity. In the case of national banks, which since 1913 have been permitted to act in fiduciary capacities, the duty of loyalty is laid down in a Regulation promulgated by the Federal Reserve Board. This provides that "Funds received or held by a national bank as fiduciary shall not be invested in stock or obligations of, or property acquired from, the bank or its directors, officers, or employees, or their interests, or in stock or obligations of, or property acquired from affiliates of the bank."[11] There is also a provision as to the converse situation to the effect that trust assets shall not be sold or transferred to the national bank, to its directors, officers, or employees, or their interests, or to affiliates of the bank.[12]

*Other violations of the duty of loyalty.* In the situations which I have been considering, the fiduciary is guilty of that particular kind of breach of the duty of loyalty known as self-dealing. The fiduciary as such deals with himself as an individual. He is on both sides of the transaction. But there may be a violation of the duty of loyalty where the trustee is not guilty of self-dealing. He may violate his duty where he is dealing with a third person.

*Bribes and commissions.* The simplest case is where the fiduciary receives a bribe from a third person with whom he is dealing in his principal's affairs. The common situations of this sort involve agents, or trustees, or corporate officers or directors. A case which is a little out of the ordinary run arose in England last year.[13] A British army sergeant received bribes amounting to £20,000 for escorting while in uniform a lorry through Cairo so that it could pass the civilian po-

---

[11] 20 CODE FED. REGS. § 206.11(a) (1948).

[12] 20 CODE FED. REGS. § 206.11(b) (1948).

[13] Reading v. The King (1948) 2 K. B. 268, *aff'd* (1949) 2 K. B. 232.

lice without inspection. The military authorities took possession of the money. The sergeant brought a petition of right against the Crown to recover it, and he even demanded interest thereon. It was held that his petition should be dismissed. Although the sergeant was not acting in the course of his employment in receiving the bribes, he got them by using the uniform of the Crown, and the Crown was entitled to the money. Mr. Justice Denning said:

> There are many cases in the books where a master has been held entitled to the unauthorized gains of his servant or agent. At law, the action took the form of money had and received. In equity there was said to be a constructive trust due to a fiduciary relationship. Nowadays it is unnecessary to draw a distinction between law and equity. . . . The claim here is for restitution of moneys which in justice, ought to be paid over. It matters not that the master has not lost any profit, nor suffered any damage. Nor does it matter that the master could not have done the act himself. It is a case where the servant has unjustly enriched himself by virtue of his service without his master's sanction. It is money which the servant ought not to be allowed to keep, and the law says it shall be taken from him and given to his master, because he got it solely by reason of the position which he occupied as a servant of his master.[14]

The conduct of the fiduciary may involve a violation of his duty of loyalty where he receives some benefit for himself, even though it does not concern something so crass as a bribe. This is the case, for example, where he receives a commission in connection with what is otherwise a perfectly proper business transaction entered into by him on behalf of his principal. Thus a fiduciary has been held accountable for commissions which he received as a real estate broker or a stock broker or a fire insurance agent, in buying or selling or insuring property of the trust. It is immaterial that the same commission would have been payable to a third person acting as such broker or agent.

Let us return to the case of the Unjust Steward. He received no bribe or commission from his master's debtors. All that he got in return for the partial release of his master's claims against them was the hope that, as he had conferred a financial benefit upon them, they would after his discharge from his stewardship confer benefits upon him. Since he thus acted in his own interest and not in that of his master, he betrayed the confidence which had been placed in him. He may not have been subject to indictment for a criminal offense, but he was certainly civilly liable for the loss which he caused to his mas-

[14] *Id.* at 275.

1949]          *THE FIDUCIARY PRINCIPLE*                    547

ter; or at least this would be so in the United States of America today. If the master chose not to insist upon his right, that was his privilege.

*Purchase of encumbrances on the trust property.* Another typical situation in which a fiduciary is not permitted to retain a profit made by him through dealings connected with the property entrusted to him, is that in which he purchases at a discount an encumbrance upon the property. In such a case he is accountable for any profit which he realizes thereby, even though the profit is not made at the expense of his principal. A trustee, for example, purchases a mortgage upon the trust property, paying the mortgagee ninety cents on the dollar. When the mortgage matures, the property is sufficient to pay the mortgage in full. Nevertheless the trustee is entitled only to the amount which he paid for the mortgage with interest, and not to the profit which the mortgagee himself would have been entitled to if he had retained the mortgage.

It is true that ordinarily an officer or director of a corporation who purchases at a discount a bond of the corporation and sells it at a profit or realizes its face amount on its maturity is not accountable to the corporation for the profit. The doctrine as to the purchase of an encumbrance by a fiduciary upon the property entrusted to him is not carried to its extreme possible limits. It is held, however, that where the corporation is bankrupt, a director who purchases claims against it at a discount will not be permitted to profit thereby and can enforce them against the corporation only at their cost to him. In a case decided by the Court of Appeals for the Third Circuit,[15] the chairman of a committee of holders of shares of preferred stock of a corporation which was being reorganized under the Bankruptcy Act was a member of a firm which as dealer purchased and sold some of these shares. It was held that this was a breach of fiduciary duty, and that he was not entitled to compensation for his services or reimbursement for his expenses.

In these, as in so many situations, there are border-line cases where the experts disagree. A case of this sort was recently decided by the Court of Appeals for the Second Circuit.[16] In that case a corporation which operated an apartment house had outstanding debentures of the face value of about $250,000. When the corporation was in financial distress, although no bankruptcy proceeding was pending or contemplated, an officer and director purchased for his wife and

---

[15] *In re* Mountain States Power Co. (C. C. A. 3d 1941) 118 F. (2d) 405.
[16] *In re* Calton Crescent (C. C. A. 2d 1949) 173 F. (2d) 944.

mother some of the debentures, paying about $8,000 for debentures of the face value of about $100,000. Acting on a tip from the director, a friend of his also purchased debentures. Thereafter bankruptcy proceedings were brought and the property was sold at a price sufficient to pay the debenture holders over 43 cents on the dollar. It did not appear that there was any failure to disclose facts to the sellers of the debentures, and they made no claim. The question was whether the director's wife and mother and friend should be allowed to prove their claims for the full amount, receiving the dividend thereon of 43 cents although they paid only 8 cents on the dollar, thus making a profit from the purchase, or whether they should be permitted to recover only the price they paid with interest. The court was divided. Judge Swan permitted them to recover the profit, suggesting that even if the director himself had made a profit, under the circumstances he would be entitled to it, and holding that at any rate the three claimants were so entitled. Judge Chase concurred. Judge Learned Hand dissented, believing that the strict rule as to the purchase of encumbrances by a fiduciary should be applied.

*Renewal of leases.* Where a person holds a lease in a fiduciary capacity and obtains a renewal of the lease for himself individually, he is guilty of an abuse of fiduciary duty and is chargeable as a constructive trustee of the new lease. This principle has frequently been applied to trustees, to partners and to other fiduciaries. In a case in Massachusetts[17] a partnership was engaged in business on premises leased by it. Shortly before the lease expired one of the partners, the plaintiff, without the knowledge of another partner, the defendant, unsuccessfully attempted to obtain a new lease in his own name from the owner of the premises. The defendant was successful in doing that very thing; he obtained a new lease for himself. It was held that the defendant must hold the lease for the partnership. The court said that "for the defendant to take the option in his own name and attempt to appropriate the profits thereof to his own use constituted not only a breach of trust but a fraud upon his copartners."[18] The plaintiff was not barred merely because he had attempted without success to do just what the defendant did.

A close case, in which the court was divided, four judges taking one view and three the other, is that of *Meinhard v. Salmon*,[19] de-

17 Lurie v. Pinanski (1913) 215 Mass. 229, 102 N. E. 629.
18 *Id.* at 231, 102 N. E. at 634.
19 (1928) 249 N. Y. 458, 164 N. E. 545.

cided by the New York Court of Appeals a few years ago. In this famous case the plaintiff and defendant as joint adventurers held a lease of a hotel at the corner of 42nd Street and Fifth Avenue in the city of New York. The lease was for twenty years and was taken in the name of the defendant, who was to have the active management of the undertaking. Shortly before the lease expired, the defendant, without communicating with the plaintiff, obtained a new lease which included not only the tract which was the subject of the joint undertaking but also large adjoining tracts owned by the lessor. The new lease was for a much longer term and at a much higher rental than that of the old lease. ($350,000 instead of $55,000) The old buildings were to be torn down and a new building to be erected at a cost of three million dollars. The defendant formed a corporation to hold the new lease. The plaintiff brought suit to compel the defendant to give him an equal share in the new lease. The Court of Appeals held that the plaintiff was entitled to one-half of the shares of the corporation, less one share. Chief Judge Cardozo, speaking for the majority, said that the parties were in a fiduciary relation to each other and that the defendant was chargeable as a constructive trustee, since he had a "pre-emptive opportunity," which was an incident of the joint undertaking and which he should not have used for his own benefit alone. The case is not as easy as the usual case of a renewal of a lease. In the first place the fiduciary relation was a temporary one, due to expire when the old lease expired; and the new undertaking was a much larger undertaking than that which had been involved in the joint adventure. Nevertheless, the decision of the court has met with general approval.

