## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————
                                              )
NATIONAL RAILROAD                             )
PASSENGER CORPORATION,                        )
                                              )
            Plaintiff,                        )
                                              )
      v.                                      )      Civil Action No. 07-1263 (RBW)
                                              )
VEOLIA TRANSPORTATION                         )
SERVICES, INC., *et al*.,                     )
                                              )
            Defendants.                       )
—————————————————————)

### NOTICE OF INTERVENING AUTHORITY

Defendants Veolia Transportation Services, Inc. and Veolia Transportation, Inc. (collectively "Veolia") moved to dismiss the Complaint of Plaintiff National Railroad Passenger Corporation ("Amtrak") on August 9, 2007, and filed a reply brief in support of their motion on August 27. Since that time, a judge in this District has issued a decision that reinforces what Veolia argued in its motion to dismiss: that both of Amtrak's counts fail as a matter of law, and this case should be dismissed under Federal Rule of Civil Procedure 12(b)(6).

In *Elemary v. Holzmann*, Civil Action No. 07-654, 2008 U.S. Dist. LEXIS 8265, at *42 (D.D.C. Feb. 6, 2008) (attached as Exhibit 1), Judge Lamberth reconfirmed the hornbook rule that on a claim for tortious interference with prospective economic advantage, a plaintiff must allege that defendant knew of plaintiff's business relationship or expectancy, and acted with the intent of interfering with it. While the required knowledge and scienter may be "averred generally" under Rule 9(b), this "does not absolve plaintiffs of their duty to plead *some* facts from which the court may reasonably infer knowledge or another mental state." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007)). Because the plaintiff in *Elemary* made

only conclusory allegations, Judge Lamberth held that "[b]ecause she has not pleaded any *facts* from which the Court can reasonably infer [defendant] knew of the prospective economic advantage of which he allegedly deprived her – an essential element of her claim – the Court must dismiss her [tortious interference] claim under Federal Rule of Civil Procedure 12(b)(6)." *Id*. at *47.

Likewise, Amtrak pleads no *facts* in support of its claim that Veolia knew about its alleged business expectancy, or in support of its claim that Veolia acted with the intent of interfering with that alleged expectancy, rather than for the purpose of competing in the marketplace. Judge Lamberth's *Elemary* opinion reiterates the longstanding rules that dismissal of a tortious interference claim is mandated where plaintiff "pleads no *facts* directly suggesting" that the defendant knew of the alleged business expectancy, and that "a plaintiff must make a 'strong showing of intent'" to interfere with that expectancy. *Elemary*, 2008 U.S. Dist. LEXIS 8265, at *42-44 (quoting *Bennett Enters. v. Domino's Pizza*, 45 F.3d 493, 499 (D.C. Cir. 1995)). At the motion to dismiss stage, "plaintiff's '[f]actual allegations must be enough to raise a right to relief above the speculative level,' and mere 'formulaic recitation of the elements of a cause of action will not do.'" *Id*. at *42-43 (quoting *Twombly*, 127 S. Ct. at 1964-65)).

Yet a "formulaic recitation of the elements of a cause of action" is all that Amtrak puts forward on the crucial elements of knowledge and intent. Amtrak does not plead *any* facts supporting the notion that Veolia knew of a business expectancy between Amtrak and SFRTA, or that Veolia acted with the intent of thwarting Amtrak rather than with the intent of competing in the marketplace. Instead, Amtrak pleads pure conclusions. *See* Complaint ¶ 61 ("Amtrak possessed a valid business relationship or expectancy in the SFRTA Operations Contract."); *id*. ¶ 62 ("Veolia knew of Amtrak's valid business relationship or expectancy in the SFRTA

Operations Contract); *id.* ¶ 63 ("Veolia intentionally interfered with Amtrak's business relationship or expectancy in the SFRTA Operations Contract."); *id.* ¶ 64 ("Veolia's conduct was egregious, and not simply competitive."). Amtrak may be "entitled to all *reasonable* inferences in [its] favor, but the Court need not accept [its] unsupported, conclusory allegations." *Elemary*, 2008 U.S. Dist. LEXIS 8265, at *47 (emphasis in original). The wholly conclusory allegations in Amtrak's Complaint should meet the same fate as those of the plaintiff in *Elemary*: dismissal for failure to state a claim.

Similarly, as Veolia noted in its reply brief in support of its motion to dismiss, a plaintiff must sufficiently plead knowledge and intent to state a claim for aiding and abetting a breach of a fiduciary duty. (*See* Reply at 8.) Amtrak has failed to provide anything more than conclusory allegations in support of this claim. (*See id.*) This failure to plead *any* facts supporting knowledge or intent is fatal to Amtrak's aiding and abetting claim, and such claim should be dismissed as well.

Dated:  March 12, 2008

/s/ Thomas M. Henry
Thomas F. Cullen, Jr. (D.C. Bar No. 224733)
Thomas M. Henry (D.C. Bar No. 479001)
Thomas A. Bednar (D.C. Bar No. 493640)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001-2113
Telephone: (202) 879-3939
Facsimile: (202) 626-1700

*Attorneys for Defendants*
*Veolia Transportation Services, Inc., and*
*Veolia Transportation, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a true and correct copy of Defendants' Notice of Intervening Authority to be served electronically using the Court's Electronic Case Filing System, pursuant to Local Rule 5.4, on this 12th day of March 2008.


/s/ Thomas M. Henry_____
Thomas M. Henry


Gary A. Orseck, Esq.
Eva A. Temkin, Esq.
ROBBINS, RUSSELL, ENGLERT,
ORSECK, UNTEREINER & SAUBER LLP
1801 K Street, N.W., Suite 411-L
Washington, DC 20006

LEXSEE 2008 US DIST LEXIS 8265

**DR. HODA ELEMARY, pro se, Plaintiff, v. PHILIPP HOLZMANN A.G., et al., Defendants.**

**Civil Action No. 07-654 (RCL)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*2008 U.S. Dist. LEXIS 8265*

**February 6, 2008, Decided**

**SUBSEQUENT HISTORY:** Transfer denied by *Elemary v. Holzmann, 2008 U.S. Dist. LEXIS 8238 (D.D.C., Feb. 6, 2008)*

**COUNSEL:** [*1] DR. HODA ELEMARY, Plaintiff, Pro se, Laguna Niguel, CA.

For WACHOVIA BANK N.A., Defendant: Mark Butler Bierbower, LEAD ATTORNEY, HUNTON & WILLIAMS LLP, Litigation, Intellectual Property & Antitrust, Washington, DC; Brent L. Van Norman, HUNTON & WILLIAMS LLP, Norfolf, VA; Dianne M. Keppler, HUNTON & WILLIAMS, Washington, DC.

For B.L. HARBERT INTERNATIONAL, LLC, a Delaware Limited Liability Company, Defendant: Roger Steven Goldman, LATHAM & WATKINS, Washington, DC.

For HARBERT INTERNATIONAL ESTABLISHMENT, INC., a Liechtenstein Corporation, BILL L. HARBERT, SR., BILLY HARBERT, JR., Defendants: Matthew H. Lembke, BRADLEY ARANT ROSE & WHITE LLP, Birmingham, AL; Roger Steven Goldman, LATHAM & WATKINS, Washington, DC.

**JUDGES:** Signed by Royce C. Lamberth, United States District Judge.

**OPINION BY:** Royce C. Lamberth

**OPINION**

**MEMORANDUM OPINION**

This opinion addresses two Motions to Dismiss that raise several common issues.

Defendants Billy Harbert, Jr. ("Billy Harbert") and B.L. Harbert International, LLC ("HILLC") moved to dismiss all claims against them for lack of personal jurisdiction, improper venue, and/or failure to state a claim. The Court has considered defendants' motion [13], plaintiff's opposition thereto [17], defendants' [*2] reply [21], and the applicable law. For the reasons set forth below, the motion is hereby GRANTED, and all claims against these defendants are DISMISSED.

Defendants Bill L. Harbert, Sr. ("Bill L. Harbert") and Harbert International Establishment, Inc. ("HIE") moved separately to dismiss certain claims against them for lack of personal jurisdiction, improper venue, and/or failure to state a claim. The Court has considered defendants' motion [14], plaintiff's opposition thereto [18], defendants' reply [22], and the applicable law. For the reasons set forth below, the motion is hereby GRANTED in part and DENIED in part. Plaintiff's claim for violation of *18 U.S.C. section 1964* ("civil RICO") against Bill L. Harbert stands. Her claims against HIE and her termination in violation of public policy and fraud claims against Bill L. Harbert are DISMISSED.

**BACKGROUND**

In the late 1970s, the United States Agency for International Development ("USAID") made funds available to the Egyptian government to complete a wastewater project. (Compl. 9.) The Egyptian government awarded contracts for the project on what were ostensibly sealed, competitive bids. *See Miller v. Holzmann, No. 95-cv-1231-RCL, 2007 U.S. Dist. LEXIS 16105, at *15-17 (D.D.C. Mar. 6, 2007).* [*3] In reality, the pre-qualified bidders ("the Contractors") conspired to manipulate the bidding process by agreeing in advance which company would win each bid. *2007 U.S. Dist. LEXIS 16105 at *16-17.* The unsuccessful bidders would receive lucrative subcontracts or guarantees of success in bidding for future contracts, and the winning bids incor-

porated these "costs." *2007 U.S. Dist. LEXIS 16105 at *17*. As a result, USAID overpaid the winning bidders *and* compensated the losers. *Id.* When uncovered, this bid-rigging scheme prompted criminal charges against numerous individual and corporate defendants as well as a *qui tam* action under the False Claims Act ("FCA"), *31 U.S.C. §§ 3729-3732.* (Compl. 6.)

Defendant Bill L. Harbert, an Alabama construction magnate, participated in the bid-rigging scheme. (*See* Compl. 11.) He also devised a phantom equipment-lending transaction through which he laundered the scheme's profits. (*Id.* at 40.) In the criminal case, the Contractors pleaded guilty and paid a $ 54 million fine, which Bill L. Harbert began paying in February 2002, in part from personal funds. (*Id.* at 6.) Bill L. Harbert was also named in the *qui tam* action, but this Court dismissed all claims against Bill L. Harbert on statute of limitations [*4] grounds. (Order [854] in 95-cv-1231-RCL (May 4, 2007).)

Bill L. Harbert's son, defendant Billy Harbert, in association with defendant HILLC, also works in the construction industry. (Compl. 11.) Neither Billy Harbert nor HILLC was criminally charged or named as a defendant in the *qui tam* action.

During the wastewater project bidding process in the 1980s, plaintiff Dr. Hoda Elemary ("Elemary"), then an Egyptian citizen, served as the Contractors' liaison with the Egyptian government. (*Id.* at 10.) Her influence with then-Prime Minister Dr. Atef Sedky, her uncle, proved crucial to the Contractors' success in securing the contract. She contends that when she acted on the Contractors' behalf, defendants Bill L. Harbert, HIE, Billy Harbert, and HILLC either intended to engage in bid-rigging or were aware that others harbored such intentions. (*Id.* at 30.) Elemary claims they concealed these intentions from her to induce her to assist them. (*Id.* at 32.) Had she been aware of their plan, she would not have aided them. (*Id.*

Elemary next represented Bill L. Harbert before the Saudi Royal Board of Grievances in Saudi Arabia, from 1990 or 1991 to 1997 or 1998. (Incorp. Sched. ii, vi.) In April [*5] 2001 or 2002, he hired her to negotiate with the Department of Justice ("DOJ") concerning the criminal and civil cases then pending against him. (Compl. 27, 32.) At that time, she claims he and Billy Harbert concealed "the extent of their culpability in the bid-rigging scheme," and she was deceived about their involvement for some undefined period. (*Id.* at 14, 31.) Again, she asserts she would not have worked for Bill L. Harbert had she been aware of his culpability. (*Id.* at 32.)