*Competition with the principal.* Delicate questions arise where the fiduciary acquires a benefit for himself in conducting a transaction of his own, but where he does so to some extent in competition with his principal. The question here is one of degree. It is a question of the closeness of the connection between what he does for himself and what he has undertaken to do for his principal. In *Beatty v. Guggenheim Exploration Company*,[20] another case in New York, the plaintiff was employed by the defendant, an exploration and mining corporation. It sent him to Alaska to investigate certain mining claims on which the defendant had an option. He discovered that there were certain adjoining claims not included in the option but which appeared to be necessary for the successful operation of those which were in-

---

[20] (1919) 225 N.Y. 380, 122 N.E. 378.

cluded. He bought these claims for himself and a partner. The court held that if the corporation had not waived its rights, the plaintiff would have been bound to surrender the claims at cost. Judge Cardozo said: "We think it would be against good conscience for the plaintiff to retain these profits unless his employer has consented. The tie was close between the employer's business and the forbidden venture."[21]

In an English case[22] a testator carried on the business of a yacht agent. By his will he appointed his daughter and the defendant and another person as executors and trustees and directed them to carry on his business. The defendant was about to set up a business of a yacht agent on his own account in competition with the testator's business, while still remaining a trustee of the will. The court held that this would be a breach of his fiduciary duty, pointing out that this particular kind of business was highly competitive, since the field was a limited one. So also in a case in New York[23] an executor continued the testator's business of making installment sales, as he was authorized to do by the will. He started a competing business on his own account. It was held that he was accountable for the profit which he made, and he was enjoined from continuing the competing business even after he had been removed as trustee.

There is another situation where a fiduciary improperly competes with his principal. Where a fiduciary purchases property which he should purchase for his principal, if he purchases it at all, he is chargeable as a constructive trustee of the property so purchased. It frequently happens that a man who wishes to acquire the title to property, but does not wish to appear himself in the transaction, engages another person to purchase the property for him; and all too frequently the latter, discovering that it is a good bargain, purchases the property for himself. It is clear enough that he will not be permitted to retain the property where there was a pre-existing fiduciary relationship between the parties, as, for example, where the person who purchases the property was an employee of the other, or where the intending purchaser was a corporation and the person making the purchase was an officer or director. The case is not so clear where there was no such pre-existing fiduciary relationship. If *A* asks *B* to purchase a piece of land for *A*, and *B* undertakes to do so, and *B*

---

[21] *Id.* at 386, 122 N.E. at 380.
[22] *In re* Thomson (1930) 1 Ch. 203.
[23] *In re* Offen's Estate (1943) 45 N.Y.S. (2d) 348.

*THE FIDUCIARY PRINCIPLE*

purchases it for himself, there are difficulties in the path of *A* when he seeks to charge *B* as constructive trustee of the land for him. Unless there was consideration for *B*'s undertaking there is no binding contract, and, indeed, in most jurisdictions, the contract would be unenforceable if not in writing. There need not be a contract, however, to give rise to a fiduciary relation. By the very fact that *B* undertakes to act for *A* he becomes *A*'s agent for this purpose. If, therefore, he buys the property for himself he is guilty of a breach of fiduciary duty. Whether he could have terminated the agency by informing *A* that he wished to do so and that he intended to purchase the property for himself is another question. Even in such a case, he would be chargeable with a breach of duty if he took advantage of confidential information given to him by *A* as his agent.

*Competition by corporate officers and directors.* Corporate officers and directors frequently find themselves in a position where they are tempted to secure for themselves some advantage which if it is to be secured at all, should be secured for the corporation. Thus in a case in New York[24] the directors of a corporation cancelled a contract which gave it the exclusive right to sell a foreign firm's product, and then made a similar contract for themselves with the firm. The court held that they were not merely liable for the loss to the corporation which resulted from the cancellation of the contract, but were accountable in equity for any profits which they made from their own contract.

Sometimes the breach of fiduciary duty is not so bold. It is not a ground for denying relief to the corporation that it did not have a preexisting interest in the property acquired by the officer or director. Nor will relief be denied merely because it does not appear that the corporation was financially able to purchase the property for itself. Nor need it appear that the purchase was necessary to the furtherance of the corporate undertaking. It is enough that the officer or director has improperly interfered with an expectancy of the corporation, with what is called a corporate opportunity. The rule rests on the unfairness in the particular circumstances of the taking advantage of an opportunity for personal profit when the interests of the corporation call for protection.[25]

---

[24] Sialkot Importing Corp. v. Berlin (1946) 295 N. Y. 482, 68 N. E. (2d) 501.

[25] Compare Durfee v. Durfee & Canning, Inc. (1948) 323 Mass. 187, 80 N. E. (2d) 522, where a director was held liable, with Blaustein v. Pan American Petroleum & Transport Co. (1944) 293 N. Y. 281, 56 N. E. (2d) 705 where recovery by a subsidiary corporation against the controlling corporation was denied.

*Corporate fiduciaries.* Corporate fiduciaries are sometimes faced with problems of loyalty which do not arise in the case of individual fiduciaries. Banks and trust companies acting as trustees are subject, as we have seen, to the rules of loyalty which are applicable to individual trustees. There are, however, two situations where a question of loyalty arises because they are corporate fiduciaries.

*Shares of a corporate trustee.* The first situation involves the question of the holding of shares of its own stock by a corporate trustee. It is well settled that a corporate trustee cannot properly purchase for its trust shares of its own stock, even though the purchase is made from a third person. Such a purchase is expressly forbidden in the case of national banks by a Regulation of the Federal Reserve Board, and is forbidden by statute in several states. A more difficult question arises where a testator owned shares of a bank or trust company and died naming the institution as trustee. Is it the duty of the trustee to dispose of the shares within a reasonable time, or may it properly retain them in the trust? It has been held that in the absence of a term of the trust or of a statute otherwise providing, the trustee should not retain the shares in the trust. It is true that the retention does not involve self-dealing. It does, however, involve a conflict of interest, a divided loyalty. The testator may, however, and frequently does, authorize the corporate trustee to retain the shares, and such an authorization is clearly valid. It seems clear that a general authorization to retain the testator's investments includes his investments in shares of the corporate trustee.

*Self deposit by a corporate trustee.* In the second place, there is a question whether a bank or trust company, acting as trustee, can properly deposit funds awaiting investment or distribution in its own commercial or savings department. In the absence of a statute otherwise providing, there is a conflict on the question whether such deposits constitute improper self-dealing. In the case of national banks it is provided by the Federal Reserve Act and by Regulations of the Federal Reserve Board that such deposits are proper if securities are deposited with the trust department as collateral to secure such deposits. In a number of states there are similar statutes applicable to the state banks and trust companies. Although in such a case there is no substantial risk of loss of the trust funds so deposited, there is a temptation to the trustee to leave the funds on deposit for an unreasonably long time, since the deposits are ordinarily earning an income for the bank or trust company.

*Confidential information.* A fiduciary in the course of his employment may acquire confidential information. It is a breach of his duty as fiduciary to use this information for his own purposes, or to communicate it to a third person who may so use it. This principle is expressed in the Restatement of Agency § 295. It is there stated that "Unless otherwise agreed an agent is under a duty to the principal not to use or to communicate information confidentially given him by the principal or acquired by him during the course of or on account of his agency or in violation of his duties as agent, in competition with or to the injury of the principal, on his own account or on behalf of another, although such information does not relate to the transaction in which he is then employed, unless the information is a matter of general knowledge."

The principle applies to trade secrets, lists of customers, and other confidential matters known to the employee because of his employment. It applies not only to agents but to other kinds of fiduciaries, such as trustees and corporate officers and directors. It applies, for example, to attorneys. Thus, in a case recently decided in New York,[26] a rather unusual one, a question of the extent of the duty of loyalty of an attorney was involved. In that case the defendant was employed as attorney by the next of kin of a testatrix to contest her will for lack of testamentary capacity. In this he was unsuccessful. By the will a legacy was given for a charitable purpose which failed. The defendant disclosed information which he had obtained as attorney for the next of kin to a charitable corporation, which thereupon employed him to apply to the court for an application of the legacy *cy pres* in its favor. He was successful in this application. It was held that he was chargeable as constructive trustee for the next of kin of the compensation which he received from the charitable corporation. The court held that the defendant should not be allowed to profit through a breach of his fiduciary duty to the next of kin, even though the next of kin had no enforceable claim to the estate.

The principle has been applied even where the information was acquired by the fiduciary more or less accidentally and not in connection with the performance of his duties. In a case in Massachusetts[27] a newspaper reporter, employed on part time, learned that his employer had only a leasehold interest in the premises upon which the paper was published, and that the lease was about to expire. He

---

[26] Zeiden v. Oliphant (1945) 54 N. Y. S. (2d) 27.
[27] Essex Trust Co. v. Enwright (1913) 214 Mass. 507, 102 N. E. 541.

went to the owner of the property and obtained a lease in his own name and offered to convey the lease to his employer for a sum much larger than he had paid for it. If the employer could not obtain the lease it would mean a serious interruption in the publication of the paper. It was held that the employer could charge him as constructive trustee of the lease and compel him to surrender it at the price which he had paid.

*Liabilities of third persons.* Not only does a fiduciary incur liabilities if he violates his duty to his principal, but third persons who participate in the breach of duty may also incur liabilities. The simplest case, perhaps, is that in which a trustee in violation of his duty sells trust property to a third person. The third person takes the property subject to the trust, unless he is a purchaser for value and without notice of the breach of trust. So also, there are numerous cases where a third person has obtained knowledge of a trade secret through a breach of duty by a fiduciary who had been entrusted with the secret, and has used it for his profit. He is held accountable for the profit.