On September 21, 2004, Elemary and Bill L. Harbert signed an agreement relating to Elemary's role as a negotiator, or "exclusive case manager," in the *qui tam*

action ("the September 21 Agreement"). (Compl. Ex. G at 4.) It defines her compensation for these duties: in addition to a monthly "fee," she was "unconditionally guaranteed to receive five percent (5%) . . . of any funds she save[d] Mr. Harbert from ultimately paying the government in a settlement" -- essentially, five percent of the difference between the government's then-current demand of $ 56 million and any ultimate settlement amount. (*Id.*

In March 2005, Elemary alleges she obtained a written offer from DOJ to settle the *qui tam* action for $ 15 [*6] million. (Compl. 23.) She asserts the "offer was acceptable to [Bill L. Harbert], but [Billy Harbert], acting in his personal capacity and on behalf of HILLC, caused it to be rejected." (*Id.* Billy Harbert "declined to obey his father's wishes" and "insisted he could a do a better job than [Elemary] in negotiating a lower [settlement] figure." (*Id.* at 7.) Elemary claims Billy Harbert feared his father would disinherit him in favor of her and thus acted "out of sheer malice towards [her]." (*Id.* at 8, 23.) She further claims he threatened her career and life repeatedly between 1997 and 2006 and actively sought "to destroy [her] financially and physically" and in her career and reputation. (*Id.* at 9, 36.)

At some point before November 2004, Elemary acquired banking records implicating the Contractors in the bid-rigging scheme. (*Id.* at 12, 28.) Thereafter, she alleges that Bill L. Harbert, Billy Harbert, HILLC, and HIE attempted to coerce her to conceal these documents from DOJ or to resign her negotiating position, and that they later threatened her life. (*Id.* When she persistently refused to withhold evidence from the government, Bill L. Harbert "terminated [her] employment" on April 5, [*7] 2005. (*Id.* at 28.) Nine days later, Elemary suffered a broken shoulder when a stranger assaulted her outside her California residence. (*Id.* at 38.) She claims Bill L. Harbert and/or Billy Harbert -- in both his personal capacity and as HILLC's agent -- dispatched this "hired Myrmidon" to dissuade her from filing the present action or from providing the incriminating records to DOJ and/or to reclaim those records. (*Id.* at 13-14, 37.)

Elemary filed the present action on April 10, 2007. Her complaint names seven defendants and lists seven causes of action: (1) tortious interference with prospective economic advantage ("TIPEA") against Billy Harbert and HILLC; (2) breach of contract against Bill L. Harbert; (3) quantum meruit against Bill L. Harbert; (4) termination in violation of public policy against Bill L. Harbert; (5) fraud against Sabbia Aktiengesellschaft, Philipp Holzmann, A.G., [1] Bill L. Harbert, HIE, Billy Harbert, and HILLC; (6) civil RICO against Billy Harbert; and (7) civil RICO against Bill L. Harbert.

1    This Court has dismissed both Sabbia Akti-engesellschaft and Philipp Holzmann, A.G., from this action for lack of service. (Order [27] in 07-cv-00654 (Jan. 7, 2008) (dismissing [*8] Holzmann); Order [29] in 07-cv-00654 (Jan. 31, 2008) (dismissing Sabbia).)

On June 27, 2007, Billy Harbert, Jr. and HILLC, and Bill L. Harbert and HIE, filed separate motions to dismiss some or all of the various claims arrayed against them. These motions raise common legal issues -- in particular, personal jurisdiction and the adequacy of Elemary's statement of her claims. [2] Accordingly, the Court addresses them here together.

2    Both motions also contest Elemary's choice of venue, but given the Court's resolution of the defendants' other objections, discussion of this issue is unnecessary and would be cumulative.

## DISCUSSION

I. Personal Jurisdiction

A. Applicable Law

A plaintiff must establish the court's jurisdiction over each defendant through specific allegations in his complaint. *Kopff v. Battaglia, 425 F. Supp. 2d 76, 80-81 (D.D.C. 2006)* (Bates, J.). He may neither "rely on conclusory allegations" nor "aggregate factual allegations concerning multiple defendants in order to demonstrate personal jurisdiction over any individual defendant." *Id. at 81* (citing *GTE New Media Servs., Inc. v. Ameritech Corp., 21 F. Supp. 2d 27, 36 (D.D.C. 1998)*, and *Rush v. Savchuk, 444 U.S. 320, 331-32, 100 S. Ct. 571, 62 L. Ed. 2d 516 (1980))*. [*9] In resolving a challenge to personal jurisdiction, "the Court may assume [] the [plaintiff's] claims are meritorious," but it need not give credence to factual allegations that are directly contradicted by affidavit. *Id.*

"In a diversity case," such as this one, "the federal district court's jurisdiction over a defendant is coextensive with that of a District of Columbia court." *Helmer v. Doletskaya, 364 U.S. App. D.C. 178, 393 F.3d 201, 205 (D.C. Cir. 2004)*. Thus, jurisdiction must satisfy both the District of Columbia long-arm statute and due process. *United States v. Ferrara, 311 U.S. App. D.C. 421, 54 F.3d 825, 828 (D.C. Cir. 1995)*.

## 1. The District of Columbia Long-Arm Statute

The District of Columbia long-arm statute provides that "[a] District of Columbia court may exercise jurisdiction over a person, who acts directly or by an agent, as to a claim arising" from the defendant's

(3) causing tortious injury in the District of Columbia by an act in the District of Columbia; [or]

(4) causing tortious injury in the District of Columbia by an act outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services [*10] rendered, in the District of Columbia . . . .

*D.C. Code § 13-423(a)* (2007). [3] The latter provision, *subsection (a)(4)*, provides for narrower jurisdiction than does the *Due Process Clause*: "[t]he drafters of this provision apparently intended that [it] would not occupy all of the constitutionally available space" and thus required a "plus factor" -- the regular solicitation, persistent conduct, or substantial revenue mandated in its final clause. *Crane v. Carr, 259 U.S. App. D.C. 229, 814 F.2d 758, 762 (D.C. Cir. 1987)*.

3    The statute also lists as qualifying activities: "transacting any business in the District of Columbia," "contracting to supply services in the District of Columbia," "having an interest in, using, or possessing real property in the District of Columbia," "contracting to insure or act as surety for or on any person, property, or risk, contract, obligation, or agreement located, executed, or to be performed in the District of Columbia at the time of contracting, unless the parties provide otherwise in writing," or having a "marital or parent and child relationship in the District of Columbia." *D.C. Code § 13-423(a)* (2007).

Elemary neither argues nor pleads facts suggesting that any of these provisions [*11] applies to any defendant here. (*See* Mem. Opp. Billy Harbert and HILLC Mot. to Dismiss 13-14.)

Both *subsections (a)(3)* and *(a)(4)* require tortious injury in the District of Columbia. Generally, "emotional or reputational injury occurs where the plaintiff lives or works . . . [but] District of Columbia law does not establish where economic injury occurs." *Helmer, 393 F.3d at 208*. The Court of Appeals confronted this open question in *Helmer*, where a District domiciliary who lived and worked in Russia sued his former girlfriend, a Russian citizen, for fraud. *Id. at 204*. He alleged she had "fraudulently induced him to entrust her with the purchase of [an] apartment [in Moscow] and to lend her financial support by concealing material facts about her personal background." *Id.* Helmer contended he had suffered economic injury in the District because "'economic harm is suffered

at the claimant's home, meaning domicile.'" *Id. at 208.* After reviewing precedents from other jurisdictions, the Court of Appeals focused, instead, on "the original events that caused the alleged injury to Helmer" -- Doletskaya's use of Helmer's credit cards, Helmer's payment of her charges on them, and the apartment [*12] purchase. *Id. at 209.* Because these events all occurred outside the District of Columbia, the court concluded Helmer had not demonstrated Doletskaya's fraud had caused him injury here. *Id.*

In addition to tortious injury, both *subsections (a)(3)* and *(a)(4)* require an "act." *D.C. Code Ann. § 13-423(a)* (2007). "The 'act,' of course, is the act of the alleged tortfeasor" -- for example, "uttering defamatory statements." *Margoles v. Johns, 157 U.S. App. D.C. 209, 483 F.2d 1212, 1218 (D.C. Cir. 1973).* "[T]hat other third party acts were necessary to consummate the tort, or that the injury itself took place in the District," is not dispositive. *Id.*

Finally, the long-arm statute also provides that "[w]hen jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him." *D.C. Code § 13-423(b)* (2007). This "requirement of a nexus between the plaintiff's claim and the defendant's business activities in the forum jurisdiction" parallels the demands of due process. *Shoppers Food Warehouse v. Moreno, 746 A.2d 320, 332 (D.C. 2000).*

### 2. The Due Process Clause

Due process circumscribes courts' power over defendants, limiting their [*13] reach to those persons who have meaningful "contacts, ties, or relations" with the state in which the court sits. *Int'l Shoe Co. v. Washington, 326 U.S. 310, 319, 66 S. Ct. 154, 90 L. Ed. 95 (1945).* This "minimum contacts" requirement assures a court's exercise of power will comport with "our traditional conception of fair play and substantial justice," *id. at 320,* so that a defendant will have "fair warning that a particular activity may subject [him] to the jurisdiction of a foreign sovereign," *Shaffer v. Heitner, 433 U.S. 186, 218, 97 S. Ct. 2569, 53 L. Ed. 2d 683 (1977)* (Stevens, J., concurring in the judgment).

A federal court's jurisdiction over a person, may be either general -- "adjudicatory authority to entertain a suit against a defendant without regard to the claim's relationship *vel non* to the defendant's forum-linked activity" -- or specific -- authority "to entertain controversies based on acts of a defendant that touch and concern the forum." *Steinberg v. Int'l Criminal Police Org., 217 U.S. App. D.C. 365, 672 F.2d 927, 928 (D.C. Cir. 1981).* In the latter case, the "'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his ac-

tivities at residents of the forum, and the litigation results from alleged injuries that 'arise [*14] out of or relate to' those activities." *Burger King v. Rudzewicz, 471 U.S. 462, 472, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)* (internal citations omitted).

### B. Analysis

Billy Harbert and HILLC contest this Court's jurisdiction as to all claims against them. Billy Harbert is an Alabama citizen, and HILLC is a Delaware limited liability company with its principal place of business in Alabama. (Compl. 1-2.) Billy Harbert claims his sole connection with the District of Columbia arises from annual visits to meet with State Department officials, in his capacity as HILLC's president, concerning overseas construction contracts. (Billy Harbert Decl. 1.) [4] He avers that HILLC has never operated in the District nor been authorized to do business here. (*Id.* at 2.)

> 4    Billy Harbert and HILLC attached this declaration to the memorandum of law accompanying their motion to dismiss.

HIE challenges the Court's jurisdiction as to the sole claim levied against it, for fraud. According to Elemary's complaint, HIE is a Liechtenstein corporation having its principal place of business in the Swiss Confederation. [5] (Compl. 2.) HIE claims it is a "shelf" corporation, one created simply to preserve a corporate name, that has never conducted any business [*15] whatsoever, either in the District or elsewhere. (Mem. Supp. Bill L. Harbert and HIE Mot. to Dismiss 6.)

> 5    HIE insists it is an Alabama corporation with its principal place of business in Alabama. (Mem. Supp. Bill L. Harbert and HIE Mot. to Dismiss 5.) For present purposes, it suffices that HIE was not incorporated in the District and does not operate its principal place of business here.

### 1. Plaintiff's TIPEA Claim: Billy Harbert & HILLC

#### a. Jurisdictional Allegations

Elemary alleges that by obstructing the settlement she had negotiated with DOJ on his father's behalf, Billy Harbert intentionally and knowingly deprived her of the benefit she expected to receive under the September 21 Agreement. (Compl. 6-7, 22-23.) She asserts this agreement was "negotiated into [its] final form[] and executed in Washington, D.C." (*Id.* at 21.)