Third persons other than purchasers of trust property or trade secrets may be chargeable as participants in breaches of fiduciary duty: for example depositaries of trust funds, brokers, corporations registering improper transfers by fiduciaries of shares of stock, agents and attorneys. Such persons are chargeable with participation in a breach of fiduciary duty where with notice of the breach they assist the fiduciary in violating his duty. Mr. Justice Stone pointed out that departures from the fiduciary principle do not usually occur without the active assistance of some member of the bar, and that during the period preceding the debacle of 1929 the bar was too absorbed in taking care of private interests to sound a warning against the prevailing disregard of the fiduciary principle.[28]

To return again to the case of the Unjust Steward, the question suggests itself whether the master could have set aside the compromises and compelled the debtors to pay the balance of his claims against them. I am no expert in the Hebrew law and can deal with the question only from the point of view of an American lawyer. Certainly if the debtors knew that the steward was attempting to feather his own nest by currying favor with them and therefore that he was violating his duty to his master, they would be liable for the unpaid balances. Even if they did not know this, they gave no value for the discharge, and under our law they might still be liable. But apparently

---

[28] Stone, *The Public Influence of the Bar* (1934) 48 HARV. L. REV. 1, 9.

the good-natured master waived his claims against them, as well as that against the steward.

### CONCLUSION

Let me conclude by quoting from the two great judges to whom I have referred from time to time; two judges who I think were most clearly conscious of the vital importance of the fiduciary principle.

Fifteen years ago, Mr. Justice (later Chief Justice) Stone, in a notable address on The Public Influence of the Bar said:

> I venture to assert that when the history of the financial era which has just drawn to a close comes to be written, most of its mistakes and its major faults will be ascribed to the failure to observe the fiduciary principle, the precept as old as holy writ, that 'a man cannot serve two masters.' More than a century ago equity gave a hospitable reception to that principle and the common law was not slow to follow in giving it recognition. No thinking man can believe that an economy built upon a business foundation can permanently endure without some loyalty to that principle.[29]

In the famous case of *Meinhard v. Salmon,* to which I have already referred, Chief Justice Cardozo (later Mr. Justice Cardozo) said:

> Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.[30]

---

[29] *Id.* at 8.

[30] Meinhard v. Salmon, *supra* note 19 at 464, 164 N. E. at 546. That such "uncompromising rigidity" with respect to trustees may not be followed in case of directors of corporations see BALLANTINE, CORPORATIONS (1946) 167, 203, 209; Note (1948) 61 HARV. L. REV. 335. These writers suggest that in regard to the fiduciary duty of a director the policy of facilitating business has prevailed over the older policy of removal of temptation.

# CONTRACT AND FIDUCIARY DUTY*

*FRANK H. EASTERBROOK and DANIEL R. FISCHEL*
*University of Chicago*

> Agency is the fiduciary relation which results from the manifes-
> tation of consent by one person to another that the other shall
> act on his behalf and subject to his control, and consent by the
> other to so act. [*Restatement (2d) of Agency* § 1 (1958)]

## I

Fᴏʀ centuries courts have required trustees to serve the interests of
beneficiaries loyally—with the same devotion that the trustees dedicate
to their own interests. The duty of loyalty, coupled with restitution of
any gain the trustee obtains by favoring his own interest, defines a special
relation.

During the last two centuries, courts have been adapting this duty of
loyalty and its remedy to other agency relations, under the title "fidu-
ciary" duty.[1] That is adaptation, not extension. The many agency rela-
tions that fall under the "fiduciary" banner are so diverse that a single
rule could not cover all without wreaking havoc. Courts have applied
the term to relations as diverse as guardian-ward, attorney-client, and
bank-borrower.

Does anything other than the word "fiduciary" and an appeal to a duty
of loyalty (in its strong form, a duty that the agent work for the "exclusive
benefit" of the principal) unite these situations? Principles of ethics? Is
the fiduciary morally bound to act in a particular way, perhaps? Or are
the different situations wholly distinct, so that a union's fiduciary "duty
of fair representation" in labor law is unrelated to a corporate manager's
fiduciary obligations to investors?

---

* Presented at the John M. Olin Centennial Conference in Law and Economics at The
Law School, The University of Chicago, April 7–9, 1992. Frank Easterbrook is a Judge,
United States Court of Appeals for the Seventh Circuit; Senior Lecturer, The Law School,
The University of Chicago. Daniel Fischel is Lee and Brena Freeman Professor of Law,
The Law School, The University of Chicago.

[1] L. S. Sealy, Fiduciary Relationships, [1962] Cambridge L. J. 69, 71–72.

[*Journal of Law & Economics,* vol. XXXVI (April 1993)]
© 1993 by Frank H. Easterbrook and Daniel R. Fischel.

HeinOnline -- 36 J.L. & Econ. 425 1993

We have suggested in earlier writings that the duty of loyalty is a response to the impossibility of writing contracts completely specifying the parties' obligations.[2] No contract can cover all contingencies, but often the parties can handle the major ones. Sometimes, however, the contracting problem is intractable, at least at the outset of the parties' dealing. (We return in Section III to this important qualification.) One party to the contract may desire an objective (maximum income from an investment, a favorable outcome to litigation) but have neither an idea nor much concern how the objective is to be achieved. Specialists in achieving this objective (trustees, managers, lawyers) agree to lend their efforts. When the task is complex, when efforts will span a substantial time, when the principal cannot measure (or evaluate) the agent's effort, when an assessment of the outcome is not a good substitute for measuring effort (because the outcome may be attributable to luck, or to a superior effort by some competitor), and when a relative shortage of information hinders the drawing of conclusions even when the outcome may be highly informative, a detailed contract would be silly. When one party hires the other's knowledge and expertise, there is not much they can write down. Instead of specific undertakings, the agent assumes a duty of loyalty in pursuit of the objective and a duty of care in performance. These legal duties reflect both the nature of the principal's choice (he is hiring expertise) and an obvious condition (the principal is unwilling to put himself at the mercy of an agent whose effort and achievements are both exceedingly hard to monitor). This is the "fiduciary" package, but it is still empty. What do terms such as "duty of loyalty" mean? Because the process is contractual—because both principal and agent enter this understanding for gain—the details should be those that maximize that gain, which the contracting parties can divide.

Ever since Ronald Coase published "The Problem of Social Cost," it has been understood that legal rules can promote the benefits of contractual endeavors in a world of scarce information and high transactions costs by prescribing the outcomes the parties themselves would have reached had information been plentiful and negotiations costless.[3] Legal

---

[2] For example, see Frank H. Easterbrook & Daniel R. Fischel, The Economic Structure of Corporate Law, at chs. 4–5 (1991); Daniel R. Fischel, The Economics of Lender Liability, 99 Yale L. J. 131, 140–47 (1989); Daniel R. Fischel & John H. Langbein, ERISA's Fundamental Contradiction: The Exclusive Benefit Rule, 55 U. Chi. L. Rev. 1105 (1988); Frank H. Easterbrook & Daniel R. Fischel, Corporate Control Transactions, 91 Yale L. J. 689, 700–715 (1982); Frank H. Easterbrook & Daniel R. Fischel, Antitrust Suits by Targets of Tender Offers, 80 Mich. L. Rev. 1155, 1171–78 (1982).

[3] 3 J. Law & Econ. 1 (1960).

rules cannot transfer wealth from agents to principals—not so long as the price agents collect for their services is unregulated. Acting on moral belief that agents *ought* to be selfless will not make principals better off; it will instead lead to fewer agents, or higher costs of hiring agents. With powers hedged in by competition and the price system, judges must choose between promoting the parties' contracting (and thus increasing both private and social wealth) and frustrating it (injuring the parties and society). That is not a hard choice. Providing, as a public service, the rules the parties themselves would have chosen in a transaction-cost-free world fosters instrumental and ethical objectives at the same time.

So, we concluded, a "fiduciary" relation is a contractual one characterized by unusually high costs of specification and monitoring. The duty of loyalty replaces detailed contractual terms, and courts flesh out the duty of loyalty by prescribing the actions the parties themselves would have preferred if bargaining were cheap and all promises fully enforced. The usual economic assessments of contractual terms and remedies then apply. Fiduciary duties are not special duties; they have no moral footing; they are the same sort of obligations, derived and enforced in the same way, as other contractual undertakings.[4] Actual contracts always prevail over implied ones. Obligations implied to maximize value in high-transactions-costs cases may have some things in common, but differences in the underlying transactions will call for different "fiduciary" obligations, just as actual contracts differ across markets.

Courts may of course deny that fiduciary obligations are fundamentally contractual. What courts cannot do is improve the lot of persons who in the future encounter situations similar to the ones at hand. Suppose a

---

[4] See Richard A. Posner, Economic Analysis of Law 100–101 (3d ed. 1986); Henry N. Butler & Larry E. Ribstein, Opting Out of Fiduciary Duties: A Response to the Anti-Contractarians, 65 Wash. L. Rev. 1, 28–32 (1990); Brian R. Cheffins, Law, Economics and Morality: Contracting Out of Corporate Law Fiduciary Duties, 19 Canadian Bus. L. J. 28 (1991); Jonathan R. Macey, An Economic Analysis of the Various Rationales for Making Shareholders the Exclusive Beneficiaries of Corporate Fiduciary Duties, 21 Stetson L. Rev. 23, 25, 36–43 (1991); Market Street Associates Limited Partnership v. Frey, 941 F.2d 599, 591–93 (7th Cir. 1991) (Posner, J.). Compare with Alison Grey Anderson, Conflicts of Interest: Efficiency, Fairness and Corporate Structure, 25 U.C.L.A. L. Rev. 738 (1977); Ernest J. Weinrib, The Fiduciary Obligation, 28 U. Toronto L. J. 1 (1975). There is surprisingly little commentary from other scholars on the economics of fiduciary duty. With the exception of Posner's Economic Analysis of Law, none of the textbooks has an entry for "fiduciary" in the index. Two important articles address the fiduciary relation from the perspective of disgorgement remedy. See W. Bishop & D. D. Prentice, Some Legal and Economic Aspects of Fiduciary Remuneration, 46 Mod. L. Rev. 289 (1983); Robert Cooter & Bradley J. Freedman, The Fiduciary Relationship: Its Economic Character and Legal Consequences, 66 N.Y.U. L. Rev. 1045 (1991). We return to this subject in Section III.