Her complaint describes more specifically how Billy Harbert accomplished the alleged interference: "acting in his personal capacity and on behalf of HILLC, [he] caused [the settlement] to be rejected" and then "negoti-

ated through counsel for several months . . . with the Department of Justice." (*Id.* at 7, 23.) DOJ, managed both the criminal action and the government's [*16] intervention in the *qui tam* action and maintains its headquarters in the District of Columbia.

Elemary also identifies her consequent damages. In her opposition to Billy Harbert and HILLC's motion, Elemary asserts she suffered injury to her reputation: "Plaintiff did suffer injuries in this district, as the actions alleged in the Complaint harmed Plaintiff's standing in the U.S. Senate, one of her major theatres [sic] of operation." (Mem. Opp. Billy Harbert and HILLC Mot. to Dismiss 13.) This allegation also appears, if less explicitly, in her complaint. [6] (*See, e.g.*, Compl. 13 ("Defendants' damages inflicted on Plaintiff arose through . . . completely and intentionally discrediting Plaintiff in the presence of [various U.S. government officials] who had earlier supported Plaintiff's activities").) Although the purported connection between this injury and the alleged tortious interference is likewise inexplicit, injury to reputation is a cognizable element of damages on a TI-PEA claim. *Restatement (Second) of Torts § 774A* (1979). Further, though she is a California citizen, Elemary alleges she has worked in the District of Columbia and has lived there six months out of every year for [*17] the past thirty years. (Compl. 19 (listing her part-time residence in the District as a fact "on jurisdiction and venue").)

> [6] Her complaint *does* expressly assert that the alleged tortious interference deprived her of her "success fee" under the September 21 Agreement, an amount she calculates as $ 2,050,000. (Compl. 23.) In its personal jurisdiction analysis, this Court will generally accept Elemary's allegations as true. *Kopff, 425 F. Supp. 2d at 80-81*. But to the extent she claims she suffered this economic harm in the District of Columbia, principles of equity prompt the Court to disregard her allegation.

> "Where a party assumes a certain legal position in a proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *Davis v. Wakelee, 156 U.S. 680, 689, 15 S. Ct. 555, 39 L. Ed. 578 (1895).* Courts may invoke this equitable doctrine -- judicial estoppel -- at their discretion, but relevant considerations include: (1) whether the party's present position is clearly inconsistent with its previous position; (2) whether the [*18] party "succeeded in persuading a court to accept the

party's earlier position"; and (3) whether "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire v. Maine, 532 U.S. 742, 750-51, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001).*

In July 2006, Elemary filed a complaint in the Central District of California that alleged the same or substantially similar claims against the present defendants and others. (*See* First Am. Compl. in CV06-4723 RGK (C.D. Cal. Oct. 30, 2006) (alleging, *inter alia*: (1) fraud against Bill L. Harbert, HIE, Billy Harbert, HILLC, and numerous other defendants; (2) civil RICO against Bill L. Harbert, Billy Harbert, and others; (3) intentional interference with contract against Billy Harbert, HILLC, and others; (4) breach of contract against Bill L. Harbert; (5) quantum meruit against Bill L. Harbert; and (6) termination in violation of public policy against Bill L. Harbert and others).) Moreover, she complained of near-precisely the same injuries she cites here: loss of her "success fee" under the September 21 Agreement, breach of contract damages, and loss of future earning ability. (*Id.* at 16-17, 26, 27, 29, 30, 31-32.)

To [*19] persuade the California district court that venue there was proper, Elemary asserted her "loss of income, both arising from the damages to her standing within the political community resulting from the fraud and her loss of income from the September 21 Agreement resulting from the wrongful termination of her employment, as well as her emotional distress, took place *in this District*." (Mem. Opp. Mot. to Dismiss in CV06-4723 RGK at 10 (C.D. Cal. Feb. 5, 2007) (emphasis added).) On its face, this position contradicts her present argument that she suffered these injuries in the District of Columbia.

The California district court accepted Elemary's position, directly quoting her brief in finding that venue was proper in the Central District of California. (Civil Minutes -- General in CV06-4723 RGK at 3 (C.D. Cal. Feb. 23, 2007).)

To permit Elemary to assert an inconsistent position here would impose an unfair detriment on the defendants. Over Elemary's objections, the California district court transferred venue to the Northern District of Alabama, and she voluntarily dismissed the case on March 22, 2007. (Compl. 4.) Less than three weeks later, she filed the in-

stant suit. Billy Harbert, HILLC, [*20] and HIE no doubt expended significant resources to meet Elemary's complaint against them in California. She now seeks to force them to litigate the same matters three thousand miles away, in a different, but still foreign, jurisdiction. To allow Elemary to tailor her jurisdictional allegations to her litigation strategy's changing geography would unfairly prejudice the defendants.

Finally, as the Supreme Court has explained, judicial estoppel "'protect[s] the integrity of the judicial process' by 'prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" *New Hampshire, 532 U.S. at 749-50* (internal citations omitted). Forum shopping directly implicates this integrity, and this Court will not encourage it by permitting Elemary to revise her factual allegations to fit her newly chosen forum.

Accordingly, as to all of her claims, Elemary is estopped from arguing she suffered loss of her "success fee" under the September 21 Agreement, breach of contract damages, or loss of future earning ability in the District of Columbia.

Though Elemary's allegations concerning damage to her reputation also appear -- verbatim -- in her California complaint (*see* [*21] First Am. Compl. in CV06-4723 RGK at 10, 17 (C.D. Cal. Oct. 30, 2006)), she never expressly argued she had suffered *this* injury in California. As such, the Court will not estop her from claiming it occurred in the District of Columbia.

**b. Analysis**

Construed liberally, Elemary's complaint establishes that this Court has jurisdiction over Billy Harbert and HILLC as to her TIPEA claim.

Because her complaint alleges both tortious acts and tortious injury in the District of Columbia, she has satisfied long-arm statute *subsection (a)(3). D.C. Code § 13-423(a)(3)* (2007). Under that provision, the relevant conduct is that "of the alleged tortfeasor," *Margoles, 483 F.2d at 1218*, who may act "directly or through an agent." *D.C. Code § 13-423(a)* (2007). Here, Elemary alleges that Billy Harbert -- in part via an agent -- obstructed a proposed agreement between his father and a federal agency by communicating and negotiating directly with that agency. These interactions concerned a lawsuit then pending in the District of Columbia. Elemary does not specify by what means Billy Harbert caused the agreement's rejection nor where the negotiations occurred. *Cf. Moncrief v. Lexington Herald-Leader Co., 257 U.S. App. D.C. 72, 807 F.2d 217, 219, 221 (D.C.*

*Cir. 1986)* [*22] (where libelous statements were printed in Maryland and mailed from there into the District of Columbia, the tortious "act" occurred in Maryland); *Margoles, 483 F.2d at 1218* (where defamatory statements were made in Michigan but transmitted via telephone to a District of Columbia listener, the utterance in Michigan was the relevant tortious "act"). Nonetheless, given that DOJ headquarters are in the District of Columbia, and that the negotiations concerned a lawsuit pending here, the Court may reasonably infer that some part of the alleged tortious conduct occurred in the District.

Elemary has also met *subsection (a)(3)*'s second requirement, tortious injury in the District of Columbia. *See D.C. Code § 13-423(a)(3)* (2007). She alleges that Billy Harbert and HILLC's tortious interference damaged her reputation, and that for the past thirty years, she has lived and worked in the District of Columbia for a substantial portion each year. Because "emotional or reputational injury occurs where the plaintiff lives or works," *Helmer, 393 F.3d at 208*, Elemary has alleged tortious injury in the District.

Finally, by meeting *subsection (a)(3)*'s requirement of tortious conduct within the District, [*23] Elemary has necessarily established that her claim arises from the defendants' alleged forum contacts, as with *subsection (b)* prescribes. *See D.C. Code § 13-423(b)* (2007). Thus, Elemary's allegations satisfy the District of Columbia long-arm statute.

Due process does not compel a contrary conclusion. First, because Billy Harbert's contacts with this forum, though minimal, gave rise to Elemary's TIPEA claim, they support specific jurisdiction. Billy Harbert claims his sole connection with the District of Columbia consists of annual visits to meet with State Department officials, in his capacity as HILLC's president, concerning overseas construction contracts. (Billy Harbert Decl. 1.) But Elemary's complaint alleges another contact between Billy Harbert and the District -- his obstruction and usurpation of her negotiations with DOJ, which Elemary's allegations suggest transpired in the District. Again according to the complaint, this conduct's object was "to avoid paying Plaintiff [the] substantial success fee to which she was entitled under" an agreement negotiated and executed in the District of Columbia. (Compl. 7, 19.) While the Court need not accept as true allegations contradicted [*24] by affidavit, Billy Harbert's declaration does not directly dispute this account. Elemary's complaint thus alleges relevant "acts of a defendant that touch and concern [this] forum." *Steinberg, 672 F.2d at 928.*

Second, requiring Billy Harbert and HILLC to litigate Elemary's TIPEA claim in this forum would not

offend fundamental fairness. Assuming that Billy Harbert acted as Elemary's complaint describes, both he and the entity on whose behalf he acted should have had "fair warning" that his conduct would subject him jurisdiction in the District of Columbia. *Shaffer, 433 U.S. at 218.*

Hence, because Elemary's jurisdictional allegations satisfy due process as well as the District of Columbia long-arm statute, the Court may exercise personal jurisdiction over both Billy Harbert and HILLC on her TI-PEA claim.

### 2. Plaintiff's Fraud Claim: Billy Harbert, HILLC, & HIE

#### a. Jurisdictional Allegations

Elemary contends that when she aided the Contractors in securing the wastewater project contract, defendants Bill L. Harbert, HIE, Billy Harbert, Jr., and HILLC either intended to engage in bid-rigging or were aware that others harbored such intentions. (Compl. 30.) She claims they concealed these intentions [*25] from her to induce her assistance, and had she been aware of their intentions, she would not have rendered it. (*Id.* at 32.) Later, when she negotiated with DOJ for Bill L. Harbert, Elemary claims he and Billy Harbert concealed "the extent of their culpability in the bid-rigging scheme," and that she was deceived concerning their involvement for some undefined period. (*Id.* at 14, 31.) Again, she asserts she would not have represented Bill L. Harbert in these matters had she known of his culpability. (*Id.* at 32.)

Elemary's complaint dwells extensively on her alleged damages from these actions. In short, she claims her innocent, fraudulently-induced involvement in the Contractors' bid-rigging scheme, and in their subsequent efforts to evade criminal and civil liability, damaged her reputation. [7] (*See* Compl. 32-33 (defendants' conduct "severely tarnished the status of Plaintiff's reputation as an honest broker between the United States business community and the Middle East as well as within the U.S. Senate").)

> [7] Elemary further asserts the taint of her association with the Contractors has "destroyed [her] source of income for life." (Compl. 32.) As discussed above, she is estopped from claiming [*26] she suffered this economic injury in the District of Columbia. *See supra* note 8.

#### b. Analysis

Even accepting these allegations as true, Elemary has not pleaded sufficient facts to establish this Court's jurisdiction over Billy Harbert, HILLC, or HIE on her fraud claim.