THE JOURNAL OF LAW AND ECONOMICS

court were to say that a broker, as the fiduciary of a client receiving investment advice, may recommend only stocks whose worth the broker has investigated personally and that because of the exclusive-benefit rule the broker's employer may not trade in the market as a principal while giving recommendations to customers.[5] Suppose the court adds that it recognizes that the parties, if able to contract at low cost, would provide otherwise, but it concludes that "high standards of commercial honor and just and equitable principles of the trade" override considerations of mere monetary advantage.[6] Such a decision might produce a windfall for the plaintiff today. What of tomorrow? Prices and practices would adjust. Firms such as Merrill Lynch might spin off a separate brokerage arm, separating advice to customers from dealing as a principal; horizontal disintegration means lost economies of scope and higher prices for customers without better advice. Or perhaps brokers will do more research (for which they must charge clients) even though prices in competitive markets are more informative (and better protection to customers) than any news a broker is apt to scare up. Other courses are open: brokers could refrain from making recommendations (even about how to balance a portfolio, the sort of recommendation that is useful no matter how efficient the price-setting mechanism in markets) or could raise their commissions to cover the extra costs. Brokers might solicit waivers from their clients, which entails longer phone calls or delay to send, read, sign, and return forms in which the client authorizes the broker to act as a dealer too. Time is valuable on both sides, so this process of express contracting both raises the price the broker will charge and diminishes the investor's benefit from the transaction. *Both* sides would have been better off had the court selected a rule that enabled them to save these costs. What is true for this agency relation is true for fiduciary relations in general.

---

[5] No court has held this, but decisions such as Chasins v. Smith, Barney & Co., 438 F.2d 1167 (2d Cir. 1970), look in that direction. We take up in Section II the question of whether a market maker may "trade ahead" of its client. E. F. Hutton & Co., CCH Fed. Sec. L. Rep. ¶84,303 (S.E.C. Rel. No. 25887, July 6, 1988). See also Burdett v. Miller, 957 F.2d 1375 (7th Cir. March 6, 1992); United States v. Dial, 757 F.2d 163 (7th Cir. 1985).

[6] The quoted language, from the National Association of Securities Dealers' Rules of Fair Practice ¶2151, appears in E. F. Hutton & Co., *supra* note 5. Cases announcing fiduciary obligations teem with such language. Three of the more famous are Pepper v. Litton, 308 U.S. 295, 311 (1939) (Douglas, J.); Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545 (1928) (Cardozo, J.); and Guth v. Loft, Inc., 5 A.2d 503, 510 (Del. 1939) (Layton, C. J.). Righteous indignation also pervades opinions about torts (and other branches of the law; moralizing is cost free to judges) without establishing that ethics rather than economics best explains the legal rules. See George J. Stigler, The Law and Economics of Public Policy: A Plea to the Scholars, 1 J. Legal Stud. 1 (1972).

## II

Objections to a contractual understanding of fiduciary duties take several forms.[7] One is that judges simply do not *talk* like Ronald Coase. No, they don't; but we seek knowledge of when fiduciary duties arise and what form they take, not a theory of rhetoric—a theory of what judges *do*, not of explanations they give. Another is that the contractual perspective cannot explain the structure of the legal rules. Such an objection is compelling, if true. Is it true?

### A.    Does Fiduciary Law Disregard or Override Contracts?

Nothing illustrates the contractual character of fiduciary law better than one of the cornerstones of trust law: an express provision in the trust instrument governs over the duty of loyalty in the event of conflict.[8] The settlor of a trust may authorize the trustee to compete with the trust. So, too, in corporate law, where the board of directors may authorize a manager to pursue corporate opportunities. Partnership agreements may permit the partners to form businesses competing with the partnership. A client may hire a lawyer with a conflict of interest, waiving the right to conflict-free representation. (Courts sometimes say that the client has a *right* to do this.) To say that express contracting is allowed is to say that the law is designed to promote the parties own perception of their joint welfare. That objective calls for filling gaps in fiduciary relations the same way courts ·fill gaps in other contracts. The subject matter may differ, but the objective and therefore the process is identical.

Statutes pose a greater challenge to the contractual perspective, for legislatures often create nonwaivable rules. We have devoted a book to the proposition that many of these rules in corporate and securities law, even seemingly rigid ones, are best understood as implicit contractual terms.[9] So, too, with other statutes. For example, the Employee Retirement and Income Security Act (ERISA) designates the trustees of a pension or welfare plan as fiduciaries and instructs them to act in the "exclusive benefit" of the plan's participants—what is in trust law a

---

[7] Victor Brudney, Corporate Governance, Agency Costs, and the Rhetoric of Contract, 85 Colum. L. Rev. 1403 (1985); Robert Charles Clark, Agency Costs versus Fiduciary Duties, in Principals and Agents: The Structure of Business 55 (John W. Pratt & Richard J. Zeckhauser eds. 1985); Deborah A. DeMott, Beyond Metaphor: An Analysis of Fiduciary Obligation, 1988 Duke L. J. 879; and John L. Howard, Fiduciary Relations in Corporate Law, 19 Canadian Bus. L. J. 1 (1991), provide forceful statements of these objections.

[8] Restatement (2d) of Trusts §222 (1957).

[9] See Easterbrook & Fischel, Economic Structure, *supra* note 2.

430          THE JOURNAL OF LAW AND ECONOMICS

presumption subject to contractual alteration becomes a mandate.[10] At the same time, however, ERISA authorizes what in trust law would be unpardonable—a trustee with a conflict of interest. Management appoints some of the trustees, who serve the firm's objectives. Interested parties negotiate the plan's terms. A pension or welfare plan may grant these trustees broad discretion in both interpretation and application.[11] Private bargains then dominate despite appearances. Employers that could not control the disposition of assets in pension and welfare plans would be willing to contribute less (equivalently, workers would have to give up greater amounts of wage income to secure the same level of deferred compensation).

Under the Securities Exchange Act of 1934 and the rules of the Securities and Exchange Commission (SEC), a broker or dealer is the customer's fiduciary. May a fiduciary "trade ahead" of its customer—that is, take an opportunity to buy or sell stock for its own account while a customer's order remains unfilled? A simple answer derived from the duty of loyalty would be "no." Customers must come first. When the SEC took up that question, however, it sought to vindicate "the reasonable expectations of the parties to the relationship. Where there is no explicit agreement to the contrary and the relationship is a fiduciary one, the law governing fiduciary duties provides presumptive definition for such expectations"—a method that strikes us as gap filling.[12] The commission added that an actual contract (or even the customer's actual knowledge of the dealer's practice) would prevail over the presumptive term.

Although courts produce many cases of this kind, in which an estimate of the parties' preferred rule is followed immediately by recognition that the estimate does not defeat actual bargains, the SEC's opinion is interesting because of the sophistication of the authors. The Commission was divided three to two, with the majority comprising a professor of law (Chairman Ruder), an economist with a Ph.D. from the University of Chicago (Commissioner Cox), and an experienced practitioner (Commissioner Peters); the dissenters, who concluded that trading ahead should be allowed presumptively, were an economist who is now a professor of

---

[10] Section 404(a)(1)(A)(i) of ERISA, 29 U.S.C. §1104(a)(1)(A)(i). See also §403(a), 29 U.S.C. §1103(a), which makes the trust form obligatory.

[11] Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111 (1989). See also John H. Langbein & Bruce A. Wolk, Pension and Employee Benefit Law 495–97 (1990); John H. Langbein, The Supreme Court Flunks Trusts, 1990 Sup. Ct. Rev. 207; Fischel & Langbein, *supra* note 2.

[12] E. F. Hutton, *supra* note 5, at 89, 328.

law (Commissioner Grundfest) and an experienced practitioner (Commissioner Fleischman). Chairman Ruder's concurring opinion delivers a homily on business ethics, but the majority's opinion is bland, touching on both the presumptive duty of loyalty and the need to find an arrangement that would serve the parties' joint interests.[13]

That legislatures, courts, and commissions treat fiduciary duties as presumptive contractual terms, promoting the parties' welfare in the absence of express contracts, is all but inevitable. Anything else is self-defeating. Fiduciaries may charge for their services, driving hard bargains at the outset.[14] Competition among fiduciaries leads to higher prices that just cover the lesser of (*a*) the extra costs of fulfilling any duties required by law, or (*b*) obtaining the beneficiary's assent to some different way of doing things. By hypothesis, method *b* will be costly (recall that it is the difficulty of negotiating and monitoring express contracts that lead to the characterization of the arrangement as "fiduciary"). So most of the time the fiduciary will charge for the extra service, or the opportunity cost of an option forgone. A beneficiary who does not value the new service or higher degree of loyalty at more than the cost of providing it is worse off, the opposite of the court's objective; if the beneficiary does value the extra service at more than its cost, then the parties would have provided for this service by contract in a transaction-cost-free world.