First, no provision of the District of Columbia long-arm statute is satisfied for any of the three defendants. As discussed above, because "reputational injury occurs where the plaintiff lives or works," *Helmer, 393 F.3d at 208*, and Elemary claims she worked in the District of Columbia, she has alleged tortious injury in the District. But because her complaint does not clearly elucidate the acts comprising the fraud, let alone hint at where such acts took place, she has not established tortious *conduct* in the District. *See D.C. Code § 13-423(a)(3)* (2007). Alternatively, assuming the ill-defined acts of fraud occurred outside the District, Elemary has not adequately pleaded a "plus factor" for any defendant. Nothing in her complaint suggests Billy Harbert, HILLC, or HIE "regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services [*27] rendered, in the District of Columbia." [8] *See id. § 13-423(a)(4).*

> [8] Opposing the motions to dismiss, Elemary offers new factual allegations intended to rectify this omission, referencing "Defendants' constant [] appearances in Washington in connection with the False Claims Case" and repeated meetings with USAID in the District -- in the late 1980s and early 1990s -- in connection with the wastewater project contract. (Mem. Opp. Billy Harbert and HILLC Mot. to Dismiss 14.) These fresh assertions do not satisfy the "plus factor" requirement. First, neither Billy Harbert nor HILLC was a defendant in the *qui tam* action, so it is unclear how Elemary's first allegation applies to them. Moreover, logic dictates that defending a lawsuit cannot comprise the "persistent course of conduct" the long-arm statute requires, lest a defendant once involuntarily haled into court in the District be thereafter always subject to suit here. Second, Elemary's complaint does not specifically allege that Billy Harbert and HILLC, an entity formed in 1999, participated in the bid-rigging scheme, and it is unclear who she now claims attended the USAID meetings. (*See id.* at 14.) Indeed, by improperly "aggregat[ing] [*28] factual allegations concerning multiple defendants," Elemary fails to show a "plus factor" for any individual defendant. *Kopff, 425 F. Supp. 2d at 80-81* (citing *Rush v. Savchuk, 444 U.S. 320, 331-32, 100 S. Ct. 571, 62 L. Ed. 2d 516 (1980)).*

In a declaration supporting his motion to dismiss, Billy Harbert asserts he visits the District of Columbia "an average of once a year" to meet with State Department officials, in his capacity as HILLC's president, concerning overseas construction contracts. (Billy Harbert Decl. 1.) These

visits do not comprise a "persistent course of conduct" by Billy Harbert and HILLC under *subsection (a)(4)* because, as Billy Harbert and HILLC argue, the "government contacts exception" exempts a defendant's federal government contacts from the personal jurisdiction calculus. *Crane v. Carr, 259 U.S. App. D.C. 229, 814 F.2d 758, 761 (D.C. Cir. 1987).*

As Elemary accurately observes, the Court of Appeals has indicated that this safe harbor provision may not be available to a defendant who has used the government contacts "as an instrumentality of the alleged fraud." *Naartex Consulting Corp. v. Watt, 232 U.S. App. D.C. 293, 722 F.2d 779, 787 (D.C. Cir. 1983).* Absent "credible and specific allegations" to this effect, however, the government contacts [*29] doctrine still applies. *See id.* Elemary offers the following:

> Defendants used the Cairo Waste Water Project financed by the USAID as a vehicle for the bid-rigging which led to the False Claims Case and to Plaintiffs [sic] damages alleged herein when it ultimately developed that the clients for whose benefit Plaintiff used her United States and Middle East contacts to obtain lucrative contracts turned around and defrauded both the United States government and the people of Egypt and, in the process, destroyed Plaintiff's reputation and credibility.

(Mem. Opp. Billy Harbert and HILLC Mot. to Dismiss 14.) This allegation misses the mark because Elemary is not a *qui tam* plaintiff. It is irrelevant whether at some point in time, Billy Harbert's annual State Department visits furthered the Contractors' scheme to defraud the United States and Egyptian governments. Elemary must "credibl[y] and specific[ally]" allege how these meetings were integral to fraud perpetrated against *her*. Because she has established no clear nexus between the government contacts admitted in Billy Harbert's declaration and his alleged concealment of his intentions and/or culpability *from her*, the doctrine removes these [*30] contacts from the personal jurisdiction analysis.

Moreover, even if Billy Harbert's annual visits did comprise a "persistent course of conduct"

within long-arm statute *subsection (a)(4)*, because Elemary's fraud claim does not "arise from" Billy Harbert's State Department visits, they will not satisfy the long-arm statute. *See D.C. Code § 13-423(b) (2007).*

Nor can Elemary establish specific jurisdiction over Billy Harbert, HILLC, or HIE. She argues that Billy Harbert and HILLC [9] "purposefully directed" their conduct toward this forum because they knew she lived and worked in the District and intended to cause her harm here. (Mem. Opp. Billy Harbert and HILLC Mot. to Dismiss 11-14 (citing *Burger King, 471 U.S. at 479-80*).) Relying on Ninth Circuit case law, Elemary then proceeds through a multi-part, three-pronged "purposeful direction" test. (*See id.* She rests her analysis on one principal factual allegation: "[a]t all relevant times, Billy Harbert [] knew that Plaintiff had residence in the District of Columbia" and thus knowingly directed his "wrongful conduct" into this forum. (*Id.* at 12.)

> 9    As to HIE, she asserts only that it "is an instrumentality of" Billy Harbert because he is the [*31] corporation's registered agent for service of process in Alabama. (Mem. Opp. Bill L. Harbert and HIE Mot. to Dismiss 3; Bill L. Harbert and HIE Mot. to Dismiss Ex. 2 at 1.)

The problem with Elemary's analysis lies once again in her pleading, a topic to be revisited below. As to her fraud claim, she has not identified the "wrongful conduct" to which she refers. Her complaint asserts, in essence, that some defendants, somehow, concealed some facts from her, for some period of time. (*See* Compl. 14, 29-33.) Her brief provides no additional clarity. (*See* Mem. Opp. Billy Harbert and HILLC Mot. to Dismiss 11-12 (noting only that defamation, intentional infliction of emotional distress, and invasion of privacy are considered "wrongful acts").) These allegations are simply too vague to ground her claim on "acts of [any particular] defendant that touch and concern the forum." *Steinberg, 672 F.2d at 928.* A court cannot determine whether a defendant had "fair warning that a particular activity [would] subject [him] to the jurisdiction of a foreign sovereign" unless it can determine what that activity was. *See Shaffer, 433 U.S. at 218* (Stevens, J., concurring in the judgment).

Thus, due process [*32] and the District of Columbia long-arm statute preclude the Court from exercising personal jurisdiction over Billy Harbert, HILLC, or HIE as to Elemary's fraud claim.

### 3. Plaintiff's Civil RICO Claim: Billy Harbert

a. Jurisdictional Allegations

Elemary describes the purported basis for this claim at length. (*See* Compl. 33-38.) To summarize, she contends: (1) during repeated telephone conversations on unspecified dates, Billy Harbert, personally and through his attorney, Lavine, attempted to convince Elemary to "premature[ly] terminat[e]" the September 21 Agreement, (*id.* at 34); (2) on or about April 2002, Billy Harbert and Lavine obstructed Elemary's efforts to negotiate with DOJ; (3) between 1997 and 2006, Billy Harbert repeatedly threatened Elemary's life and career, (*id.* at 36); (4) in March 2005, Billy Harbert orchestrated an automobile "accident" in Alabama in which Elemary's attorney nearly died, (*id.* at 37); and (5) in April 2005, Billy Harbert dispatched a "hitman" to Elemary's California home to obtain records from her, and when this person pushed her, she fell and suffered a broken shoulder, (*id.* at 37-38).

Elemary's complaint alleges she "was injured in her business and property" [*33] due to this conduct. (*Id.* at 39.) In opposing the motion to dismiss, she explains that her broken shoulder prevented her from working for seven months and that the injury to her business thus consists of lost earnings. [10]

> 10 The Court has estopped Elemary from arguing she suffered certain injuries -- including lost earnings -- in the District of Columbia based on her inconsistent claims in a prior lawsuit. There, however, she expressly cited only "loss of income, both arising from the damages to her standing within the political community resulting from the fraud and her loss of income from the September 21 Agreement resulting from the wrongful termination of her employment" as having occurred in California. (Mem. Opp. Mot. to Dismiss in CV06-4723 RGK at 10 (C.D. Cal. Feb. 5, 2007).) She raised an identical civil RICO claim against Billy Harbert in that action but did not specifically site her consequent lost income in California. As such, estoppel does not apply to *these* lost earnings.

**b. Analysis**

Once again, Elemary's allegations satisfy no provision of the District of Columbia long-arm statute because they do not establish she suffered tortious injury in the District. *See D.C. Code § 13-423(a)(3)*, [*34] *(4)* (2007). Because "District of Columbia law does not establish where economic injury occurs," the Court will look to "the original events that caused the alleged injury." *Helmer, 393 F.3d at 208, 209.* Here, Elemary's injury flowed from conduct outside the District of Columbia [11] : a "hitman," allegedly dispatched by Alabama resident Billy Harbert, assaulted her outside her home in California. (Compl. 37-38.)

> 11 Elemary does not suggest Billy Harbert (or his purported agent) initiated telephone calls to her from within the District, nor that she was present there when she received them. (*See* Compl. 34.) Nor does she allege Billy Harbert made any specific threat against her life or career within the District. (*See id.* at 36.) Her attorney's allegedly pre-arranged automobile accident occurred in Alabama. (*Id.* at 37.) Indeed, of the conduct she describes as forming the basis for her civil RICO claim, only the obstruction of her efforts to negotiate with DOJ could conceivably be characterized as having occurred in the District of Columbia. (*See id.* at 35-36.)

Further, Elemary has never argued this particular economic injury occurred in the District. Her complaint does not address where [*35] the harm was suffered, and in opposing the motions to dismiss, she relies solely on the harm to her "standing in the U.S. Senate" to bring her claims within the ambit of the District's long-arm statute. (*See id.* at 39; Mem. Opp. Billy Harbert and HILLC Mot. to Dismiss 13.) Hence, the Court concludes Elemary has not demonstrated tortious injury in the District of Columbia as to her civil RICO claim.

Because her factual allegations do not satisfy the District of Columbia long-arm statute, this Court lacks personal jurisdiction over Billy Harbert as to Elemary's civil RICO claim.

**C. Conclusion**

For the reasons set forth above, the Court concludes it may exercise personal jurisdiction over Billy Harbert and HILLC as to Elemary's TIPEA claim but otherwise lacks jurisdiction over Billy Harbert, HILLC, and HIE as to her fraud claim.

**II. Failure to State a Claim**

**A. Applicable Law**

In resolving a motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)*, the Court must ascertain whether the challenged complaint adequately states a claim on which relief may be granted. *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982).* Generally, [*36] the Federal Rules require only "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)* (quoting *Fed. R. Civ. Pro. 8(a)(2)*). In measuring a complaint against

this standard, the court must construe all allegations therein and draw all reasonable inferences in the plaintiff's favor. *Scheuer, 416 U.S. at 236; United States ex rel. Harris v. Bernad, 275 F. Supp. 2d 1, 5 (D.D.C. 2003).* Indeed, courts long adhered to the rule that "a complaint should not be dismissed for failure to state a claim unless it appears *beyond doubt* that the plaintiff can prove *no set of facts* in support of his claim which would entitle him to relief." *Conley, 355 U.S. at 45-46* (emphasis added).

Recently, however, the U.S. Supreme Court recast this language as but "an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1969, 167 L. Ed. 2d 929 (2007).* While a complaint need not plead "detailed [*37] factual allegations," the factual allegations it does include "must be enough to raise a right to relief above the speculative level" and to "nudge[] [] claims across the line from conceivable to plausible." *Id. at 1964-65, 1974.* As the Court observed, *Federal Rule of Civil Procedure 8(a)(2)* requires a "showing" that the pleader is entitled to relief. *Id. at 1965 n.3.* Though conclusory assertions may afford a defendant "fair notice" of the nature of a plaintiff's claim, only factual allegations can clarify the "grounds" on which that claim rests. *Id.*

Indeed, in evaluating a motion to dismiss, the court need not accept plaintiffs' unsupported inferences, nor "legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc'ns Corp., 305 U.S. App. D.C. 60, 16 F.3d 1271, 1276 (D.C. Cir. 1994).* The court may consider "documents attached as exhibits or incorporated by reference in the complaint and matters about which the court may take judicial notice" in addition to the complaint, itself. *Gustave-Schmidt v. Chao, 226 F. Supp. 2d 191, 196 (D.D.C. 2002)* (Walton, J.).