A court setting out to protect principals from their agents *must* use the hypothetical contract approach; the only alternative is to injure the persons the rule makers want to help. Some will be priced out of the market, producing the same allocative loss as monopoly; others will pay extra. A court cannot make tenants better off by requiring all apartments to have three bedrooms: landlords would charge for the extra space, injuring

---

[13] Hutton was a market maker, and its profit came from the bid-ask spread. "Trading ahead" meant that, although Hutton would sell from its own portfolio at the asked price, it would not fill a customer's limit order until the highest bid by any dealer reached the price the customer wanted. If trading ahead is forbidden, a customer's limit order at the asked price must be executed first. Yet this would mean that the customer could sell his stock at the asked price, rather than the bid price. To recover the cost of making a market in stock (including the economic return on the capital invested in the equipment and inventory of stock that makes this possible) the dealer would have to charge the client placing a limit order an extra commission equal to the bid-asked spread. This would be economically equivalent to selling the customer's stock only at the inside bid price—exactly what happens when the firm trades ahead of its customer! An open-price term means that the presumptive rule has little future significance. The alternative to a surcharge in limit-order cases is extra disclosure and consent (that is, the extra costs of transacting), which the parties seek to avoid. We expect that market makers will go on trading ahead of their clients with extra disclosure and consent, rather than increase the price of brokerage services. If this is so, then Commissioner Grundfest was right to conclude that the rule presumptively should allow trading ahead, conserving on the costs of transacting.

[14] Maksym v. Loesch, 937 F.2d 1237, 1242 (7th Cir. 1991) (collecting authority).

some tenants and doing no favors for persons who wanted and were willing to pay for extra rooms anyway. Just so with fiduciary duties. Even if one party has the power to overawe the other, it can collect the value of the position in the price. It can't take its return more than once—but courts, in a vain effort to undercut that power, could injure everyone.

## B.  Do Noneconomic Approaches Offer a Superior Explanation of Legal Doctrine?

A contractual perspective on fiduciary duties implies differences across the many kinds of endeavors characterized by high costs of specifying duties and monitoring agents. What a loyal corporate manager does may be very different from what a loyal labor leader does. Noneconomic organizing principles may imply uniformity (honesty is honesty) or distinctive kinds of differences.

That fiduciary duties deviate substantially from one agency relation to another, no one could deny. Consider some of the many topics to which the label ''fiduciary'' is applied:

- *Trustee/Beneficiary.*   A duty of loyalty means acting for the exclusive benefit of the beneficiary; the duty of care is a high degree of prudence; the usual remedy is disgorgement of the trustee's gain, even if the beneficiary lost nothing. All rules are freely variable by contract in advance, but alteration after establishment of the trust is exceedingly hard.
- *Pension Trustee/Beneficiary.*   This is similar to the trustee/beneficiary relation, except that the exclusive benefit rule is not modifiable, trustees may have conflicts of interest, and all substantive rules are freely variable after establishment of the trust and before the ''vesting'' of benefits.
- *Guardian/Ward.*   This is much the same as the trustee/beneficiary relation, except that variation by contract is disallowed in light of the ward's youth or other incapacity. Variation may be allowed by the court on application and approval in advance.
- *Attorney/Client.*   Here we find the same as the duty of loyalty as with the preceding examples, but the duty of care is the ordinary negligence rule. The usual remedy is not disgorgement but recompense for the client's loss. All rules are freely variable by contract in advance; variation after the relation is established is also possible, with full disclosure to client and an elevated standard of review.
- *Partner/Partner.*   The duty of loyalty is commonly relaxed because partners often do not commit full time to venture. (For example, one promoter may have dozens of real estate partnerships.) The duty of

care is the negligence rule. All rules are freely variable by contract in advance and afterward with disclosure; the standard of review of such disclosures is not particularly elevated. Partners are treated more as co-owners than as each others' keepers.

- *Corporate Manager/Investor.*   There is no fiduciary duty to debt investors. To equity investors, the duty of loyalty is strong but the duty of care is weak (the "business judgment rule" blocks inquiry, and negligent management is not actionable). The remedy is usually loss based, only occasionally taking disgorgement form. Managers effectively set their own salary. Most rules are freely variable at the outset, and afterward with reasonable (that is, less than complete) disclosure to the board, *or* when the court believes the alteration is fair even in the absence of informed consent.
- *Majority or Inside Investor/Minority Investor.*   There is no duty of loyalty. The duty of care is limited to restrictions on deceit or opportunistic conduct. Remedies are usually loss based.
- *Investment Adviser/Client.*   The duty of loyalty is limited to avoiding conflicts in the transaction; the adviser may participate as principal in similar investments and claim these for himself without notice. The duty of care is the negligence standard. The remedy is usually loss based. Most rules are freely variable at the outset or afterward. Notice to the investor, followed by action, is deemed consent.
- *Labor Union/Employee.*   The duty of loyalty is robust (a union cannot be in cahoots with management, have managers as members, or accept payments from the employer), and the duty of care is summed up as the "duty of fair representation." Unions have substantial freedom in practice, probably even more than corporate managers under business judgment rule.[15] Remedies are loss based. The duty is not amenable to alteration by contract, but compliance with contractual rules (or union bylaws) usually will be taken as fulfilling the fiduciary duty.
- *Lender/Borrower.*[16]   There is no duty of loyalty (a bank may lend to

[15]  "[C]ourts are not authorized to review the rationality of good-faith, nondiscriminatory union decisions consistent with federal labor policy." Air Line Pilots Ass'n v. O'Neill, 111 S. Ct. 1127, 1133 (1991). Only action that is "arbitrary, discriminatory, or in bad faith" is actionable. Vaca v. Sipes, 386 U.S,. 171, 190 (1967). See also Steelworkers v. Rawson, 495 U.S. 362 (1990).

[16]  Whether this is a "fiduciary" relation is a contested question. Compare K.M.C. Co. v. Irving Trust Co., 757 F.2d 752 (6th Cir. 1985), and State National Bank of El Paso v. Farah Manufacturing Co., 678 S.W.2d 661 (Tex. Ct. App. 1984), with Kham & Nate's Shoes No. 2 v. First Bank of Whiting, 908 F.2d 1351 (7th Cir. 1990), and Secon Service System, Inc. v. St. Joseph Bank & Trust Co., 855 F.2d 406 (7th Cir. 1988) (all collecting other cases). See also Fischel, Lender Liability, *supra* note 2; Comment, What's So Good about Good Faith? The Good Faith Performance Obligation in Commercial Lending, 55 U. Chi. L. Rev. 1335 (1988).

a customer's business rivals). The duty of care requires the bank to avoid opportunistic timing of withdrawal or limitation of credit. Remedies are loss based. Duties are freely variable by contract before or after the lending relation is established, with no special duty of disclosure or judicial scrutiny. The lender may set the rate of interest to appropriate the full benefit of the transaction.

- *Franchisor/Franchisee.* There is no duty of loyalty (the franchisor may open its own stores in competition with the franchisee). The duty of care is principally a requirement to avoid taking opportunistic advantage of the franchisee's dependence on business symbols of the franchisor. Remedies are loss based. In the absence of legislation (which some states have enacted, and which the federal government has established for auto dealers and gasoline stations), duties are freely variable by contract before or after the grant of a franchise, with no special duty of disclosure or judicial scrutiny.

How well do noncontractual theories hold up in explaining these differences? Professor DeMott, one of the critics of the contractual view, asserts that a "fiduciary's duties go beyond mere fairness and honesty; they oblige him to act to further the beneficiary's best interests. The fiduciary must avoid acts that put his interests in conflict with the beneficiary's."[17] That describes some of the fiduciary categories but misses the mark widely on others. She ends up conceding as much: "[T]he fiduciary obligation is a device that enables the law to respond to a range of situations in which, for a variety of reasons, one person's discretion ought to be controlled because of characteristics of that person's relationship with another. This instrumental description is the only general assertion about fiduciary obligation that can be sustained."[18] Such a conclusion leaves her with no theory at all, and it takes a theory to beat a theory.

Dean Clark proposes a positive theory of fiduciary duties that does not depend on the contractual view. He identifies four attributes as common to fiduciary relations: affirmative duties to disclose, open-ended duties to act, closed-in rights to positional advantages, and moral rhetoric.[19] Moral rhetoric does not distinguish opinions about fiduciary duties from many other judicial efforts and is in any event a proposition about judges rather than about rules. Similarly, much of the law, from torts to the requirement of good faith in carrying out ordinary contracts, is characterized by "open-ended duties to act." Our rudimentary list shows that many fiduciary relations do not come with strong (if any) affirmative duties to

[17] DeMott, *supra* note 7, at 882.
[18] *Id.* at 915.
[19] Clark, *supra* note 7, at 71–76.

disclose or "closed-in rights to positional advantages." Meanwhile, some ordinary contractual cases have duties to disclose,[20] and contracts often constrain use of positional advantages.[21]

There are many other theories of the fiduciary relation , and J. C. Shepherd provides a comprehensive summary.[22] Consider some of the candidates, and some of their faults:

- *Unjust Enrichment.*   A fiduciary may not take unjust advantage of the principal's property, and a fiduciary relation comes into existence when a person obtains property that in justice belongs to someone else. This is perfectly circular. The description can fit any rule while predicting no outcomes.

- *Reliance.*   A fiduciary relation arises when one person reposes trust and confidence in another. Circular again. This bit of circularity also is a poor descriptor, as our list shows cases in which duties and trust do not go hand in glove. Like unjust enrichment, it is useless in figuring out which obligations accompany which kinds of relations.