**B. Analysis**

12

    12   In addition to civil RICO, Elemary asserts several common law tort causes of action. The defendants argue that under [*38] District of Columbia choice of laws rules, the Court should apply Alabama substantive law to Elemary's common law tort claims, but their motions nonetheless analyze those claims under District of Columbia law. (Mem. Supp. Billy Harbert and HILLC Mot. to Dismiss 15 n.18; Mem. Supp. Bill L. Harbert and HIE Mot. to Dismiss 8 n.10.) Elemary does not express a preference for any state's substantive law, and her oppositions cite both California and District of Columbia law.

"Under a choice of law analysis," District of Columbia courts will apply "another state's law when (1) its interest in the litigation is substantial and (2) 'application of District of Columbia law would frustrate the clearly articulated public policy of that state.'" *Herbert v. District of Columbia, 808 A.2d 776, 779 (D.C. 2002)* (quoting *Kaiser-Georgetown Cmty. v. Stutsman, 491 A.2d 502, 509 (D.C. 1985)).* Further, in tort actions, District of Columbia courts often look to the factors set forth in *Restatement (Second) of Conflicts section 145:* (1) where the injury occurred; (2) where the tortious conduct occurred; (3) the parties' domiciles; and (4) where the parties' relationship is centered. *Hercules & Co. v. Shama Restaurant Corp., 566 A.2d 31, 41 (D.C. 1989)* [*39] (citing *Restatement (Second) of Conflict of Laws § 145 (1971)).*

Each of Elemary's claims potentially implicates the interests of California, her domicile, and Alabama, where both Bill L. Harbert and Billy Harbert are domiciled. Yet as to each claim analyzed here -- TIPEA, termination in violation of public policy, and fraud -- the District of Columbia's interest is most substantial.

First, as concluded above, her TIPEA claim rests on injury in the District and tortious conduct in the District. Though Elemary is a California domiciliary, her complaint asserts she resides and works part-time in the District of Columbia, and the District has a strong interest in providing a remedy for wrongs committed and suffered within the forum. Furthermore, because the essential elements of Elemary's claim would be nearly identical under California and Alabama law, application of District of Columbia law would not frustrate any policy goal of either state. *Compare Bennett Enters. v. Domino's Pizza, 310 U.S. App. D.C. 192, 45 F.3d 493, 499 (D.C. Cir. 1995) with Gross v. Lowder Realty Better Homes & Gardens, 494 So. 2d 590, 597 (Ala. 1986), and Blank v. Kirwan, 39 Cal. 3d 311, 216 Cal. Rptr. 718, 703 P.2d 58, 70 (Cal. 1985).*

Second, Elemary's termination in violation [*40] of public policy claim also strongly implicates this forum's interests. She does not specifically allege the circumstances of her actual termination (merely its date) so it is unclear where the tortious "act" occurred. Nonetheless, she contends the September 21 Agreement -- which was allegedly negotiated and executed in the District of Columbia -- formalized the underlying employment relationship. Moreover, from that relationship's inception, Elemary performed her du-

ties in the District. Finally, Alabama law does not recognize a cause of action for termination in violation of public policy, *Wright v. Dothan Chrysler Plymouth Dodge, 658 So. 2d 428, 431 (Ala. 1995)*, and California and District of Columbia treatments of this tort are substantially similar, *compare District of Columbia v. Beretta, U.S.A. Corp., 872 A.2d 633, 645 (D.C. 2000), with Green v. Ralee Eng'g Co., 19 Cal. 4th 66, 78 Cal. Rptr. 2d 16, 960 P.2d 1046, 1053 (Cal. 1998).* Unlike the District, California permits a plaintiff to proceed in tort even when the statute embodying the violated public policy provides its own remedy, but only in limited circumstances not applicable here. *Compare Nolting v. Nat'l Capital Group, Inc., 621 A.2d 1387, 1390 (D.C. 1993)* [*41] (no public policy exception to the at-will employment doctrine where statute embodying the public policy provides its own remedy for violations), *with Hentzel v. Singer Co., 138 Cal. App. 3d 290, 301-05, 188 Cal. Rptr. 159 (1982)* (CAL-OSHA did not provide exclusive remedy for plaintiff's claim of retaliatory termination for complaints about working conditions because statute was intended to supplement, not abrogate, employees' then-existing common law rights). Thus, application of District of Columbia law to this claim would not frustrate any Alabama or California public policy.

Third and finally, a fraud claim necessarily implicates government's interest in protecting those whose credulity or ignorance is exploited by persons on whom they reasonably rely. The District, California, and Alabama thus share a common public policy interest in the application of their laws to Elemary's fraud claim. As the Court has concluded, however, Elemary suffered the tortious injury in the District of Columbia, and her allegations' generality precludes the Court from determining where the tortious conduct occurred or establishing where the parties' relationship is "centered." Under the circumstances, the Court finds it [*42] appropriate to apply this forum's law. *See Herbert v. District of Columbia, 808 A.2d 776, 779 (D.C. 2002)* (another state's law applies only when that state has a substantial interest in the litigation).

## 1. TIPEA (Billy Harbert & HILLC)

"To establish a claim for tortious interference with prospective economic advantage under District of Columbia law," a plaintiff must plead facts showing "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the

part of the interferer, (3) intentional interference inducing or causing a breach [or] termination of the relationship or expectancy, and (4) resultant damage." [13] *Bennett Enters. v. Domino's Pizza, 310 U.S. App. D.C. 192, 45 F.3d 493, 499 (D.C. Cir. 1995)* (further observing that to establish liability, a plaintiff must make a "strong showing of intent"). The Federal Rules provide that knowledge and other conditions of mind may be "averred generally." *Fed. R. Civ. Pro. 9(b)*. But this nod to the practical difficulties of proving *scienter* does not absolve plaintiffs of their duty to plead *some* facts from which the court may reasonably infer knowledge or another mental state. *See Twombly, 127 S. Ct. at 1964-65* [*43] (plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," and mere "formulaic recitation of the elements of a cause of action will not do").

> 13    *Cf. Paul v. Howard Univ., 754 A.2d 297, 309 (D.C. 2000)* (where the relationship or expectancy has matured into a legally enforceable agreement, the plaintiff may style his claim as one for tortious interference with contract, which requires: "(1) the existence of a contract; (2) knowledge of the contract [on the part of the defendant]; (3) intentional procurement of a breach of the contract; and (4) damages resulting from the breach").

Elemary's complaint casts her claim as one for interference with a particular expectancy rather than for interference procuring breach of the underlying contract. Nonetheless, some allegations in her complaint would support this alternative theory. She alleges that Billy Harbert directed an agent to forge several letters, purportedly drafted by Bill L. Harbert, "in the form of amending the September 21 agreement" that were "intended to summarily dismiss Plaintiff from her job." (Compl. 7.) Yet by Elemary's own account, these attempts to procure termination of her [*44] employment failed, as Bill L. Harbert identified the forgeries as such and affirmatively sought to rectify any confusion they caused concerning Elemary's status. (*Id.* at 8.) Indeed, she attributes her ultimate termination not to Billy Harbert's alleged machinations but to her refusal to withhold documents from DOJ. (*Id.* at 28.) Thus, she appears to have no viable claim against Billy Harbert for intentionally procuring a breach of the September 21 Agreement.

Billy Harbert attacks Elemary's pleading of the second element, knowledge, insisting she relies on a conclusory assertion and unreasonable inferences to demonstrate he knew of her expectancy under the September 21

Agreement. (Mem. Supp. Billy Harbert and HILLC Mot. to Dismiss 16-17.) She asserts that "[t]he provisions of the September 21 Agreement were known to Defendants" for two reasons: because she "had been working with John Harbert since 1979," and because she "had been acting as exclusive case manager on the False Claims Case since April, 2001." (Compl. 23.) Although she pleads no *facts* directly suggesting Billy Harbert knew of the Agreement's existence and terms, she insists "it is only reasonable [to infer] that after five [*45] years everybody at top management of the Harbert enterprises would know of Plaintiff's [sic] contract." (Mem. Opp. Billy Harbert and HILLC Mot. to Dismiss 17.)

Her first factual allegation -- that she had worked with Billy Harbert's uncle for twenty-five years -- is inapposite. In no way does it indicate the *nephew* knew she had formed a contract with *his father*, let alone that he was familiar with its subject matter or terms. Elemary's second factual allegation lands slightly closer to the mark. In March 2005, when she alleges the interference occurred, she had been negotiating on Bill L. Harbert's behalf with DOJ for approximately four years. Assuming, as Elemary implies throughout her complaint, that Bill L. Harbert involved his son heavily in his business affairs, a reasonable person in Billy Harbert's position would likely infer that Elemary received compensation for her work as a "case manager."

But these allegations will not support the inference she draws from them. Elemary's claim requires that Billy Harbert have had very specific knowledge about her compensation agreement -- in particular, that it provided she would receive a bonus for negotiating a settlement with DOJ, to be [*46] calculated based on the ultimate settlement value. Otherwise, he could not have realized that "disrupt[ing] settlement negotiations between DOJ and Plaintiff" and "caus[ing] [the $ 15 million settlement she had negotiated] to be rejected" would negatively impact her compensation. (*See* Compl. 23.) Furthermore, Elemary's complaint indicates she acted as "case manager" for three years *without a written contract*. The Agreement itself bears only Elemary and Bill L. Harbert's signatures (along with those of two notaries), and she does not allege that either of them shared it with Billy Harbert or anyone else.

Her complaint also contends that Billy Harbert directed an attorney to forge several letters "in the form of amending the September 21 Agreement" in the months directly following its signature. (*Id.* at 7.) Elemary has attached these letters to her complaint, but none of them explicitly or implicitly references the September 21 Agreement. (*See* Compl. Ex. B.) She has also attached a letter addressed to the alleged forger, apparently from Bill L. Harbert, that mentions "a confirmed agreement with Dr. Elemary under liability to me," but it describes

her compensation under that agreement [*47] as consisting of "payments to her for a limited period of time." (Compl. Ex. C.) Hence, these documents offer no support for Elemary's allegation that Billy Harbert knew of her expected gain under the September 21 Agreement.

Elemary is entitled to all *reasonable* inferences in her favor, but the Court need not accept her unsupported, conclusory allegations. *See Kowal, 16 F.3d at 1276.* Because she has not pleaded any *facts* from which the Court can reasonably infer Billy Harbert knew of the prospective economic advantage of which he allegedly deprived her -- an essential element of her claim -- the Court must dismiss her TIPEA claim under *Federal Rule of Civil Procedure 12(b)(6).*

## 2. Termination in Violation of Public Policy (Bill L. Harbert)

Under District of Columbia law, "an employer may discharge an at-will employee at any time and for any reason, or for no reason at all." *Adams v. George W. Cochran & Co., 597 A.2d 28, 30 (D.C. 1991). See also Sullivan v. Heritage Found., 399 A.2d 856, 860 (D.C. 1987)* (plaintiff must overcome rebuttable presumption of at-will employment).

But "wrongful termination in violation of a clear public policy is an exception to [this] traditional . . . doctrine." [*48] *District of Columbia v. Beretta, U.S.A. Corp., 872 A.2d 633, 645 (D.C. 2000).* Indeed, the District of Columbia Court of Appeals has recognized that "to permit further employment to be conditioned upon the employee's commission of an illegal act would 'encourage criminal conduct upon the part of both employer and employee and . . . is patently contrary to the public welfare.'" *Adams, 597 A.2d at 32* (quoting *Petermann v. Int'l Brotherhood of Teamsters Local 396, 174 Cal. App. 2d 184, 344 P.2d 25, 27 (Cal. Ct. App. 1959)).*

Bill L. Harbert directs the Court to two purported flaws in Elemary's pleading. First, he charges she has not pleaded facts showing they had an employment relationship. (Mem. Supp. Bill L. Harbert and HIE Mot. to Dismiss 8-9.) Though he characterizes the September 21 Agreement as a contract, he insists it bears no indicia of an employment agreement. (*Id.* at 9.) Second, he insists she has not pleaded facts to support causation -- that her termination was predicated on her refusal to conceal incriminating bank records from DOJ. (*Id.* at 10.) Neither criticism succeeds.