- *Property.*   A fiduciary relation accompanies A's management of B's property. This common description is flat wrong, unless we treat "property" as silly putty. Most of the relations on the fiduciary list do not involve management of property, and those that do have substantial differences in both the nature of the duties and remedies for breach. Shepherd remarks: "After all the criticisms that have been leveled at the property theory in recent years, it seems almost superfluous to deal with it again"—which has not prevented repetition, as if Gresham's Law applies to legal and economic theories.[23]

---

[20] Anthony T. Kronman, Mistake, Disclosure, Information, and the Law of Contracts, 7 J. Legal Stud. 1 (1978), describes the cases and gives an economic explanation for limited disclosure obligations in arm's length contracting. Information that is costly to generate may be used for private benefit, to stimulate its production. Information that one party obtains without (significant) cost, but which is important to the allocation of resources, often must be disclosed in "ordinary" contracting. Much information held by fiduciaries comes their way without separate investment of effort (or during time purchased by the principal), making disclosure rules understandable without reference to any special features of fiduciary duties.

[21] In standard contract cases, the problem goes by the name opportunism, on which there is a burgeoning literature. For example, Varovj Aivazian, Michael Trebilook, & Michael Penny, The Law of Contract Modifications: The Uncertain Quest for a Benchmark of Enforceability, 22 Osgoode Hall L. J. 173 (1984); Timothy J. Muvis, Opportunistic Behavior and the Law of Contracts, 65 Minn. L. Rev. 521 (1981).

[22] J. C. Shepherd, The Law of Fiduciaries 51–91 (1981). Shepherd's summary and critique enables us to be brief (and to omit further citation, for Shepherd collects many sponsors, on and off the bench, of these approaches to fiduciary obligation).

[23] J. C. Shepherd, Towards a Unified Concept of Fiduciary Relationships, 97 Mod. L. Rev. 51, 63 (1981). See also Boardman v. Phipps, [1967] 2 A.C. 46 (H.L.), at 91 (Dilhorne, J.), 102 (Cohen, J.); Robert Goff & Gareth Jones, The Law of Restitution 47 (2d ed. 1978).

- *Unequal Relationship.* Fiduciary duties redress the inequality of information or power between parties to a contract. Nice try, but it is hopeless as a description—for the most conspicuous differences in size, power, and sophistication (say, a passenger versus a giant transportation company) produce transactions that are the most likely to be brought under the umbrella of contract, which will be enforced to the last detail.[24] In these cases the price reflects the value of the entire contractual package. Fiddling with the details while leaving the price subject to negotiation is a doomed endeavor, and courts regularly stand clear unless one party suffers from incapacity or the deal is so one-sided in prospect ("unconscionable") that fraud or a defect in capacity is a logical inference. But all this is traditional contract law. People may take advantage of their superior information, the better to induce them to gather information.[25]
- *Power and Discretion.* Recent academic theories link the fiduciary relation to A's holding power over decisions important to B, and having discretion in the exercise of that power. Back to principals and agents! Agency is a necessary but not sufficient condition. (If it were sufficient, then all business relations would be fiduciary, and the category would lose its distinctive quality.) What kind of power, under what circumstances, with what ensuing duties? It is essential to fill out these categories to get anywhere, and joint wealth maximization is the prime candidate for such service. No noneconomic rationale does very well at explaining even the outlines of fiduciary rules. The implied contract approach can and does. Our book about corporations undertakes the task at length for the complex of doctrines, statutory and judicial in origin, dealing with investors and managers.

Economic considerations provide sound footing for many if not all of the differences we have sketched. This is not the place to rehearse arguments that we, among others, have set out elsewhere. A few quick notes

[24] For example, see Carnival Cruise Lines, Inc. v. Shute, 111 S. Ct. 1522 (1991), enforcing a forum-selection clause printed in teensy type on a passenger ticket.

[25] Kronman, *supra* note 20. To see the point, contrast the rule of contract law permitting Texas Gulf Sulfur (TGS), after prospecting to discover nickel, to lease the land from farmers who had no idea what they were giving up, with the holding that TGS's managers could not trade in stock markets on the same information. Compare Leitch Gold Mines, Ltd. v. Texas Gulf Sulfur, [1969] 1 Ontario Rep. 469, 492–93, with SEC v. Texas Gulf Sulfur Co., 401 F.2d 833 (2d Cir. 1968) (en banc). See also E. Allan Farnsworth, 1 Contracts §4.11 at pp. 406–10 (2d ed. 1990). The "unequal relationship" approach cannot explain this difference, but an economic approach of the sort Kronman supplies could. (Whether "could" equals "does" depends on the resolution of the authors' intramural debate about managers' trading on material corporate information, on which see Easterbrook & Fischel, Economic Structure, *supra* note 2, ch. 10.)

suffice for current purposes. Managers owe fiduciary duties to equity investors, but not debt investors or employees, because these claimants can contract at low cost, while the costs of specification are prohibitively high for the residual claimants.[26] A trustee is held to the strict ''prudent man'' standard, while a partner is not, because the trustee can diversity across investments at low cost and so protect the beneficiary, while partnerships typically specialize and accept additional risk, partners having more in common with managers and equity investors than with orphans and charitable institutions. Managers and partners may undertake some self-interested transactions in order to encourage (by allowing reward) the process of finding new opportunities for effectively risk-neutral firms. The strict ban on self-interested transactions for trustees prevents this activity and achieves the benefit of passive diversification for risk-averse beneficiaries. The law of trusts thus discourages what the law of corporations encourages—and in each case all parties are better off.

Investors in corporations owe few if any duties to fellow investors, because the financing device for these firms achieves substantial separation of management and risk bearing. We then take it as common (if not desirable) for a person investing in one public corporation to invest in its rival too (perhaps even to manage its rival). Partners owe each other greater duties because of the incomplete separation of management and risk bearing. Attorneys owe their clients strong duties of loyalty because clients have a hard time monitoring their effort or using the results obtained as a clue to that effort and devotion, but brokers do not owe their clients similar duties because market prices provide a low-cost means of measuring both effort and success. What goes with this explanation is that persons counseling purchases of limited partnerships or other illiquid investments owe stronger duties to their clients than persons counseling purchases of stock traded over the counter, and persons selling stock traded on a national exchange owe almost no duties (beyond avoiding churning). This is indeed the pattern.

Traditional legal theory has great trouble with unions, whose exclusive bargaining rights and unsophisticated members seem to call for strong duties, but which in practice owe only slight care to their members. An implied-contract approach, by contrast, notices that the price term is open—that both wages and dues are flexible—and observes that people often prefer money to process and other services delivered in kind.[27]

---

[26] See Macey, *supra* note 4; Easterbrook & Fischel, Economic Structure, *supra* note 2, ch. 2.

[27] ''A union may choose to rely on part-time, untrained, overworked grievers—with the inevitable difference in the outcome of some cases—rather than purchase a higher quality

Scholars of non- or antieconomic bent have had trouble coming up with a unifying approach to fiduciary duties because they are looking for the wrong things. They are looking for something special about fiduciary relations. There is nothing special to find. There are only distinctive and independently interesting questions about particular consensual (and thus contractual) relations. When transactions costs reach a particularly high level, some persons start calling some contractual relations "fiduciary," but this should not mask the continuum. Contract law includes a principle of good faith in implementation—honesty in fact under the Uniform Commercial Code, plus an obligation to avoid (some) opportunistic advantage taking.[28] Good faith in contract merges into fiduciary duties, with a blur and not a line. Searching for the right definition of a fiduciary duty is not a special puzzle. In short, there is no subject here, and efforts to unify it on a ground that presumes its distinctiveness are doomed.

Still, many sing the refrain that any economic understanding, and the hypothetical-bargain approach in particular, are novel and without support. We do not doubt that anticontractual reasoning may be found in many opinions.[29] A nation with thousands of judges issuing opinions over

---

of representation. A union may conclude that its limited resources should go into a strike fund or toward negotiating the next contract." Camacho v. Ritz Carlton Water Tower, 786 F.2d 242, 245 (7th Cir. 1986). See also Dober v. Roadway Express, Inc., 707 F.2d 292 (7th Cir. 1983); Graf v. Elgin, Joliet & Eastern Ry., 697 F.2d 771 (7th Cir. 1983); James D. Holzhauer, The Contractual Duty of Competent Representation, 63 Chi.-Kent L. Rev. 255 (1987).

[28] See UCC § 1–201(19); 2 Farnsworth on Contracts, *supra* note 24, at § 7.17a; Robert S. Summers, "Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code, 54 Va. L. Rev. 195 (1968). See also Market Street Associates Limited Partnership v. Frey, 941 F.2d 588, 595 (7th Cir. 1991): "This duty [of good faith in carrying out a contract] is, as it were, halfway between a fiduciary duty (the duty of *utmost* good faith) and the duty merely to refrain from active fraud. Despite its moralistic overtones it is no more the injection of moral principles into contract law than the fiduciary concept itself is. Tymshare, Inc. v. Covell, 727 F.2d 1145, 1152 (D.C. Cir. 1984); Summers, *supra*, at 204–7, 265–66. The concept of the duty of good faith like the concept of fiduciary duty is a stab at approximating the terms the parties would have negotiated had they foreseen the circumstances that have given rise to their dispute. The parties want to minimize the costs of performance. To the extent that a doctrine of good faith is designed to do this by reducing defensive expenditures [on self-protection] is a reasonable measure to this end, interpolating it into the contract advances the parties' joint goal."

[29] For example, Professor DeMott contends that Arnott v. American Oil Co., 609 F.2d 873, 882–84 (8th Cir. 1979), a case using anticontractual rhetoric to increase a franchisee's entitlements against a franchisor, shows the "degree of estrangement between the definition of fiduciary obligation in the *Jordan* opinions and the prior caselaw." DeMott, *supra* note 7, at 885. (In Jordan v. Duff & Phelps, Inc., 815 F.2d 429 [7th Cir. 1987], both majority and dissenting opinions used the hypothetical-contract approach. *Id.* at 436, 446–47.) Yet only three years after *Arnott*, the eighth circuit concluded that a franchisor was free to compete against its franchisee (and at a lower price). Bain v. Champlin Petroleum Co., 692 F.2d 43, 47–48 (8th Cir. 1982). So much for the duty of loyalty, when it is likely that the parties

the course of decades will generate support for almost any position and almost every rationale. You can find other cases using the hypothetical contract approach.[30] We shall rest content by demonstrating that even the principal case given for the proposition that fiduciary duties have no relation to contract does not support that claim, and may well support the opposite one.