First, Elemary asserts she "was *employed* by [Bill L. Harbert] as exclusive case manager for the False Claims Case and the declaratory [*49] relief action from April, 2002 to April, 2005." (Compl. 27 (emphasis added). *Cf. id.* at 6 ("Plaintiff was then contracted by Defendants to delay the prosecution of the False Claims Case for a pe-

riod of approximately four years . . . . Plaintiff was also contracted to negotiate a settlement . . . .").) Throughout, she describes her performance of duties in this capacity. In late 2004, she alleges she and Bill L. Harbert formalized their existing employment relationship in a written instrument, the September 21 Agreement. (Compl. 22; Compl. Ex. G.) That agreement, appended to her complaint, announces its purpose as confirming "the parties' relevant prior agreements on key issues" and establishing "a forum to transact their business and communicate more efficiently." (Compl. Ex. G 1.)

Bill L. Harbert makes much of the document's omission of the word "employment," any reference to benefits, or any restriction on Elemary's ability to accept other professional engagements. (Mem. Supp. Bill L. Harbert and HIE Mot. to Dismiss 9.) He implicitly argues that Elemary was not an employee but rather an independent contractor. This argument has some merit. "The most important criterion for assessing  [*50] employee status is 'the extent of the employer's right to control the means and manner of the worker's performance.'" *Zhengxing v. Nathanson, 215 F. Supp. 2d 114, 117 (D.D.C. 2002)* (Urbina, J.) (quoting *Spirides v. Reinhardt, 198 U.S. App. D.C. 93, 613 F.2d 826, 831 (D.C. Cir. 1979)).* Additional relevant factors include:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the 'employer' or the individual furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice or explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the 'employer'; (9) whether the worker accumulates retirement benefits; (10) whether the 'employer' pays social security taxes; and (11) the intention of the parties.

*Spirides, 613 F.2d at 832* (applying "general principles of the law of agency"  [*51] to determine whether Title VII plaintiff was an employee).

Here, Elemary's complaint does not clearly delimit Bill L. Harbert's control over the "means and manner" of

her performance. For example, though the September 21 Agreement indicates Elemary was to report to Bill L. Harbert only "from time to time," (Compl. Ex. G at 1), her complaint refers to "bi-weekly briefing[s]," (Compl. 8). Other factors indicate Elemary was an employee: she worked for Bill L. Harbert for several years, (Compl. 27, 32); she received a monthly salary, (Compl. Ex. G at 2); and her duties -- negotiating on his behalf with DOJ concerning multi-million dollar criminal and civil fines -- would typically be done under a principal's close supervision. Still other factors suggest she was an independent contractor: she was hired for a particular "job," and her work was not an "integral" part of Bill L. Harbert's construction business.

On this motion to dismiss, it suffices that Elemary has offered *some* facts that support the existence of an employment relationship. These factual allegations are "enough to raise [her] right to relief above the speculative level," and the dispute as to her status is properly a matter  [*52] for further litigation. *Twombly, 127 S. Ct. at 1964-65.*

Second, as noted above, Bill L. Harbert also challenges Elemary's causation pleading. Her complaint alleges that in November 2004, Bill L. Harbert, Billy Harbert, HILLC, and HIE "attempted to coerce" her to conceal documents requested by DOJ in the False Claims Case. (Compl. 28.) She contends they delivered an ultimatum: "either resign her position as exclusive case manager, or agree to cover up [] evidence." (*Id.* at 28.) She asserts that she refused to conceal evidence and that, consequently, Bill L. Harbert terminated her employment. [14] (*Id.*)

> 14    In his reply brief, Bill L. Harbert points to allegations in Elemary's complaint indicating she was terminated "for personal reasons." (Bill L. Harbert and HIE Reply 5.) He contends these statements "override" the causation allegations addressed here. (*Id.* This argument fails for two reasons. First, to pass muster under *Rule 12(b)(6)*, a complaint need only offer some allegations as to each material element of a viable legal claim. *District of Columbia v. Air Florida, Inc., 243 U.S. App. D.C. 1, 750 F.2d 1077, 1082 n.14 (D.C. Cir. 1984)* (citing *In Re Plywood Antitrust Litigation, 655 F.2d 627, 641 (5th Cir. 1981)).*  [*53] At this stage, the Court will not assess the relative weight or credibility of her factual allegations. Second, as a practical matter, a termination decision may rest on more than one ground.

The Federal Rules do not require that a complaint include *all* relevant facts, nor that it be a model of clarity. *See Fed. R. Civ. P. 8(a)(2).* Further, because she is a *pro se* plaintiff, the Court must hold Elemary's complaint "to

less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner, 404 U.S. 519, 521, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1971).* Her causation pleading could certainly be more detailed, but the Court concludes it suffices to provide Bill L. Harbert with both "fair notice" of her claim and "the grounds on which it rests." *Fed. R. Civ. Pro. 8(a)(2).*

Nonetheless, Elemary's termination in violation of public policy claim fails for a wholly separate reason. "Whether a discharge violates public policy is determined on a case-by-case basis, guided by the concept that a wrongful termination cause of action must be 'firmly anchored in the Constitution or in a statute or regulation which reflects the particular public policy being relied upon.'" *Bowie v. Gonzales, 433 F. Supp. 2d 24, 30 (D.D.C. 2006)* [*54] (Lamberth, J.) (quoting *Warren v. Coastal Int'l Secs., Inc., 96 Fed. Appx. 722, 722-23 (D.C. Cir. 2004)).* "[W]here the very statute creating the relied-upon public policy already contains a specific and significant remedy for the party aggrieved by its violation," the plaintiff may not invoke the exception to the at-will employment doctrine. *Nolting v. Nat'l Capital Group, Inc., 621 A.2d 1387, 1390 (D.C. 1993), followed by Kassem v. Washington Hosp. Ctr., No. 05-cv-02352, slip. op. at 5-6, 2008 U.S. App. LEXIS 1174 (D.C. Cir. Jan. 22, 2008)* (where hospital employee claimed he was fired for refusing to violate Nuclear Regulatory Commission regulations, and those regulations were promulgated pursuant to the Energy Reorganization Act, wrongful termination claim dismissed because Act, itself, provided a "remedy for retaliation against nuclear-safety whistleblowers").

Elemary alleges she was terminated because she refused to conceal documents requested by DOJ in the *qui tam* action, and she identifies the False Claims Act as the statute embodying the public policy violated in her case. [15] (Compl. 28.) Yet the very provision Elemary cites in her complaint -- *31 U.S.C. section 3730(h)* -- creates a right of action for [*55] retaliation in "[a]n employee who is discharged . . . by his or her employer because of lawful acts done by the employee . . . in furtherance of" a False Claims Act suit. [16] *31 U.S.C. § 3730(h) (2002).* If successful, the wrongfully discharged employee "shall be entitled to all relief necessary to make the employee whole," to include "reinstatement with the same seniority status such employee would have had but for the discrimination, 2 times the amount of back pay, interest on the back pay, and compensation for any special damages . . . ." *Id.* Hence, the False Claims Act provides "a specific and significant remedy" for one who is "aggrieved by [a] violation" of the public policy it creates. *See Nolting, 621 A.2d at 1390.* Moreover, its "whistleblower" protection extends to all "employees who assist the government in investigation and prosecution of vio-

lations of the False Claims Act." *Hutchins v. Wilentz, 253 F.3d 176, 185-86 (3rd Cir. 2001), cert. denied, 536 U.S. 906, 122 S. Ct. 2360, 153 L. Ed. 2d 182 (2002).* It thus embraces those who, like Elemary, furnish requested documents to the government.

15   *See 31 U.S.C. § 3733(a)* (empowering the Attorney General to issue civil investigative demands for documents, materials, [*56] and/or testimony to any person believed to be "in possession, custody, or control of any documentary material or information relevant to a false claims law investigation").

16   *See Shekoyan v. Sibley Int'l, 366 U.S. App. D.C. 144, 409 F.3d 414, 422 (D.C. Cir. 2005)* ("To assert such a retaliation claim, the employee must show: (1) that he engaged in protected activity . . .; and (2) that he experienced discrimination 'because of' his protected activity.").

Because this remedy lies open to her, Elemary may not invoke the public policy exception to the at-will employment doctrine. *Nolting, 621 A.2d at 1389* (declining to recognize public policy tort where such a remedy would not afford "the only possibility for compensation for [appellant's] claimed injury"). Therefore, she has failed to state a claim for termination in violation of public policy.

### 3. Fraud (Billy Harbert, HILLC, Bill L. Harbert & HIE)

Elemary styles her fraud claim as one for "suppression of facts," or concealment. In the District of Columbia, fraud consists of: "(1) a false representation, (2) in reference to a material fact, (3) made with knowledge of its falsity (4) with intent to deceive, and (5) action taken by [plaintiff] in reliance upon the [*57] representation, (6) which consequently resulted in provable damages." *Dresser v. Sunderland Apartments Tenants Ass'n, 465 A.2d 835, 839 (D.C. 1983).* But "actionable fraud" may also lie in "the concealment of a fact which should have been disclosed." *Rosenberg v. Howle, 56 A.2d 709, 710 (D.C. 1948).* Indeed, even "[n]ondisclosure of material information may constitute fraud, especially where there is a duty to disclose." *Pyne v. Jamaica Nutrition Holdings, 497 A.2d 118, 131 (D.C. 1985).*

Under *Federal Rule of Civil Procedure 9(b)*, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Fed. R. Civ. Pro. 9(b).* Various rationales support this heightened pleading requirement, *see* 5A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1296 (2004), among them, that "[b]ecause 'fraud' encompasses a wide variety of activities, the requirements

of *Rule 9(b)* guarantee all defendants sufficient information to allow for preparation of a response," *United States ex rel Joseph v. Cannon, 206 U.S. App. D.C. 405, 642 F.2d 1373, 1385 (D.C. Cir. 1981)*.

Courts hold *pro se* complaints "to less stringent standards than formal pleadings drafted    [*58] by lawyers." *Haines, 404 U.S. at 521*. But the stated rationale for *Rule 9(b)* applies with equal strength to defendants sued by a *pro se* litigant. *See Shekoyan v. Sibley Int'l Corp., 217 F. Supp. 2d 59, 64 (D.D.C. 2002)* (Walton, J.). "Conclusory allegations that a defendant's actions were fraudulent or deceptive do not satisfy *Rule 9(b)*." *Id. at 73*. A plaintiff must specifically allege the time, place, and contents of any affirmative misrepresentation. *See United States ex rel. Totten v. Bombardier Corp., 351 U.S. App. D.C. 30, 286 F.3d 542, 552 (D.C. Cir. 2002)*. By extension, a plaintiff claiming fraud through "suppression of facts" must identify the facts concealed and/or acts of concealment with particularity. "In other words, *Rule 9(b)* requires that the pleader provide the "who, what, when, where, and how" with respect to the circumstances of the fraud." *Anderson v. USAA Cas. Ins. Co., 221 F.R.D. 250, 253 (D.D.C. 2004)* (Urbina, J.).

The defendants point to several inadequacies in Elemary's fraud pleading: first, she presents no facts indicating *any* of them owed her a duty to disclose the information concealed; second, it is unclear what *facts* she believes were concealed from her; and third, her own allegations    [*59] demonstrate her claims are time-barred. (Mem. Supp. Billy Harbert and HILLC Mot. to Dismiss 18-26.) Each of these criticisms rings true, but the fatal flaw lies in her failure to satisfy *Rule 9(b)*'s heightened pleading standard.