In *Meinhard v. Salmon* Judge Cardozo penned his famous aphorism that "[a] trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior."[31] Salmon acquired a twenty-year lease in a hotel. Meinhard put up half of the money for the hotel's renovation and management, receiving half of the profits. At the end of the twenty years, the owner of reversion proposed a substantial enlargement of the building (at great expense to the lessee) and more than ten times the old annual rent. Salmon took that offer for himself. The court of appeals divided four to three on the question whether Salmon had to tell Meinhard about the landlord's proposal. Notice the question: it is not whether Salmon had to share. Both Chief Judge Cardozo for the four and Judge Andrews for the three put this in hypothetical-contract terms. Cardozo speculates that had Gerry, the reversionary owner, known that

---

would have allowed competition had they contracted about the subject expressly. A series of cases has pulled the plug on *Arnott*, which the eighth circuit now treats as a pure contract interpretation case—hardly a disproof of the prevalence of contractual approaches! Cambee's Furniture, Inc. v. Doughboy Recreational, Inc., 825 F.2d 167, 171 (8th Cir. 1984); W.K.T. Distributing Co. v. Sharp Electronics Corp., 746 F.2d 1333, 1336–37 (8th Cir. 1984). See also O'Neal v. Burger Chef Systems, Inc., 860 F.2d 1341, 1349 n.4 (6th Cir. 1988) (collecting cases limiting or repudiating *Arnott*); Lee v. Wal-Mart Stores, Inc., 943 F.2d 554 (5th Cir. 1991) (holding that fiduciary relations are exclusively matters of contract, so that a long-term, harmonious relationship between a real estate developer and a tenant store has no fiduciary attributes in the absence of express or implied contractual terms creating them). Let us not forget that Professor Scott, who presided for decades over the leading treatise on the law of trusts, had a contractual approach to the subject. See Austin W. Scott, The Fiduciary Principle, 37 Calif. L. Rev. 539, 540 (1949).

[30] The bribery cases are a nice illustration. Courts frequently say that an employee who takes a side payment for the performance of his duties holds the money in trust for the employer. See United States v. Holzer, 816 F.2d 304 (7th Cir. 1987), on remand, 840 F.2d 1343 (1988) (collecting cases). Reading v. Attorney General, [1951] A.C. 507 (H.L.), one of the best known in this line, also is one of the most explicit. Lord Oaksey observes, *id.* at 33: "I do not think there is any difficulty in imputing to a servant an implied obligation that he will account to his master for any moneys he may receive in the course of his master's business or by the use of his master's property or by the use of his position as his master's servant." Indeed there is no difficulty. We can be confident that had the parties addressed the subject explicitly, they would have required the servant to return bribes to the master. Bribes usually are designed to drive a wedge between the servant's interests and the master's, and a turnover rule restores the employer's control. An applicant who proclaimed a desire to take and receive bribes would have little prospect of being hired.

[31] 249 N.Y. at 464, 164 N.E. at 546.

Meinhard was a silent venturer, Gerry would have put his proposal to Meinhard too. Cardozo conjectures that Meinhard would have bought an interest or made a better bid and adds that, if he had not, Salmon could have proceeded for his own account.[32] By allowing Meinhard to purchase an interest, the court created the contract that it thought would have the outcome of bargaining without transactions costs. If this is not a contract-completing approach, it is a contract-forcing one (to which we return in Section III). Judge Andrews, in dissent, did not disagree with the approach so much as he disputed its application. He believed that the twenty-year joint venture agreement continued only if the lease were extended without substantial change. That is, he believed that the parties' (implicit) bargain was to persevere after twenty years if renewal were available on the same terms, and otherwise to dissolve.[33]

It is possible to repeat this demonstration for many cases laden with moralizing language. We have done so in a number of footnotes encumbering the text earlier in this essay. More recent cases dispense with the need to reconstruct. For example, courts formerly spoke with high dudgeon about managers' trading on material nonpublic information. *Chiarella v. United States*[34] recast the subject as an inquiry into property rights.[35] Courts now use the method and language of contract (including the imputation of terms when language fails) to determine who owns nonpublic information and may or may not trade.[36]

[32] Or, at least, *almost* says this: "Had he [Salmon] done this [informed Meinhard], we need not say whether he would have been under a duty, if successful in the competition, to hold the lease so acquired for the benefit of the venture then about to end, and thus prolong by indirection its responsibilities and duties." 164 N.E. at 547.

[33] Judge Andrews's unwillingness to find implicit terms in agreements is in the ascendancy in New York. Gallagher v. Lambert, 74 N.Y.2d 562, 549 N.E.2d 136 (1989), holds that a corporation may fire an at-will employee in order to prevent the vesting of valuable rights to purchase stock. New York earlier held that, although employment at will is a contract, the employer owes the employee no contractual duty of good faith. Murphy v. American Home Products, 58 N.Y.2d 293, 448 N.E.2d 861 (1986). Jordan v. Duff & Phelps, *supra* note 28, on the assumption that Illinois would recognize a contractual good-faith obligation in at-will employment, held (using the hypothetical contract approach) that in the absence of contrary agreement the firm must disclose to the employee impending transactions that affect the value of the stock held incident to employment. For an anticontractual treatment of the same problem, see Smith v. Duff & Phelps, Inc., 891 F.2d 1567 (11th Cir. 1990).

[34] 445 U.S. 222 (1980).

[35] Jonathan R. Macey, Insider Trading: Economics, Politics, and Policy (1991), recounts the cases and contentions. See also Easterbrook & Fischel, Economic Structure, *supra* note 2, ch. 10.

[36] For example, see United States v. Newman, 664 F.2d 12 (2d Cir. 1981); Rothberg v. Rosenbloom, 771 F.2d 818 (3d Cir. 1985); SEC v. Clark, 915 F.2d 439 (9th Cir. 1990); SEC v. Cherif, 933 F.2d 403 (7th Cir. 1991). Cf. United States v. Chestman, 947 F.2d 551 (2d Cir. 1991) (en banc), at 567–71 (majority opinion), 572–81 (Winter, J., concurring and dissenting).

## III

   Surely, though, there is a distinctive subject here, manifest in the remedy: disgorgement of all profit obtained in violation of the fiduciary duty of loyalty. This looks distinctly anticontractual. Throughout the law of contracts the presumptive remedy is based on the promisee's loss, and a large economic literature proclaims the superiority of loss-based measures because they enable the parties to avoid performance that is more costly than the benefit created.[37] Disgorgement, by contrast, makes it unprofitable to depart from the contractual duty in any particular and so stifles even actions to which the parties would have agreed, had they been able to negotiate without transactions costs. A remedy aimed at achieving unconditional deterrence is so far from the contractual norm, the argument goes, that it disproves the contractual understanding of fiduciary duties.

   Robert Cooter and Bradley Freedman give this argument a 180 degree turn in the course of their economic assessment of fiduciary duties.[38] They observe that damages for breach of the duty of care generally reflect the beneficiary's loss, a measure that induces the fiduciary to supply the optimal degree of care provided the court uses the proper definition of negligence. Breaches of the duty of loyalty, in contrast, may be hard to detect—for it is difficulty in monitoring that characterizes a relation as "fiduciary." When violations are hard to detect, penalties must be a multiple of the loss in a particular case. So, for example, a thief who steals $100 and is caught one time in three must be fined at least $300, or theft will carry an anticipated profit. The duty of loyalty defines a variety of theft, so just as the optimal sanction for crime exceeds the loot, so the optimal sanction for breach of the duty of loyalty must exceed the fiduciary's profits. Profits alone are an inadequate remedy. Instead of using a multiplier, the law uses a principle of suspicion: the *appearance* of a breach of duty is treated as a wrong, substantially increasing the probability that a breach of duty will be detected (and reducing the need for a profits multiplier when detection occurs). Both the strict duty and the disgorgement remedy turn out to be what the parties would have provided by contract in a world without transactions costs.

   We are not wholly persuaded by either perspective. Recall from our capsule summary in Section II that disgorgement remedies are not the

---

[37] Alan Schwartz, The Myth That Promisees Prefer Supracompensatory Remedies: An Analysis of Contracting for Damages Measures, 100 Yale L. J. 369 (1990), summarizes and extends this literature. The substantial literature on optimal sanctions for torts and crime reaches much the same conclusion.

[38] Cooter & Freedman, *supra* note 4.

universal mark of fiduciary duties. Quite a few relations called "fiduciary" start from loss-based remedies—and, as it turns out, some contractual relations that no one would call "fiduciary" employ profits-based recoveries.[39] Courts that award disgorgement of gain often temper that remedy by allowing the fiduciary a substantial reward for his entrepreneurial efforts. For example, the famous *Boardman v. Phipps*,[40] in which the fiduciary earned large profits for himself and the trust after a technically defective ratification, and the court first ordered the return of all profits to the beneficiary and then directed the compensation of the trustee for his efforts "on a generous basis." Recompense of some kind is necessary to spur the fiduciary to discover and exploit opportunities; the alternative is a structure of compensation such as a flat fee or a percentage of the managed assets that promotes idleness.[41] So the law does not extract all gain, and treating every appearance of profit taking by the fiduciary as if there were a real problem would yield far too many false positives.[42] You have only to think of corporate law, where disgorgement would frustrate many mutually beneficial transactions, from management buy-outs to profit sharing when corporate employees make inventions. Corporate statutes commonly limit remedies to loss-based measures even when the managers reap substantial gains from the contested transactions.[43]

Profits-based remedies discourage the transaction, and often it is better to accept some risk of transgression than to extirpate a category of trans-

---

[39] E. Allan Farnsworth, Your Loss of My Gain? The Dilemma of the Disgorgement Principle in Breach of Contract, 94 Yale L. J. 1339 (1985), discusses the perplexing and spotty use of disgorgement remedies in contract cases.