Elemary's fraud claim is essentially two-fold. First, when she aided the Contractors in securing the wastewater project contract, defendants Bill L. Harbert, HIE, Billy Harbert, and HILLC either intended to engage in bid-rigging or were aware that others harbored such intentions but failed to disclose these intentions to her. (Compl. 30.) Second, when she negotiated for Bill L. Harbert with DOJ, Bill L. Harbert and Billy Harbert concealed "the extent of their culpability in the bid-rigging scheme." (*Id.* at 31.)

She now insists she cannot offer any more specific factual allegations in advance of discovery. (Mem. Opp. Billy Harbert and HILLC Mot. to Dismiss 27.) Yet to assert the present cause of action for concealment in good faith, Elemary must have discovered that some *facts* were concealed from her. Her complaint neither identifies these facts nor specifies when she uncovered them. She alleges Bill L. Harbert and Billy Harbert concealed "the extent of their    [*60] culpability in the bid-rigging scheme," which implies she knew *some* facts

about their involvement but later discovered *additional* facts indicative of deeper involvement. (*See* Compl. 31.) Her complaint does not delineate what she originally knew and what she later learned. [17] This is hardly the particularity *Rule 9(b)* mandates, and the defendants cannot reasonably respond to such vague allegations. [18]

[17] Somewhat bewilderingly, after asserting that "[d]uring and after the bid-rigging, [Bill L. Harbert] and Billy Harbert [] insisted on maintaining a facade of lack of knowledge of the crimes they were committing," Elemary proceeds to describe how she purposefully collected contrary evidence. (Compl. 14.) She refers to a "specific conversation that [she] legally recorded" in which Bill L. Harbert acknowledged committing illegal acts. (*Id.* at 14-15.) Thus, she evidently learned "the extent of [his] culpability in the bid-rigging scheme" at some point, but she does not indicate precisely when. In the "incorporated schedule" attached to her complaint, she declares that she performed work for Bill L. Harbert in Saudi Arabia between 1991 and 1998, during which time she "had no knowledge    [*61] of" the bid-rigging scheme. (Incorp. Sched. vi.) She then states she "became aware of the extent of Defendants' culpability" in 2004 and 2005. (*Id.* While these allegations at least incorporate a temporal element, they do not achieve the specificity *Rule 9(b)* requires.

[18] Due to her pleading's lack of specificity, Elemary has not established that any of the defendants owed her a duty of disclosure. She argues, citing California law, that a duty arose because "the facts [were] known or accessible only to the defendant[s], who [knew] they [were] not known or reasonably discoverable by [Elemary]" and because "the defendant[s] actively conceal[ed] the facts from discovery by [Elemary]." (*Id.* at 21 (citing *Marketing West, Inc. v. Sanyo Fisher (USA) Corp., 6 Cal. App. 4th 603, 613, 7 Cal. Rptr. 2d 859 (1992)* (independent sales representatives alleged their employer had induced them to sign contract modifications by misrepresenting and/or concealing the documents' import)).) Even assuming the District of Columbia would recognize a duty in either situation, Elemary fails to explain how these principles would apply to any of the defendants she has sued. (*See id.*

Moreover, even if Elemary had properly stated a fraud    [*62] claim against Billy Harbert, HILLC, Bill L. Harbert, or HIE, the statute of limitations would very likely bar her suit. In the District of Columbia, a fraud claim must be brought, if at all, "within three years from

the time the fraud either is discovered or reasonably should have been discovered." *King v. Kitchen Magic, Inc., 391 A.2d 1184, 1186 (D.C. 1978)* (citing *D.C. Code § 12-301*). Such a claim accrues "when the plaintiff has knowledge of (or by the exercise of reasonable diligence should have knowledge of) (1) the existence of the injury, (2) its cause in fact, and (3) some evidence of wrongdoing." *Knight v. Furlow, 553 A.2d 1232, 1234 (D.C. 1989)*. Because Elemary filed the present action on April 10, 2007, to survive the defendants' statute of limitations challenge, her claim must have accrued after April 10, 2004.

The defendants contend Elemary reasonably should have discovered their culpability in the bid-rigging scheme during her tenure as "case manager" for Bill L. Harbert. (Mem. Supp. Billy Harbert and HILLC Mot. to Dismiss 20.) Indeed, according to her complaint, in April 2001, "the Harbert Contractors" [19] engaged Elemary "to reduce the $ 54 million criminal fine imposed [*63] on them by [an] antitrust case" and to negotiate "a three-year extension of time with senior officials from the Department of Justice . . . concerning the prosecution of the Harbert Contractors on the False Claims Case." (Compl. 10-11.) Notice of the bid-rigging scheme and the Contractors' involvement therein was thus *inherent in her job duties*. As "exclusive case manager" for the *qui tam* action, she could not possibly have been wholly ignorant of the extensive bid-rigging allegations in the government's complaint. Elemary argues "the fact that something is pleaded in a complaint does not make it true." (Mem. Opp. to Billy L. Harbert and HILLC Mot. to Dismiss 20.) Though she may have believed the government's allegations unwarranted, she nonetheless had notice of the defendants' fraud. Furthermore, she indicates she knew Bill L. Harbert had entered into a *plea agreement* in the anti-trust action in February 2002. (*Id.* at 6.) Thereafter, if Elemary continued to rely on Bill L. Harbert and Billy Harbert's "facade of lack of knowledge," her reliance was neither reasonable nor justifiable.

> 19    Elemary defines this term as including Bill L. Harbert, Billy Harbert, HILLC, and HIE. (Compl. 11.) [*64] Otherwise, however, she refers only to agreements between herself and Bill L. Harbert in his personal capacity.

This conclusion impacts both prongs of Elemary's fraud claim. First, it renders untenable her claim of fraud during the period when she negotiated for Bill L. Harbert with DOJ. To be actionable, fraudulently induced reliance must be *justified*. *See Restatement (Second) of Torts § 537* (1977). Elemary cannot reasonably assert both that she was deceived about "the extent of [the defendants'] culpability in the bid-rigging scheme" and that she exclusively managed their efforts to mitigate its conse-

quences. (Compl. 31.) Second, to the extent any of the defendants concealed a planned criminal scheme from her in the 1980s, knowledge of this scheme -- and its effect on her reputation in the business and political communities -- was within Elemary's grasp no later than April 2002. [20] *See Knight, 553 A.2d at 1234* (claim accrues "when the plaintiff has knowledge of (or by the exercise of reasonable diligence should have knowledge of) (1) the existence of the injury, (2) its cause in fact, and (3) some evidence of wrongdoing"). The limitations period for any such claim concluded in April [*65] 2005, two years before Elemary filed her complaint.

> 20    Elemary first alleges that she commenced working as case manager in April 2001, (Compl. 10, 23), but she later refers to April 2002, (*id.* at 27). Though it does not affect the outcome, the Court will afford her the benefit of the later date.

Thus, because Elemary has not satisfied *Rule 9(b)*'s heightened pleading requirement, and because the statute of limitations has run, Elemary's fraud claim must be dismissed for failure to state a claim on which relief may be granted.

### 4. Plaintiff's Civil RICO Claims

The Racketeer-Influenced and Corrupt Organizations Act ("RICO") creates a right of action in a private person who is "injured in his business or property by reason of a violation of *section 1962*." *18 U.S.C. § 1964(c)* (2002). *Section 1962* provides, in relevant part, that "[i]t shall be unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs, through a pattern of racketeering activity . . . ." [21] *Id. § 1962(c)*. A violation of this section requires "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering [*66] activity." *Sedima S.P.R.L. v. Imrex, Co., Inc., 473 U.S. 479, 496, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985)*. This entails showing that the defendant played " *some* part in directing the enterprise's affairs" -- that is, that he "participate[d] in the operation or management of the enterprise itself." *Reves v. Ernst & Young, 507 U.S. 170, 179, 185, 113 S. Ct. 1163, 122 L. Ed. 2d 525 (1993)*. Moreover, to survive a motion to dismiss, the plaintiff must allege the predicate acts of racketeering with particularity. *Prunte v. Univ. Music Group, 484 F. Supp. 2d 32, 43 (D.D.C. 2007)* (Friedman, J.) (heightened pleading standard in *Rule 9(b)* applicable to civil RICO claims).

> 21    The term "racketeering activity" embraces extortion, wire fraud, threats of serious physical harm, and a variety of other offenses. *18 U.S.C. § 1961(1)* (2002). A "pattern" requires at least two

such acts. *Id.* § *1961(5). See Sedima S.P.R.L. v. Imrex, Co., Inc., 473 U.S. 479, 496 n.14, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985)* (referring to legislative history for proposition that "two isolated acts of racketeering activity do not constitute a pattern"). Any "individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity" qualifies as [*67] an enterprise. *18 U.S.C. § 1961(4) (2002).*

A private, civil RICO plaintiff must also establish standing by pleading injury to his business or property proximately caused by the RICO violation. *18 U.S.C. § 1962(c) (2002); Browning v. Clinton, 352 U.S. App. D.C. 4, 292 F.3d 235, 249-50 (D.C. Cir. 2002).* "[T]he RICO pattern or acts proximately cause a plaintiff's injury if they are a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence." *Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 23-24 (2d Cir. 1990).*

**a. Billy Harbert**

Billy Harbert challenges Elemary's pleading as to three elements of this claim. First, he contends she lacks standing because she has alleged no *facts* demonstrating injury to her business and property. (Mem. Supp. Billy Harbert and HILLC Mot. to Dismiss 28.) Second, he insists she offers only a conclusory assertion that he "was 'employed by or associated with' HILLC, the putative RICO enterprise." (*Id.* at 29.) Third, he charges she has pleaded no facts suggesting he participated in HILLC's operation or management. (*Id.* at 30.)

As Billy Harbert correctly observes, Elemary does, at one point, barely   [*68] assert she suffered "injur[y] in her business and property in a sum at present unknown, but in excess of" $ 210,000. (Compl. 39.) Elsewhere, however, she claims she required seven months of physical therapy before her broken shoulder healed "sufficiently so [she] could function again," (*id.* at 38), and that she "suffer[ed] incapacitation and intolerable physical pain for over seven months following the assault," (*id.* at 14). In opposing Billy Harbert's motion, Elemary explains she "could not work for [those] seven months" due to her injuries, and that this period of lost income comprises the injury to her business. (Mem. Opp. Billy Harbert and HILLC Mot. to Dismiss 23.) On this motion to dismiss, Elemary is entitled to "all reasonable inferences in [her] favor." *Scheuer, 416 U.S. at 236.* The inference she proposes is a reasonable one: logically, one who earns her living through provision of personal services will suffer some reduction in income while "incapacitat[ed]" and unable to "function." Particularly because Elemary is a *pro se* plaintiff, the Court will not penalize

her for failing to take this additional logical step in her complaint.

Although Elemary has alleged facts sufficient   [*69] to confer standing, however, she has not made out a civil RICO claim against Billy Harbert. Specifically, though Elemary alleges conduct that could qualify as a pattern of racketeering activity, she fails to satisfy *Rule 9(b)*'s heightened pleading standard and offers no facts linking this conduct to HILLC's operation or management. Rather, though she offers that Billy Harbert was "'associated with'" HILLC, (Compl. 33), her description of his motives and behavior does not raise an inference that he engaged in the alleged RICO violations as HILLC's agent. In short, she has not pleaded *the conduct of an enterprise through* a pattern of racketeering activity. *See Sedima S.P.R.L., 473 U.S. at 496.*

In the portion of her complaint specific to her RICO claim against Billy Harbert, Elemary describes numerous instances of temporally and factually unrelated conduct. (*See* Compl. 33-38.) Three allegations of racketeering activity emerge from this narrative. [22] First, Elemary contends that between 1997 and 2006, Billy Harbert repeatedly threatened her life and career. (*Id.* at 36.) She describes neither the substance of these threats, nor when or by what means they were transmitted. Such a sweeping   [*70] and generalized allegation cannot adequately notify a defendant of "the grounds on which [the plaintiff's] claim rests," *Fed. R. Civ. Pro. 8(a)(2)*, and it certainly lacks the particularity required by *Rule 9(b)*.