[40] [1976] 2 A.C. 46 (H.L.).

[41] A point that Bishop & Prentice, *supra* note 4, at 296–302, stress.

[42] A point that Cooter & Freedman elide, but that Kenneth B. Davis, Jr., Judicial Review of Fiduciary Decisionmaking—Some Theoretical Perspectives, 80 Nw. U. L. Rev. 1 (1985), hammers home.

[43] For example, Delaware's appraisal statute provides in self-interested transactions such as management buy-outs, the investors receive a remedy "exclusive of any element of value arising from the accomplishment or expectation" of the transaction. 8 Del. Code §262(h). The American Bar Association's Model Business Corporation Act (1984 rev.), adopted in a majority of the states, is quite similar. The model statute provides that dissenters receive "fair value" for their shares and defines this term in § 13.01(3) as "the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable." Delaware flirted with a disgorgement remedy in Lynch v. Vickers Energy Corp., 429 A.2d 497 (Del. 1981), but quickly retreated. Rosenblatt v. Getty Energy Co., 493 A.2d 929, 939–40 (Del. 1985); Cede & Co. v. Technicolor, Inc., 542 A.2d 1182, 1187 (Del. 1988). See generally Easterbrook & Fischel, Economic Structure, *supra* note 2, ch. 6.

actions.[44] We could avoid this problem only by limiting the category of violations of duty to cases in which we seek unconditional deterrence— for then no remedy short of the defendant's wealth is too high.[45] Yet (almost) no one, and certainly not Cooter and Freedman, believes that fiduciaries *never* should engage in profitable transactions arising out of their employment.

E. Allan Farnsworth has demonstrated that disgorgement remedies today are likely to award the beneficiary or promisee only the profit net of the opportunity cost incurred—that is, gross profits less what the fiduciary or promisor *could* have made with equal time and effort exploiting some other opportunity, rather than gross profits less out-of-pocket expenses.[46] When there are active markets in the goods or services, this collapses to the principle of "cover," a standard tool in computing expectation damages. Consider *SEC v. MacDonald*.[47] James MacDonald, bound by a fiduciary duty to a corporation and its investors not to trade on information about an impending transaction, nonetheless bought stock in the firm. On December 23, 1975, MacDonald bought shares of the firm's stock at 4L. On December 24 the firm issued a press release with good news that propelled the price of its stock to 5H, a 19 percent gain. It closed the year at 5I. MacDonald held the shares until early 1977, when he sold at roughly ten dollars per share. The court held that MacDonald must disgorge his profit. But what was that profit? The difference between 5H and 4L per share, or the difference between ten and 4L? The court reasoned that, because MacDonald could have purchased the shares lawfully as soon as the news had been absorbed into the price of the stock, the profit from the violation of fiduciary duties was the difference between 4L and the price at which he could cover lawfully. A later increase from other sources was not part of the profit—and, the court properly added, neither would a decrease in the stock's price after the cover date have decreased the amount the fiduciary needed to disgorge. The court thus separated the component of profit attributable to the use of information belonging to the firm from the profit attributable to holding the stock after

[44] For a case making this point in the context of securities transactions, see Bastian v. Petren Resources Corp., 892 F.2d 680 (7th Cir. 1990) (discussing the "loss causation" rule, which precludes recovery in litigation under the Securities Exchange Act of 1934 unless the investor establishes not only that the fraud induced him to enter into the transaction but also that the loss occurred because of the misrepresented fact).

[45] Louis Kaplow, The Optimal Probability and Magnitude of Fines for Acts That Definitely Are Undesirable, 12 Int'l Rev. L. & Econ. 3 (1992).

[46] Farnsworth, Your Loss of My Gain? *supra* note 38.

[47] 699 F.2d 47 (1st Cir. 1983) (en banc), affirming the computation after remand, 725 F.2d 9 (1984).

the price had adjusted and thus taking ordinary investment risks. That gain depended on the duration of holding the firm's stock, not on the fiduciary role. It may well be that the court's measure is too low, because much improper trading escapes detection, but the court selected a sensible starting point from which a damages multiplier might proceed, while the difference between 4L and ten had no economic significance. Calculations such as the one in *MacDonald* have become the norm in determining profits subject to disgorgement—yet the approach looks remarkably like the method used to determine expectation damages when the promisee can cover in the market.

Now consider an occurrence of a full-blooded disgorgement remedy in a pure contract case. Frank Snepp promised the Central Intelligence Agency that he would not write a book about his employment without showing the manuscript to the agency first, so that it could remove classified matter. Snepp published a book without review, and the Supreme Court held that he must turn over his profits—all of them, not simply the incremental profits he earned by avoiding the expense and delay of review.[48] Farnsworth sees this as a puzzle,[49] but we see it as an economically apt outcome, the remedy the parties would have selected had they bargained in advance without transactions costs.[50] The cost of submitting the manuscript was small. The loss if an unreviewed manuscript should contain secrets is potentially large—much larger than the author's wealth. A disgorgement remedy unconditionally deters premature publication. To put this slightly differently, it requires the parties to enter into a second contract. The first contract established the employment relation and the submission requirement. The second contract would establish the terms of publication. Just as restitution plus an additional penalty induces the would-be thief to enter into market transactions instead, the profits remedy induces the parties to contract explicitly. It is a contract-inducing, not a contract-frustrating, approach.

Extolling the benefits of disgorgement in promoting actual contracts may seem a strange thing for us to do. We began by using impossibly high transactions costs as a defining characteristic of a fiduciary relation. Here we use the fiduciary relation (and its distinctive remedy) as a means to promote actual bargains. Both make sense. At the outset of Snepp's employment, the parties could not have specified what Snepp was allowed to write and what he must keep secret during the next decade.

---

[48] Snepp v. United States, 444 U.S. 507 (1980).

[49] Farnsworth, Your Loss of My Gain? *supra* note 38, at 1359–60.

[50] Frank H. Easterbrook, Insider Trading, Secret Agents, Evidentiary Privileges, and the Production of Information, 1981 Sup. Ct. Rev. 309, 342–44.

They could do nothing but set in train a process for making that decision later, and a disgorgement remedy contributes to the success of that process.

Creating hypothetical contracts is difficult. Judges have less information than the parties. Although judges can examine the contracts people have reached when the stakes were high enough to overcome the transactions costs, big-stakes negotiations may be special cases rather than models on which to base presumptive rules for other parties. Real transactions, at real prices, are accordingly preferable. Many legal rules induce people to enter into transactions—not just the stiff penalty for theft, but rules prescribing injunctions or specific performance,[51] rules requiring disclosure of information,[52] and rules calling for supracompensatory damages,[53] all of which may send the parties back to the table, where they will strike real bargains.

Rules inducing people to bargain are undesirable when bargaining is costly but its outcome clear; then courts can save parties the transactions costs by establishing a preset rule and leaving those with unusual desires or circumstances to transact for some different approach. Transaction-forcing rules coupled with high costs of bargaining could lead to too few contracts formed ex ante (the promisor's costs rise to cover the anticipated remedy, which the promisee does not value at this cost) and too much performance ex post (the promisor performs even when the cost of doing so exceeds the value of the promisee). But when it is hard to know the optimal approach, when judicial valuation is haphazard, and when transactions costs ex post are small, a contract-forcing remedy is superior. Coasian transacting then maximizes private and social wealth alike. This characterizes many fiduciary relations. At the outset the range of contingencies is too large and information too scarce for effective contracting. During the course of performance the subjects become more concrete, options more specific. Should the corporation develop a particular product or allow a manager to form a separate corporation to exploit the opportunity? Should the union rearrange the seniority tables in a particular way? These are more tractable questions, on which voluntary transactions are preferable to judicial guesses. Transaction-forcing remedies promote their resolution.

Notice that nothing in this approach distinguishes fiduciary duties from

---

[51] Guido Calabresi & A. Douglas Melamed, Property Rules, Liability Rules, and Inalienability: One View of the Cathedral, 85 Harv. L. Rev. 1089 (1972).

[52] Ian Ayres & Robert Gertner, Filling Gaps in Incomplete Contracts: An Economic Theory of Default Rules, 99 Yale L. J. 87 (1989).

[53] David D. Haddock, Fred S. McChesney, & Menahem Spiegel, An Ordinary Economic Rationale for Extraordinary Legal Sanctions, 78 Calif. L. Rev. 1 (1990).

446    THE JOURNAL OF LAW AND ECONOMICS

other high-transactions-cost cases. Farnsworth concluded that the use of disgorgement remedies in both contract and fiduciary cases "show[s] no coherent pattern."[54] The lack of pattern in the rules reinforces our conclusion that fiduciary duties are not a distinctive topic in law or economics. When actual contracts are reached, courts enforce them; when actual contracts are feasible, courts induce parties to bargain; when transactions costs are too high, courts establish the presumptive rules that maximize the parties' joint welfare. Contract and fiduciary duty lie on a continuum best understood as using a single, although singularly complex, algorithm.

[54] Farnsworth, Your Loss of My Gain? *supra* note 38, at 1369.