> 22    Much of the conduct she describes -- attempting "to effectuate the premature termination of the September 21 Agreement" through "repeated one-on-one and conference telephone calls with Plaintiff," (Compl. 34), and initiating "[u]nwarranted and severe criticism" of her, (*id.* at 35) -- is not facially tortious, let alone criminal.

Furthermore, even had she adequately pleaded this instance of racketeering activity, Elemary does not tie it to the putative RICO enterprise, HILLC. Throughout her complaint, she dwells repeatedly on Billy Harbert's personal animosity toward and jealousy of her, which she attributes to his fear of disinheritance. (*See, e.g.,* Compl. 8-9 ("Billy Harbert, Jr. therefore developed an obsession with seeking to destroy Plaintiff financially and physically and to deprive her of her peace of mind and her right to pursue her career or any form of employment or happiness . . . .").) She offers no discernible link between his alleged threats and his role in operating   [*71] and managing HILLC. [23]

> 23    Elemary does state that Billy Harbert received annual loans from his father to support HILLC's continued operations. (Compl. 17.) She

alleges Billy Harbert learned his father had purchased a residence for Elemary in California and that he somehow "used this information to secure substantial funding from" his father and to influence his father to breach an agreement with her. (*Id.* Because Elemary has not asserted that Billy Harbert's "use" of this information involved unlawful threats, these facts, alone, would not comprise extortion. *See 18 U.S.C. § 1951(b)(2)* [hereinafter, Hobbs Act] (defining extortion as "the obtaining of property from another, with his consent, induced by wrongful use or actual or threatened force, violence, or fear, or under color of official right"); *Wilkie v. Robbins, 127 S. Ct. 2588, 2605, 168 L. Ed. 2d 389 (2007)* (in civil RICO action, noting Hobbs Act definition of extortion applies to actions against private parties). Further, it is unclear how Billy Harbert's alleged "blackmail[]" of Bill L. Harbert to support HILLC relates to Elemary's professed injuries.

Second, Elemary claims that in March 2005, Billy Harbert orchestrated an automobile "accident" [*72] in Alabama in which her attorney nearly died. (*Id.* at 37.) Though her factual allegations concerning this incident exceed the required standard of particularity, she again fails to tie it to anything other than Billy Harbert's personal hatred for her and his desire to end her involvement in the *qui tam* action. (*See id.* at 36-37.)

Third, Elemary asserts that in April 2005, Billy Harbert dispatched a "hitman" to her California home to obtain records from her, and when this person pushed her, she fell and suffered a broken shoulder. (*Id.* at 37-38.) Yet again, it is unclear from her complaint how the alleged conduct flowed from or facilitated Billy Harbert's management or operation of HILLC.

Because she has failed to plead *the conduct of an enterprise through* a pattern of racketeering activity, her civil RICO claim against Billy Harbert does not state a claim on which this Court may grant relief. *See Sedima S.P.R.L., 473 U.S. at 496.*

### b. Bill L. Harbert

Along with his son, Bill L. Harbert challenges Elemary's pleading of injury to her business or property, and he insists she has offered no facts linking any injury she did suffer with his alleged wrongful conduct. (Mem. Supp. Bill L. Harbert [*73] and HIE Mot. to Dismiss 11-12.) Neither criticism survives close scrutiny.

As an initial matter, Elemary has alleged conduct of an enterprise through a pattern of racketeering activity. *Sedima S.P.R.L., 473 U.S. at 496.* Further, she has done so with the requisite particularity: her complaint provides "the 'who, what, when, where, and how' with respect to

the circumstances of the fraud." *Anderson, 221 F.R.D. at 253.* She pleads that Bill L. Harbert "organized a phantom equipment-lending transaction" and arranged for defendant Sabbia to act as the putative lessee. (Compl. 40.) Though this scheme apparently comprised his sole association with Sabbia, to the extent he devised and directed the scheme, he played " *some* part in directing the enterprise's affairs." *Reves, 507 U.S. at 179.* Elemary further avers that for over three years, Sabbia wired regular lease payments totaling more than $ 4,000,000 from a Swiss bank to a bank in Alabama. (*Id.* at 41.) Thus, under Bill L. Harbert's aegis, Sabbia repeatedly committed wire fraud and/or money laundering. *See 18 U.S.C. §§ 1343, 1956(a)(1)(A) (2002).* These payments reduced Bill L. Harbert's apparent profits from the wastewater project contract [*74] -- ensuring the U.S. and Egyptian governments would not discover the underlying bid-rigging -- and created a pool of funds from which the "losing" bidders received kickbacks. (Compl. 40.)

Elemary has also pleaded sufficient factual allegations to demonstrate standing. First, contrary to Bill L. Harbert's contention, she has pleaded injury to her business: the destruction of her professional reputation and hence, her source of income. [24] Second, Elemary's allegations establish the alleged RICO violations as a "substantial factor in the sequence of responsible causation." *See Hecht, 897 F.2d at 23-24.* To summarize, Elemary contends: (1) the "phantom equipment-leasing transaction" facilitated the underlying bid-rigging scheme; [25] (2) that scheme defrauded the United States government of millions of dollars; [26] and (3) when the fraud came to light, Elemary, an innocent dupe, was tainted by her close association with the schemers and consequently lost significant professional credibility and opportunities. [27] This outcome was entirely foreseeable. Bill L. Harbert should reasonably have recognized that despite his best efforts to conceal the scheme, the bid-rigging might ultimately be uncovered. [*75] Were that to happen, given Elemary's key role in securing the wastewater project contract for Bill L. Harbert and his fellows, damage to her professional reputation was an eminently foreseeable result.

24    She contends, *inter alia*, that her "credibility with Middle East heads of states [sic] with whom [she] had enjoyed a very lucrative business relationship" was "undermine[d]," (*id.* at 12); that she sustained "permanent" and "substantial losses in her theaters of operation," (*id.*); and that she was discredited "in the presence of many United States Senators, the White House and DOJ officials who had earlier supported [her] activities in writing and who would have continued to benefit her career economically," (*id.* at 13). She claims

pecuniary damages of more than $ 3,000,000 flowing from this reputational injury. (*Id.* at 43.)

25    Specifically, she alleges:

> In order to conceal the excessive amount of the profits being generated by the bid-rigging scheme, which amounted to 65 of the Subject Contracts as opposed to the negotiated 15 rate, Mr. Harbert organized a phantom equipment-leasing transaction in which Sabbia would purport to make lease payments to South Trust Bank in Birmingham, Alabama [*76] in respect of equipment which was never, in fact, purchased. The transaction had the effect of simultaneously reducing the apparent profitability of the Subject Contracts to the Harbert Contractors while providing a fund -- the purchase price for the equipment allegedly being leased -- which was in fact paid to participants in the bid-rigging scheme.

(Compl. 40.)

26    Her complaint refers, *inter alia*, to a "$ 54 million . . . criminal fine imposed by the United States in the plea agreement in an anti-trust case . . . for bid-rigging government contracts," (Compl. 6); fraud on "the United States and Plaintiff through unjust enrichment and unlawful pocketing of $ 40 million beyond the profit stipulated in the contracts between Defendants and the United States," (*id.* at 12); and to "Defendants' . . . obtaining a collusive, artificially inflated, and noncompetitive price for the Subject Project and an illegal and inflated profit thereon," (*id.* at 30).

27    In the "Incorporated Schedule," for example, Elemary explains:

> Defendants knowingly interfered with Plaintiff's special contacts and violated the trust vested by the most senior Egyptian and Arab government officials in Plaintiff as their own [*77] private inspector on the ground while the Harbert Contractors unjustly enriched themselves by stealing funds intended for Egypt's development. To this end, the bid-rigging conspiracy severely tarnished the status of Plaintiff's reputation as an honest broker between the United States business community and the Middle East.

(Incorp. Sched. iii-iv.)

Accordingly, Elemary has pleaded all elements of her civil RICO claim against Bill L. Harbert with the requisite particularity, and it need not be dismissed. [28]

28    Elemary's civil RICO claim against Bill L. Harbert and her fraud claim arise from similar facts and allege the same injury -- damage to her reputation suffered once the bid-rigging conspiracy came to light. In their motions to dismiss, all four defendants asserted Elemary's *fraud* claim was time-barred. (Mem. Supp. Billy Harbert and HILLC Mot. to Dismiss 19-22; Mem. Supp. Bill L. Harbert and HIE Mot. to Dismiss 10-11.) As explained above, the Court agrees. *See supra* part II.B.3.

By contrast, Bill L. Harbert did not raise a statute of limitations defense to Elemary's *civil RICO* claim. Statutes of limitations are generally classified as affirmative defenses. *Fed. R. Civ. Pro. 8(c).* [*78] Yet when a complaint's allegations, on their face, demonstrate the applicable limitations period has run, the court may dismiss for failure to state a claim even where the defendant has not raised the issue. *Jones v. Bock, 127 S. Ct. 910, 920-21, 166 L. Ed. 2d 798 (2007)* ("A complaint is subject to dismissal for failure to state a claim if the allegations, taken as true, show the plaintiff is not entitled to relief."). The applicable limitations period for civil RICO is four years. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 156, 107 S. Ct. 2759, 97 L. Ed. 2d 121 (1987).* A civil RICO plaintiff's claim accrues when he discovers the injury he has suffered to his business or property. *Rotella v. Wood, 528 U.S. 549, 552-53, 120 S. Ct. 1075, 145 L. Ed. 2d 1047 (2000).*

Here, while one can reasonably infer injury and discovery occurred in rapid succession, Elemary's allegations do not make clear *when* she

suffered the alleged harm to her reputation and consequent loss of business. Presumably, the reputational injury occurred when Bill L. Harbert's complicity in the bid-rigging scheme became public knowledge. Absent any temporal reference in her complaint, however, and considering Bill L. Harbert's failure to raise the issue in his motion, the Court will not   [*79] now attempt to assess whether Elemary's claim is timely.

## C. Conclusion

Because Elemary offers no facts showing Billy Harbert had knowledge of the prospective economic advantage of which he allegedly deprived her -- an essential element of her claim -- the Court must dismiss her TIPEA claim under *Federal Rule of Civil Procedure 12(b)(6)*. Likewise, because she has not satisfied *Rule 9(b)*'s particularity requirement, she has failed to state a claim for fraud against any defendant. Finally, though her civil RICO claim against Bill L. Harbert survives, her allegations do not reflect Billy Harbert's *conduct of an enterprise through* a pattern of racketeering activity, and her civil RICO claim against him must also be dismissed.

## CONCLUSION

For the forgoing reasons, the Court concludes as follows:

(1) Plaintiff's TIPEA claim against Billy Harbert and HILLC must be dismissed pursuant to *Federal Rule of*

*Civil Procedure 12(b)(6)* because it fails to state a claim on which relief may be granted;

(2) Plaintiff's fraud claim against Bill L. Harbert, Billy Harbert, HILLC, and HIE must also be dismissed, both because it fails to state a claim and because the Court lacks personal jurisdiction over the latter   [*80] three defendants as to this claim;

(3) Plaintiff's civil RICO claim against Billy Harbert must be dismissed, both for failure to state a claim and want of personal jurisdiction; and

(4) Plaintiff's termination in violation of public policy claim against Bill L. Harbert must be dismissed for failure to state a claim.

Accordingly, these claims -- listed as the first, fourth, fifth, and sixth causes of action in plaintiff's complaint -- must be dismissed.

(5) Plaintiff has made out a claim for civil RICO against Bill L. Harbert, and to this extent, his motion to dismiss must be denied.

Plaintiff' s second, third, and seventh causes of action -- for breach of contract, quantum meruit, and civil RICO, all against Bill L. Harbert -- remain pending.

A separate order shall issue this date.

Signed by Royce C. Lamberth, United States District Judge, February 6, 2008.