# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| NATIONAL RAILROAD PASSENGER CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-1263 (RBW) |
| | ) | |
| VEOLIA TRANSPORTATION SERVICES, INC., and VEOLIA TRANSPORTATION, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

The plaintiff, National Railroad Passenger Corporation ("Amtrak"), filed this action on July 16, 2007, against Veolia Transportation Services, Inc. and Veolia Transportation, Inc. (collectively "Veolia"), asserting, in Count I, that Veolia aided and abetted the breach by several former Amtrak employees of the fiduciary duties they owed to Amtrak and, in Count II, that Veolia tortiously interfered with Amtrak's prospective economic advantage with regard to a public transportation operation in Southern Florida. See generally Complaint ("Compl."). Currently before the Court is the plaintiff's motion for partial summary judgment on Count I of its Complaint and the defendants' cross-motion for summary judgment on both Counts I and II of the Complaint. Upon consideration of the parties' submissions and for the reasons set forth below,[1] both parties' motions for summary judgment must be denied.

---

[1] In resolving these motions, the Court also considered: the Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment as to Liability on Count I ("Pl.'s Mem."); the Plaintiff's

(continued...)

# I. Background

The factual background giving rise to the allegations in the plaintiff's Complaint was set forth in this Court's earlier opinion denying the defendants' motion to dismiss. See Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc., 592 F. Supp. 2d 86 (D.D.C. 2009) (Walton, J.) ("Amtrak I"). While that background was drawn solely from the allegations made in the plaintiff's Complaint, the following is based upon facts that are either undisputed or are matters of public record, except where otherwise noted.

Veolia and Amtrak are both "providers of transportation services, including operations services for commuter rail systems." Compl. ¶ 6. Both have "the infrastructure, personnel, and institutional experience necessary to operate major urban commuter rail services." Plaintiff's Statement of Material Facts Not in Dispute ("Pl.'s Facts") ¶ 6; Defendants' Local Rule 7(h) Counterstatement of Facts in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Defs.' Counter Facts") § I ¶ 6.

---

[1](...continued)
Statement of Material Facts Not in Dispute ("Pl.'s Facts"); the Defendants' Memorandum of Points and Authorities in Opposition to Amtrak's Motion for Partial Summary Judgment ("Defs.' Opp'n"); the Defendants' Local Rule 7(h) Counterstatement of Facts in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Defs.' Counter Facts"); Plaintiff National Railroad Passenger Corporation's Reply Brief in Further Support of Its Motion for Partial Summary Judgment ("Pl.'s Reply"); the Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment ("Defs.' Mem."); the Defendants' Local Rule 7(h) Statement of Material Facts as to Which There Is No Genuine Issue to be Litigated in Support of Defendants' Motion for Summary Judgment ("Defs.' Facts"); Plaintiff National Railroad Passenger Corporation's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Opp'n"); the Plaintiff's Responses to Statements of Material Facts by Defendants Veolia Transportation Services, Inc. and Veolia Transportation, Inc. and Plaintiff's Supplemental Statements of Facts Precluding Summary Judgment ("Pl.'s Supp. Facts"); the Defendants' Reply Memorandum of Points and Authorities in Further Support of Their Motion for Summary Judgment ("Defs.' Reply"); and the Defendants' Local Rule 7(h) Reply Statement of Material Facts in Further Support of Defendants' Motion for Summary Judgment ("Defs.' Reply Facts"). The Court also considered the declarations and affidavits submitted by the parties in conjunction with their motions and oppositions, which will be identified throughout this opinion.

The controversy in this case arises from the two companies' participation in a competitive bidding process for a contract to provide commuter rail operation service for the South Florida Regional Transportation Authority (the "SFRTA") for "seven years with one three-year option period." Compl. ¶ 11; Plaintiff's Motion for Partial Summary Judgment on Count I ("Pl.'s Mot."), Declaration of Gary A. Orseck ("Orseck Decl."), Exhibit ("Ex.") 8 (RFP No. 06-112) at AMTH 003757-3761.[2] Amtrak alleges that Veolia aided and abetted three former Amtrak employees in breaching their fiduciary duties to Amtrak in connection with Veolia's efforts to acquire the SFRTA contract. Compl. ¶¶ 53-59. Amtrak also contends that Veolia interfered with its prospective economic advantage by soliciting the employment of those former Amtrak employees and causing two of them to refuse to be listed as part of Amtrak's management team in its bid to acquire the SFRTA contract. Id. ¶¶ 60-66.

A.      The Request for Proposals

The SFRTA is a public transit agency that receives public funds and operates the commuter rail service known as the Tri-Rail in Miami-Dade, Broward, and Palm Beach counties in South Florida. Defendants' Local Rule 7(h) Statement of Material Facts as to Which There Is No Genuine Issue to be Litigated in Support of Defendants' Motion for Summary Judgment ("Defs.' Facts") ¶ 1; Plaintiff's Responses to Statements of Material Facts by Defendants Veolia Transportation Services, Inc. and Veolia Transportation, Inc. and Plaintiff's Supplemental Statements of Facts Precluding Summary Judgment ("Pl.'s Supp. Facts") § I ¶ 1. In the latter part of 2006, the SFRTA issued a request for bid proposals ("RFP" or "Request for Proposals"),

---

[2] Part of the administrative record in this case was submitted to the Court as attachments to the parties' various filings. When citing to the administrative record, the Court will first indicate the particular filing with which the administrative record was submitted, followed by the document's administrative record Bates numbers.

inviting service providers to submit bids to operate and maintain the Tri-Rail commuter system. Defs.' Facts ¶ 4; Pl.'s Supp. Facts § I ¶ 4.  Eight companies purchased the SFRTA's Operations Request for Proposal information, Defs.' Counter Facts § I ¶ 19, and representatives from four of those companies, Herzog Transit Services, Inc. ("Herzog"), Veolia, Amtrak, and the Washington Group International attended a Tri-Rail pre-proposal conference on October 18, 2006, id.; Pl.'s Facts ¶ 19.  Proposals for the Tri-Rail contract were due on or before January 11, 2007.  Compl. ¶ 12.  According to the RFP, the requirements needed for a successful bid included, inter alia, the composition of a "Key Management Team" that would be responsible for operating and managing the Tri-Rail system.  Id. ¶ 13.  Specifically, "[t]he Operations [Request for Proposals] required that each bidder propose a general manager and an on-site Key Management Team[] comprised of members responsible for the following functions: Transportation, Safety, Human Resources/Labor Relations, and Communications (Operations Center)."  Defs.' Facts ¶ 23; Pl.'s Supp. Facts § I ¶ 23.  "The Operations [Request for Proposals] set forth strict requirements concerning the qualifications of the Key Management Team [M]embers," which required each team member to "possess a minimum of [three] years of recent experience . . . as the operator of a passenger railroad service."  Compl. ¶ 14 (internal quotation marks omitted).  Further, it required that the Key Management Team as a whole "demonstrate relevant experience with the key railroad functions," including "[t]rain operations in a multiple user environment[;] . . . [c]rew management; . . . [c]ustomer service[;] . . . [r]ailroad employee training and certification; [r]ail operations interface management with maintenance and new construction; [f]inancial management and reporting of rail operations[;] . . . [and r]ailroad safety program management." Id.  Amtrak and Veolia were the only two companies that submitted proposals.  Defs.' Facts ¶

200; Pl.'s Supp. Facts § I ¶ 200.

B.      Veolia's Proposed Key Management Team On Its Tri-Rail Bid

Veolia began recruiting for its Tri-Rail general manager position in early 2006.  Defs.'
Facts ¶ 36.  Recruiting a general manager was "[o]ne of Veolia's first priorities in pursuing the
Tri-Rail" contract because the person selected could then "help manage the proposal effort and .
. . manage the contract if it was awarded to Veolia." Id. ¶ 35.  Among the candidates Veolia
considered for the position was Joseph Yannuzzi, an Amtrak employee.  Id. ¶ 38.  Several
months before the proposal due date, Veolia contacted Mr. Yannuzzi about potentially working
for Veolia, but Veolia and Amtrak dispute whether Mr. Yannuzzi was aware that Veolia's
potential offer would be contingent on the success of its bid for the Tri-Rail Operations contract.
Id. ¶¶ 90-92; Pl's Supp. Facts § I ¶¶ 90-92.[3]  Following Veolia's "entreaty,"[4] Mr. Yannuzzi
informed Gilbert Mallery, Amtrak's Vice President of Strategic Planning and Contract
Administration, regarding the contact he had with Veolia.  Defs.' Facts ¶ 92.

Ultimately, on June 15, 2006, Veolia hired Sidney Birckett for the position of general
manager, id. ¶ 41, who had been an at-will employee with Amtrak, id. ¶ 37.  His selection for
the position with Veolia was not contingent upon it securing the Tri-Rail Operations contract.

---

[3] Several similar encounters occurred between Veolia and other Amtrak employees.  Id. ¶¶ 94-98;
Pl.'s Supp. Facts § I ¶¶ 94-98.  Despite these alleged encounters, Amtrak and Veolia disagree on whether
Amtrak knew about Veolia contacting its employees concerning contingent offers of employment.  Pl.'s
Supp. Facts § I ¶¶ 94-98.

[4] The recruitment of Mr. Yannuzzi was discontinued when he informed Veolia that he would be
unwilling to leave Amtrak unless Veolia was able to match his retirement and health benefits.  Defs.'
Facts ¶ 91.

Id. ¶¶ 37, 41; Pl.'s Facts ¶ 31.[5]  As general manager, Mr. Birckett worked with Neil Shah,

Veolia's Manager of Rail Development, John Kerins, Veolia's Vice President for Rail

Development, and Veolia's Human Resources Department to identify and recruit candidates for

the other members of Veolia's Key Management Team.  Defs.' Facts ¶¶ 42, 44; Pl.'s Supp. Facts

§ I ¶ 42.

For its Transportation position, Veolia considered James Turngren and Victor Salemme,

both Amtrak empoyees,[6] as well as Marcus Moore, an independent consultant, and Deborah

Wetter, a Veolia employee.  Defs.' Facts ¶ 45; Pl.'s Supp. Facts § I ¶ 45.[7]  Veolia ultimately

extended a contingent offer of employment to Mr. Salemme, who accepted the offer on

November 3, 2006.  Defs.' Facts ¶¶ 45, 56; Pl.'s Supp. Facts § I ¶ 45, 56.  Although, the offer

was contingent upon Veolia being awarded the Tri-Rail Operations Contract, Mr. Salemme

permitted Veolia to list him and his résumé on its bid.  Defs.' Facts ¶ 56.  At the time of the

offer, Mr. Salemme was the Assistant Superintendent for Amtrak's Maine Passenger Service,

and he had previously been recognized by Amtrak for his exceptional service.  Id. ¶¶ 49, 52;

Pl.'s Supp. Facts § I ¶¶ 49, 52.

For its Safety position, Veolia considered Amtrak employees Doug Stencil and Jewel

---

[5] The Court recognizes that there is a dispute concerning whether Veolia ever extended Mr. Birckett a contingent offer of employment if Veolia was awarded the Tri-Rail Operations contract, or rather, merely discussed the possibility of a contingent offer with him. Pl.'s Facts ¶¶ 29-31; Defs.' Counter Facts § I ¶¶ 29-31.

[6] The Court notes that it is unclear from the record whether Veolia contacted Mr. Turngren for purposes of recruitment.  However, the record is clear that Veolia initiated the recruitment of Mr. Salemme.  Pl.'s Mot., Orseck Decl., Ex. 32 (May 8, 2008 Deposition Transcript of Victor Salemme) ("Salemme Dep.") at 44:10-18.

[7] The Court notes that there is a dispute whether Ms. Wetter was actually considered by Veolia for its Transportation position. Pl.'s Supp. Facts § I ¶ 45.

Picket,[8] along with James Waterman, a Veolia employee. Defs.' Facts ¶ 59. Veolia interviewed

Mr. Stencil, a Senior Analyst in the Operation Practices Section, id. ¶¶ 60, 63; Pl.'s Mot., Orseck

Decl., Ex. 33 (May 7, 2008 Deposition Transcript of Douglas Stencil) ("Stencil Dep.") at

44:11-19, who had an exceptional record as an Amtrak employee, see Defs.' Facts ¶ 65 (noting

that he had "never been disciplined or reprimanded"). On October 31, 2006, Veolia extended

Mr. Stencil an offer of employment contingent on it being awarded the Tri-Rail Operations

contract, which Mr. Stencil accepted on November 3rd of the same year. Id. ¶ 68. Veolia's offer

to Mr. Stencil was identical in nature to the offer accepted by Mr. Salemme. Id. ¶¶ 56, 68.

For its Communications position, Veolia considered Amtrak employee Gary Mauck,[9]

James Tylick of Veolia,[10] and Mr. Moore, who also had been considered for the Transportation

position. Id. ¶ 71. Veolia first heard of Mr. Mauck's potential availability from Tom Kirk, an

Amtrak Assistant Superintendent in Florida, who said that Mr. Mauck was planning to retire

from his position with Amtrak. Defs.' Facts ¶ 76; Pl.'s Supp. Facts § I ¶ 76. Mr. Moore had

been Veolia's first choice for the position; however, after learning that Mr. Moore would be

unavailable for the initial proposal deadline, Defs.' Facts ¶ 72, Veolia "called Mr. Mauck and

asked him if he would be interested in the potential Communications Manager position with

_____

[8] The Court notes that it is unclear from the record whether Veolia initiated the recruitment of Ms. Picket, however, the Record seems to suggest that Veolia initiated the recruitment of Mr. Stencil, Pl.'s Mot., Orseck Decl., Ex. 33 (May 7, 2008 Deposition Transcript of Douglas Stencil) ("Stencil Dep.") at 70:1-22, 71:1-3.

[9] The Court notes that the record is clear that Veolia initiated the recruitment of Mr. Mauck. Pl.'s Mot., Orseck Decl., Ex. 31 (May 8, 2008 Deposition Transcript of Gary Mauck) ("Mauck Dep.") at 32:4-11.

[10] Mr. Tylick was offered the position but he declined the offer. Pl.'s Supp. Facts § I ¶ 71; Defs.' Reply Facts § I ¶ 71.

Veolia for the Tri-Rail Operations [C]ontract," id. ¶ 77.  Mr. Mauck submitted his résumé to

Veolia for the position on November 8, 2006, id. ¶ 78, and within a few days he was extended a

contingent offer similar to the terms offered to Mr. Salemme and Mr. Stencil, which he accepted,

id. ¶ 83.  At that time, Mr. Mauck was the District Manager for Amtrak in New Mexico and had

an exceptional employment record.  Id. ¶¶ 73, 81.

Finally, Veolia filled the Human Resources and Labor Relations position with a

contractor employed by CSX Transportation, Inc.,[11] proposing the identical contingent offer that

was made to the other potential members on the Key Management Team.  Id. ¶¶ 87-89.

Veolia submitted its proposal to the SFRTA on January 11, 2007, with a price proposal of

$97,155,817.  Id. ¶¶ 155-56.

C.      Amtrak's Tri-Rail Proposal

On November 2, 2006, Amtrak posted openings on its public website for its Key

Management Team positions for the Tri-Rail contract, and stated that it would accept

applications for the positions from both external and internal candidates.  Id. ¶¶ 110, 112; Pl.'s

Supp. Facts § I ¶¶ 110, 112.  Ultimately, Amtrak selected three individuals for its Key

Management Team from existing Amtrak employees, Defs.' Facts ¶¶ 113, 159 (Joe Yannuzzi as

General Manager, Lou Pescevic as Assistant Superintendent of Transportation, and Doug Stencil

as Principal, Safety/Training), along with Guy Whitney, a Herzog employee to whom Amtrak

extended a contingent offer as its choice for the Communications position.  Id. ¶¶ 113, 133, 134;

Pl.'s Supp. Facts § I ¶¶ 113, 133, 134.  Angel Torress, who did not possess the level of railway

_____

[11] CSX, like Amtrak and Veolia, Inc., is a provider of transportation services, including
operations services and commuter rail systems.  See Defs.' Facts ¶ 4.  At the time the Requests for
Proposals for the Tri-Rail Contract were issued in 2006, the SFRTA's "dispatching and maintenance of
way services [were] being provided by CSX," whose contract was soon scheduled to expire. Id.

experience required by the Operations Request for Proposals,[12] nonetheless was selected by Amtrak for the Human Resources and Labor Relations position.  Defendants' Local Rule 7(h) Reply Statement of Material Facts in Further Support of Defendants' Motion for Summary Judgment ("Defs.' Reply Facts") § III ¶¶ 41-44.  Amtrak identified Mr. Stencil as the person who would occupy the Safety position, Defs.' Facts ¶¶ 125-26; Pl.'s Supp. Facts § I ¶¶ 125-26, and he signed the Key Employee Certification submitted with Amtrak's December 21, 2006 bid, but the parties dispute whether Mr. Stencil and Amtrak ever agreed to do more than merely permit his name and résumé to be submitted with the bid, Defs.' Facts ¶¶ 129, 130; Pl.'s Supp. Facts § I ¶ 129.  Finally, Amtrak asked Mr. Salemme about his interest in the Transportation position, but Mr. Salemme refused to be considered for that position, Pl.'s Facts ¶ 57; however, the parties disagree on whether he rejected Amtrak's overtures because he "was involved with [Veolia] already," id., or for other reasons, Defs.' Facts ¶ 119.  Ultimately, Amtrak selected Lou Pescevic for the Transportation position.  Pl.'s Supp. Facts § I ¶¶ 118, 121.[13]

Amtrak also assembled a team to prepare its proposal for the Tri-Rail contract.  Defs.' Facts ¶ 157.  In preparing Amtrak's bid, the team considered various factors affecting price, including statutory requirements, labor costs, overhead rates, potential liabilities, and management fees.  Id. ¶¶ 161-192.  Amtrak had particular "concern[s] that [its] total cost package was already higher than [its] competitors and that increasing the management fee would

---

[12] The Operations Request for Proposals established that the "General Manager and each member of the Contractor's Key Management Team must possess a minimum of 3 years of recent experience (i.e.[,] within the past 5 years) as the operator of a passenger railroad service." Pl.'s Mot., Orseck Decl., Ex. 8 (RFP) § 3.1 at AMTH 003718.

[13] The complete title of this position was "Assistant Superintendent, Transportation for the Operations [C]ontract." Pl.'s Supp. Facts § I ¶ 121.

only further increase Amtrak's costs." Id. ¶ 189; Pl.'s Supp. Facts § I ¶ 189. Despite these concerns, Amtrak's team received final approval for its proposal from senior Amtrak management officials sometime between late December 2006 and early January 2007. Defs.' Facts ¶¶ 193, 195; Pl.'s Supp. Facts § I ¶¶ 193, 195. Consequently, Amtrak submitted its proposal to the SFRTA on January 4, 2007, with a price proposal of $162,639,724. Defs.' Facts ¶¶ 197, 198; Pl.'s Supp. Facts § I ¶¶ 197, 198.

D.      The SFRTA Awards the Contract to Veolia

Upon receiving the two bids for the Tri-Rail contract, a SFRTA evaluation committee assigned numerical scores to each bid in four categories for purposes of determining which bid to select. Compl. ¶¶ 43-47; Pl.'s Mot., Orseck Decl., Ex. 13 (Evaluation Memo). Those four categories and the scores assigned to each category were the following: the price of the bid (which accounted for 15 points of the final score), the technical approach of the bid (worth 25 points of the final score), the operating plans (worth 25 points of the final score), and the qualifications and experience of the Key Management Team (worth 35 points of the final score). See Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment ("Defs.' Mem."), Declaration of T. Stewart Rauch ("Rauch Decl."), Ex. 1 (Operations RFP) at AMTH004101-02, AMTH004169-70. In reviewing the bids, the SFRTA retained the right to reject both proposals if, for example, neither proposal was sufficiently responsive to the SFRTA's requirements. See Pl.'s Mot., Orseck Decl., Ex. 15 (May 27, 2008 Deposition Transcript of Bonnie Arnold) ("Arnold Dep.") at 26:2-30:25. Excluding the score awarded to the price component, Veolia's bid received a total score of 70 points, while Amtrak's bid received a score of 62.3 points. Defs.' Mem., Rauch Decl., Ex. 62 (SFRTA Evaluation

Committee Rankings) at AMTH002916. As to the price component of its equation, the SFRTA adopted a policy of not awarding any points to bids that were priced more than 15 points higher than the lowest price proposal, id., Rauch Decl., Ex. 1 (Operations RFP) at AMTH004170, and because Veolia had underbid Amtrak by 66%, the SFRTA awarded Veolia 15 points, while Amtrak received a score of zero,[14] id., Rauch Decl., Ex. 62 (SFRTA Evaluation Committee Rankings) at AMTH002916. Amtrak's and Veolia's scores were nearly identical in the qualifications and experience category, with Veolia receiving 28.0 points and Amtrak receiving 27.3 points for the composition of their respective Key Management Teams. Id.; id., Affidavit of Joseph Giulietti ("Giulietti Aff.") ¶ 7. The scores in this category were based on the individual reviewers' assessments of each Key Management Team based on criteria identified in the SFRTA's Request for Proposals. See id., Rauch Decl., Ex. 1 (Operations RFP) at AMTH004169-70.[15] Accordingly, the SFRTA's Evaluation Committee awarded Veolia's proposal a total score of 85 points, and Amtrak's proposal received a total score of 62.3. Defs.' Facts ¶ 212; Pl.'s Supp. Facts ¶ 212. As a result of this large disparity, the SFRTA selection committee voted unanimously to award Veolia the Operations contract. Defs.' Mem., Rauch Decl., Ex. 61 (SFRTA Recommendation Memo) at 2; see id., Giulietti Aff. ¶ 7.

On January 24, 2007, Amtrak was notified by the SFRTA that it had not been awarded the Tri-Rail contract. Id., Rauch Decl., Ex. 68 (Notice of Intent to Award for RFP 06-112). As a

---

[14] As noted above, Amtrak's final bid price was $162,639,724, Defs.' Mem., Rauch Decl., Ex. 15 (Amtrak Proposal) at AMTH000422, while Veolia's final bid price was $97,155,817, id., Rauch Decl., Ex. 10 (Veolia SFRTA Proposal) at AMTH006557. See also Defs.' Facts ¶ 202.

[15] The evaluation criteria for this category were corporate skills and experience, financial resources, experience of the proposed general manager and Key Management Team members, safety record, references from past and current projects, and understanding of commuter rail operating environments. Defs.' Mem., Rauch Decl., Ex. 1 (Operations RFP) at AMTH004169.

result of not being selected, Amtrak filed a notice of intent to file a bid protest and requested

copies of Veolia's proposal, Defs.' Mem., Rauch Decl., Ex. 71 (January 25, 2007 Letter from

Thomas Moritz of Amtrak to Christopher C. Bross of SFRTA), which it received on January 26,

2007, Compl. ¶ 52. Receipt of Veolia's proposal provided Amtrak access to information not

only about Veolia's price proposal, but also about the fact that Mauck, Salemme, and Stencil had

appeared on Veolia's bid as members of its proposed Key Management Team. Id. ¶¶ 51-52.

On February 8 and 9, 2007, Amtrak informed Salemme and Mauck that they had violated

its conflict-of-interest policy by permitting their names to be associated with Veolia's bid, and

that they had to resign from their positions with Amtrak or they would be involuntarily

terminated.[16] Pl.'s Facts ¶¶ 95, 99; Defs.' Facts ¶¶ 228, 233. Both opted to resign. Defs.' Facts

¶¶ 228, 233; Pl.'s Mot., Orseck Decl., Ex. 32 (May 8, 2008 Deposition Transcript of Victor

Salemme) ("Salemme Dep.") at 36:18-43:14; id., Orseck Decl., Ex. 31 (May 8, 2008 Deposition

Transcript of Gary Mauck) ("Mauck Dep.") at 85:4-14. In addition, Amtrak terminated Mr.

Stencil's employment based on its conflict-of-interest policy. Defs.' Facts ¶¶ 231-32.

On February 12, 2007, Salemme, Stencil, and Mauck received permanent offers from

Veolia. See Defs.' Mem., Rauch Decl., Ex. 75 (Offer letter from John Kerins to Mr. Salemme);

id., Rauch Decl., Ex. 76 (Offer letter from Mr. Kerins to Mr. Stencil); id., Affidavit of Gary F.

Mauck ("Mauck Aff."), Ex. C (Offer letter from Mr. Kerins to Mr. Mauck). All three

commenced their employment with Veolia shortly thereafter and are currently employed by

Veolia on the SFRTA Tri-Rail project. See Pl.'s Mot., Orseck Decl., Ex. 31 (Mauck Dep.) at

---

[16] According to Amtrak, its employees are required to "agree to Amtrak's Conflict of Interest Policy," which "prohibits employees from having relationships with competitors of Amtrak that result in compensation or other value received, and requires the disclosure of any relationships/positions that may be potential or actual conflicts of interest." Pl.'s Facts ¶ 95.

21:14-22:17; id., Orseck Decl., Ex. 32 (Salemme Dep.) at 43:15-44:9; id., Orseck Decl., Ex. 33 (Stencil Dep.) at 9:11-22.

Salemme, Stencil, and Mauck had been at-will Amtrak employees, Defs.' Facts ¶¶ 50, 64, 79; Pl.'s Supp. Facts § I ¶¶ 50, 64, 79, and none of them had signed documents barring them from competing with Amtrak after their employment with Amtrak terminated, Defs.' Facts ¶¶ 50, 64, 80; Pl.'s Supp. Facts § I ¶¶ 50, 64, 80. The parties disagree on whether any of the three Amtrak employees knew that Amtrak was seeking to acquire the Tri-Rail contract before signing contingent offers with Veolia. Defs.' Facts ¶¶ 54, 70, 85; Pl.'s Supp. Facts § I ¶¶ 54, 70, 85. It is also disputed whether Veolia asked the employees "not to sign up with Amtrak" on its bid to acquire the Tri-Rail contract. Defs.' Facts ¶¶ 57, 69, 84; Pl.'s Supp. Facts § I ¶¶ 57, 69, 84.

E.     The Current Litigation

In this action, Amtrak seeks to recover damages it has allegedly suffered as a result of not being awarded the SFRTA contract. Compl. at 1-2. As noted earlier, Amtrak asserts two claims against Veolia. The first count of the Complaint alleges that Veolia aided and abetted the three former Amtrak employees' breach of their fiduciary duties owed to Amtrak, resulting in Amtrak not being awarded the SFRTA contract. Id. ¶¶ 53-59. The second count of the Complaint alleges that Veolia tortiously interfered with Amtrak's prospective business expectancy associated with the Tri-Rail contract. Id. ¶¶ 60-66.

Pursuant to Federal Rule of Civil Procedure 56, Amtrak has moved for partial summary judgment on the first count of its Complaint. Pl.'s Mot. at 1. Amtrak contends as support for its motion that (1) its three former employees each owed a fiduciary duty to Amtrak, Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment as to Liability on Count I ("Pl.'s

Mem.") at 15-17, and (2) Veolia helped the employees breach those duties by extending contingent offers to them, id. at 23-24, including their names and résumés on its bid for the Tri-Rail contract, and inducing them to exclude their names from Amtrak's bid, id. at 24.

Veolia opposes the motion on the ground that genuine issues of material fact exist as to the claim asserted in Count I. Defendant's Memorandum of Points and Authorities in Opposition to Amtrak's Motion for Partial Summary Judgment ("Defs.' Opp'n") at 1. In addition, Veolia has filed a cross-motion for summary judgment on both counts of the Complaint, asserting, as to Count I, that there is no genuine issue of material fact as to the following: (1) that Amtrak's former employees did not breach any fiduciary duties owed to Amtrak because the SFRTA contract was outside the scope of their employment, Defs.' Mem. at 13; Defs.' Opp'n at 9-10; (2) that signing the contingent offers did not constitute a breach of a fiduciary duty, Defs.' Opp'n at 21; Defs.' Mem. at 15-18; (3) that Veolia did not know its behavior would be aiding and abetting the breach of any fiduciary duty by Amtrak's former employees, Defs.' Opp'n at 18-20; and (4) that Amtrak cannot show that the inclusion of its then-employees on Veolia's bid caused it to lose the SFRTA contract, id. at 15-17; Defs.' Mem. at 25-28. As to Count II, Veolia argues that (1) as a competitive bidder Amtrak did not have a valid business expectancy in the SFRTA contract, Defs.' Mem. at 31-35; (2) Veolia could not have known of Amtrak's business expectancy because it did not know Amtrak was bidding on the contract, id. at 35-37; (3) Amtrak cannot show that it would have been awarded the contract even if Veolia had failed to submit a bid, id. at 37-42; and (4) various theories demonstrate that Amtrak is not entitled to money damages, id. at 42-44.

## II. Standard of Review

To grant a motion for summary judgment under Rule 56(a), a court must find that the pleadings, the discovery, and any affidavits "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." Hamilton v. Geithner, 743 F. Supp. 2d 1, 6 (D.D.C. 2010) (Walton, J.). In showing the existence of a material fact, the non-moving party cannot rely on "mere allegations or denials," Burke v. Gould, 286 F.3d 513, 517 (D.C. Cir. 2002) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)) (internal quotation marks omitted), because "conclusory allegations unsupported by factual data will not create a triable issue of fact," Pub. Citizen Health Research Grp. v. FDA, 185 F.3d 898, 908 (D.C. Cir. 1999) (internal brackets, quotation marks, and citation omitted). If a party against whom a motion is filed fails to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment for the movant is warranted. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). However, the party moving for summary judgment bears the burden of establishing that there is insufficient evidence to support the non-moving party's case. Id. at 325. "When ruling on a motion for summary judgment, the courts must view the evidence in the light most favorable to the non-moving party." Quigley v. Giblin, 582 F. Supp. 2d 1, 8 (D.D.C. 2008) (citing Bayer v. U.S. Dep't of the Treasury, 956 F.2d 330, 333 (D.C. Cir. 1992)). Thus, a court "must draw all reasonable inferences in favor of the non[-]moving party, and it may not make credibility determinations or weigh the evidence." Id. at 8.

### III. Legal Analysis

A.    The Defendants' Failure to Exhaust Administrative Remedies Challenge[17]

As an initial matter, Veolia seeks summary judgment on Amtrak's claims on the grounds that Amtrak failed to exhaust its administrative remedies.  Defs.' Mem. at 44.  Amtrak responds that Florida law does not require "an unsuccessful bidder [to] exhaust administrative remedies before it may sue a competitor."  Plaintiff National Railroad Passenger Corporation's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Opp'n") at 37.

Under Florida law, "[i]t is improper, if administrative remedies are adequate, to seek relief in [a trial] court before those remedies are exhausted."  Fla. Marine Fisheries Comm'n v. Pringle, 736 So. 2d 17, 20 (Fla. Dist. Ct. App. 1999) (internal quotation marks and citation omitted).  "While ordinarily a plaintiff who has an administrative remedy provided by statute must exhaust that remedy before a court will act to give the same remedy, a plaintiff is not required to pursue administrative remedies where they are not available and adequate," Berkowitz v. City of Tamarac, 654 So. 2d 982, 983 (Fla. Dist. Ct. App. 1995) (internal quotation marks and citation omitted), "such as when a plaintiff seeks monetary damages that an administrative forum has no authority to award," Barry Cook Ford, Inc. v. Ford Motor Co., 616 So. 2d 512, 517 (Fla. Dist. Ct. App. 1993).

Pursuant to the Request for Proposals, bidders for the Tri-Rail contract had the right to file a protest of the SFRTA's decision within 72 hours of the contract's award.  Defs.' Mem.,

---

[17] The Court will analyze the issues regarding exhaustion of administrative remedies under Florida law because the bids were submitted in Florida, and the Request for Proposals provides that this challenge shall be decided based on Florida Law.  See Defs.' Mem., Rauch Decl., Ex. 1 (RFP) § 1.16(d) (stating that unresolved protests are subject to proceedings pursuant to Florida law); id. § 2.20 (stating that "[t]he [c]ontract shall be interpreted under[,] and its performance governed by[,] the laws of the State of Florida").

Rauch Decl., Ex. 1 (RFP) § 1.16(a) at AMTH 004102; Defs.' Facts ¶ 29. "Failure to file a notice of protest or failure to file a formal written protest . . . [would] constitute a waiver of proceedings." Defs.' Mem., Rauch Decl., Ex. 1 (RFP) § 1.16(d) at AMTH 004103. In the event that such a protest was made and remained unresolved, the protest would be referred to the Florida Division of Administrative Hearings for further proceedings. Id., Rauch Decl., Ex. 1 (RFP) § 1.16(g)–(h) at AMTH 004103-04. While Amtrak considered filing a protest, it never did. See Defs.' Facts ¶¶ 215, 218. However, such a protest would have been ineffective considering the claims asserted by Amtrak.

The Request for Proposals allowed for protests of "the specifications contained in [the Request for Proposals]" and by those who were "affected adversely by [the] SFRTA's decision . . . concerning a solicitation or contract award." Defs.' Mem., Rauch Decl., Ex. 1 (RFP) § 1.16(a)–(b) at AMTH 004102-03. Here, however, Amtrak seeks monetary relief for acts allegedly committed by Veolia, not by the SFRTA. Compl. at 1. In other words, Amtrak challenges the actions of Veolia and its employees, rather than the specifications of the Request for Proposals or the SFRTA's selection decision. Thus, even if Amtrak had filed a timely protest, neither the SFRTA nor the Division of Administrative Hearings could have granted the relief now being requested by Amtrak in this litigation. See W. Radio Servs. Co. v. Qwest Corp., 530 F.3d 1186, 1199 (9th Cir. 2008) (noting that exhaustion is generally required in actions against agencies and agency officials, not those between two private parties). Therefore, the Court must deny the defendants' motion for summary judgment based on the plaintiff's alleged failure to exhaust its administrative remedies.

17

B.    The Plaintiff's Aiding and Abetting the Breach of a Fiduciary Duty Claim (Count I)[18]

Amtrak and Veolia both seek summary judgment on Amtrak's claim that Veolia aided and abetted breaches of fiduciary duties owed to Amtrak by its former employees. Amtrak contends in support of its motion for partial summary judgment that "there is no jury-submissable issue as to any of the[] elements" necessary to prevail on its claim for aiding and abetting a breach of fiduciary duty. Plaintiff National Railroad Passenger Corporation's Reply Brief in Further Support of Its Motion for Partial Summary Judgment ("Pl.'s Reply") at 2. The foundation for its position is that "Amtrak employees Mauck, Salemme and Stencil owed a fiduciary duty of loyalty to Amtrak; they each breached that duty at the behest of Veolia; Veolia (having induced and orchestrated the breach) certainly had knowledge of the breaches; and Veolia (to say the least) substantially assisted and encouraged the wrongful conduct." Pl.'s Mem. at 14-15. More specifically, Amtrak argues that (1) the three employees were all Amtrak employees who owed it an undivided duty of loyalty, id. at 15-16; (2) the three employees breached that duty by entering into competition with Amtrak by agreeing to have their names placed on Veolia's bid proposal for the SFRTA contract, id. at 19-21; (3) Veolia was aware that it was aiding and abetting the three employees' breach of their fiduciary duties because it knew the employees worked for Amtrak, the three employees consented to appear on Veolia's bid, and they were subject to a conflict-of-interest policy similar to the one Veolia itself employs, id. at 22-23; and (4) Veolia substantially assisted the three employees' breaches by approaching them and offering them contingent job offers if it acquired the SFRTA contract, id. at 23-25. In

_____

[18] The Court will examine Amtrak's claims of aiding and abetting the breach of a fiduciary duty and tortious interference with an economic advantage in accordance with District of Columbia law because, as this Court noted in Amtrak I, the standard for adjudicating this claim is the same under Florida law. 592 F. Supp. 2d at 94 n.6, 98 n.7. Accordingly, a conflicts-of-law analysis is unnecessary.

response, Veolia argues that the Court cannot grant the plaintiff's partial motion for summary judgment because "there are genuine issues of material fact [that] preclud[e] summary judgment." Defs.' Opp'n at 1. Veolia contends that factual issues exist because it can show that (1) the former Amtrak employees did not breach a fiduciary duty that was within the scope of their employment, id. at 7-15; (2) it could not have known of, nor did it, substantially aid and abet a breach that never occurred, id. at 18-21; and (3) Amtrak cannot establish that it would have been awarded the SFRTA contract had its former employees not agreed to have their names placed on Veolia's bid for the SFRTA contract, thus precluding Amtrak from establishing an essential element of its breach of a fiduciary duty claim, that is, causation, id. at 15-18.

To prevail on its motion for summary judgment on Count I of its Complaint, Amtrak must show that there is no genuine dispute of a material fact as to the following: "(1) a fiduciary duty on the part of the primary wrongdoer, (2) a breach of this fiduciary duty, (3) knowledge of this breach by the alleged aider and abettor, and (4) the aider and abettor's substantial assistance or encouragement of the wrongdoing." Amtrak I, 592 F. Supp. 2d at 94 (quoting AmeriFirst Bank v. Bomar, 757 F. Supp. 1365, 1380 (S.D. Fla. 1991)); see also Halberstam v. Welch, 705 F.2d 472, 477 (D.C. Cir. 1983). Conversely, for Veolia to prevail on its cross-motion for summary judgment on Count I, it must show that there are no genuine disputes of material facts and that those undisputed facts are sufficient to defeat one or more elements of Amtrak's claims regarding any of these four elements, or on the question of whether Amtrak suffered "injuries that were proximately caused by the breach of [its former employees'] fiduciary duties." Armenian Genocide Museum & Mem'l, Inc. v. Cafesjian Family Found., Inc., 607 F. Supp. 2d 185, 191 (D.D.C. 2009) (citing Paul v. Judicial Watch, Inc., 543 F. Supp. 2d 1, 5-6 (D.D.C.

2008)).

            1.      <u>Fiduciary Duty Owed to Amtrak By the Three Former Amtrak Employees</u>

"Unless otherwise agreed, an agent" owes a fiduciary duty to his principal "to act solely for the benefit of the principal in all matters concerned with his agency." <u>Gross v. Akin, Gump, Strauss, Hauer & Feld, LLP</u>, 599 F. Supp. 2d 23, 32 (D.D.C. 2009).  Thus, the threshold question in determining whether Salemme, Stencil, and Mauck owed a fiduciary duty of loyalty to Amtrak is whether they were "agents" of Amtrak.  Whether an agency relationship existed between Amtrak and its three former employees depends, in part, on "(1) the selection and engagement of the [employees], (2) the payment of wages, (3) [Amtrak's] power to discharge [the employees], (4) [Amtrak's] power to control the [employees'] conduct, (5) and whether the work [or conduct at issue] is part of the regular business of the employer." <u>LeGrand v. Ins. Co. of N. Am.</u>, 241 A.2d 734, 735 (D.C. 1968) (quoting <u>Dovell v. Arundel Supply Corp.</u>, 361 F.2d 543, 544 (D.C. Cir. 1966)); <u>Judah v. Reiner</u>, 744 A.2d 1037, 1040 (D.C. 2000).  The District of Columbia Court of Appeals has noted that when "the employer has the right to control and direct the servant," then an agency relationship will generally be found.  <u>Judah</u>, 744 A.2d at 1040 (quoting <u>LeGrand</u>, 241 A.2d at 735).  However, it is not the "actual exercise" of control or supervision that is determinative, but merely "the right [of the employer] to control" an employee that "is usually dispositive of whether there is an agency relationship." <u>Id.</u> (citing <u>Safeway Stores, Inc. v. Kelly</u>, 448 A.2d 856, 860 (D.C. 1982)).

Generally, "[an] agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship." Restatement (Third) of Agency § 8.01 (2006). A "'fiduciary relationship arises when one person . . . manifests assent to another person . . . that

the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.'" Jenkins v. Strauss, 931 A.2d 1026, 1033 (D.C. 2007) (quoting Restatement (Third) of Agency § 1.01). Accordingly, fiduciary principles are applicable to employees. See Gov't Relations Inc. v. Howe, No. Civ. A 05-1081, 2007 WL 201264, at *10 (D.D.C. Jan. 24, 2007) (stating that in "the field of corporate employment . . . it has been established that employees . . . owe an undivided and unselfish loyalty to the corporation" (citations and internal quotation marks omitted)); see also Draim v. Virtual Geosatellite Holdings, Inc., 631 F. Supp. 2d 32, 39 (D.D.C. 2009) (indicating that "even in the absence of a written contract and even in an employment agreement that is at will, an employee must, as a matter of agency law, act solely for the benefit of her principal in all matters concerning her agency" (citations omitted)). Here, although the three employees were at-will employees, Amtrak had the right to "control and direct . . . [their] work performance[ and] the manner in which they conducted their work, and . . . [that] their work was part of the regular business of Amtrak." Amtrak I, 592 F. Supp. 2d at 95. Also, Amtrak has a policy prohibiting its employees from engaging in activities that create a conflict of interest with Amtrak. Pl.'s Reply at 8 n.6. Mauck and Stencil each signed a "Certificate of Compliance," certifying that they reviewed and agreed to the policy. Pl.'s Facts ¶¶ 96-97. While Salemme declined to sign the document, he was aware of his obligations under the policy. Id. ¶ 98.[19] Indeed, "it has been established that employees–especially managers, corporate officers, and directors–owe an undivided and unselfish loyalty to [their corporate employers,] such that there shall be no

---

[19] The Court recognizes that Veolia disputes actual knowledge of this policy, Defs.' Counter Facts ¶ 95, which weighs against Amtrak being entitled to summary judgement.

conflict between duty and self interest," <u>Gov't Relations, Inc.</u>, 2007 WL 201264, at *10 (internal

quotation marks omitted), and here, Salemme, Stencil, and Mauck were all management-level

employees, <u>see</u> Pl.'s Reply at 5; Defs.' Facts ¶¶ 49, 63, 73 (noting that their titles were Assistant

Superintendent for Maine Passenger Service, Senior Analyst in Amtrak's Operating Practices

Section, and District Manager of Stations, respectively).  Mr. Salemme's responsibilities

included "start[ing] a brand new service," and he was tasked with "organiz[ing] and protect[ing]

the agreements that Amtrak had . . . with the state agencies." Pl.'s Mot., Orseck Decl., Ex. 32

(Salemme Dep.) at 35:10-36:1.  Mr. Stencil, as Senior Analyst in Amtrak's Operating Practices

Section, was primarily responsible for training employees.  <u>Id.</u>, Orseck Decl., Ex. 33 (Stencil

Dep.) at 39:18-43:21.  He provided training regarding operating rules, customer service, safety,

revenue, and engineering recertification, and also administered operating rules examinations.  <u>Id.</u>

Mr. Mauck managed station operations in four states, which involved "[t]he day-to-day

manag[ement] of people." <u>Id.</u>, Orseck Decl., Ex. 31 (Mauck Dep.) at 21:2-6, 26:11-28:20.  Given

the three employees' job responsibilities, the Court agrees that they all owed Amtrak a general

duty of loyalty.

        2.     <u>Breach of the Fiduciary Duty</u>

As to this component of its claim, Amtrak first argues that the three employees breached

their fiduciary duties by accepting a rival bidder's contingent offers for employment, which

created "a substantial financial incentive to see that Veolia, not Amtrak, won the [bid]." Pl.'s

Mem. at 19.  Second, Amtrak contends that the employees breached their fiduciary duties by

permitting Veolia to include their names and résumés with its proposal, <u>id.</u> at 20, and by

agreeing to withhold their names from Amtrak's bid, Pl.'s Opp'n at 12-13, thus placing

themselves "in direct competition with their employer's best interests," Pl.'s Mem. at 19

(internal alterations, quotation marks, and citation omitted).[20]

Veolia responds that the three employees did not solicit customers or employees for it,

that it did not divert any Amtrak corporate opportunities, and it did not misuse any of Amtrak's

trade secrets. Defs.' Mem. at 22-23. Instead, Veolia argues, the employees merely prepared to

go into competition with Amtrak by making plans to work for Veolia after their employment

ended. Id. at 15-16. Furthermore, Veolia posits that the employees were free not to disclose to

Amtrak that they intended to work for Veolia so long as they did not compete with Amtrak prior

to their separation from its employment. Id. at 16. Veolia contends that the employees acted in

accordance with industry custom because "[i]n the government contracts public procurement

world, it is custom and practice for contingently hired proposed employees to appear on multiple

[bid] proposals." Id. at 24. Veolia also represents that it did not ask the employees to refrain

from appearing on Amtrak's bid. Id. at 18.[21] Finally, while Veolia concedes that an employee

---

[20] Amtrak also claims that by helping Veolia prepare its bid, the employees breached their employment duties. See Pl.'s Supp. Facts § II ¶ 11. However, the only evidence this Court can find indicating that any of the three employees actually assisted Veolia in preparing its bid was Mr. Birckett asking Mr. Salemme a question relating to an engineering training program, which Mr. Salemme either never answered, Pl.'s Mot., Orseck Decl., Ex. 18 (May 6, 2008 Deposition Transcript of Sidney N. Birckett) ("Birckett Dep.") at 235:4-238:17, or answered by directing Mr. Birckett to the Code of Federal Regulations, id., Orseck Decl., Ex. 32 (Salemme Dep.) at 88:9-90:22. It is therefore questionable whether there was such assistance provided by Mr. Salemme. Moreover, even if the Court had a basis for believing that these former Amtrak employees read the Request for Proposals, see Pl.'s Opp'n, Declaration of Eva A. Temkin in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Temkin Decl."), Ex. 15 (Birckett-Stencil Email), this alone would not be sufficient to grant Amtrak summary judgment absent evidence that the employees did more than merely review the Request for Proposals.

[21] Veolia argues that because the employees were not bound by any post-termination covenant not to compete, it could not have breached any fiduciary duties owed to Amtrak. Defs.' Mem. at 17, 21-22. The Court finds these arguments unresponsive to Amtrak's theory that the three employees' actions constituted a breach prior to their termination. See Pl.'s Opp'n at 10-12.

does owe a general duty of loyalty to an employer, it asserts that "there are genuine issues of material fact as to whether the individual employee's scope of employment was so broad as to include a duty to refrain from accepting a better albeit potential job unrelated to their current work locations and responsibilities," Defs.' Opp'n at 7, and thus beyond their "scope of employment," id. at 9.

Amtrak has identified two separate acts that it maintains amounted to breaches of the three employees' fiduciary duties. Veolia argues that even if these acts occurred, they would not fall within the scopes of the three former employees' employment and therefore could not constitute breaches of their fiduciary duties. The Court will examine each purported act separately.

        a.      Participation In A Rival's Bid

While employees are not permitted to enter into competition with their employer, they are entitled to "make arrangements or plans to go into competition with [their] principal before terminating [their employment] . . . ." Mercer Mgmt. Consulting, Inc. v. Wilde, 920 F. Supp. 219, 233 (D.D.C. 1996) (quoting Sci. Accessories Corp. v. Summagraphics Corp., 425 A.2d 957, 962 (Del. 1980)). In determining whether an act is a breach or constitutes mere preparation, courts assess whether the employee engaged in "unfair acts" or caused "injury" to his employer. Gov't Relations, 2007 WL 201264, at *10 (quoting Sci. Accessories Corp., 425 A.2d at 962). Acts that have been deemed to constitute preparation rather than actual competition include "mere preparation to open a competing business[,] . . . [o]pening a bank account and obtaining office space and telephone service," Harllee v. Prof'l Serv. Indus., Inc., 619 So. 2d 298, 300 (Fla. Dist. Ct. App. 1992), as well as "purchas[ing] a rival business and upon termination of

employment immediately compet[ing]" with a former employer, <u>Gov't Relations</u>, 2007 WL 201264, at *11 (quoting <u>Mercer</u>, 920 F. Supp. at 233); <u>see also</u> <u>Jet Courier Serv., Inc. v. Mulei</u>, 771 P.2d 486, 494 (Colo. 1989). By comparison, acts that have been found to constitute <u>actual</u> competition include solicitation of business for an employee's personal endeavor, which otherwise the employee had an obligation to obtain for an employer, competing with the employer for customers or employees, and employee behavior leading to the mass resignation of the employer's workforce. <u>See</u> <u>Sci. Accessories Corp.</u>, 425 A.2d at 965; <u>Mercer</u>, 920 F. Supp. at 234.

Veolia argues that there is no legal support for the proposition that accepting a contingent offer of employment is a breach of fiduciary duty, Defs.' Opp'n at 14, and Amtrak acknowledges that "[t]here is nothing inherently wrong with the concept of a 'contingent offer,'" Pl.'s Opp'n at 15 n.13. Instead, Amtrak asserts that it is improper for an employee to accept a contingent offer of employment from one company and permit his name to appear on that company's bid for the same contract the employee's current employer is also seeking to acquire. <u>Id.</u> at 14. Further, Amtrak contends that the employees did not merely prepare to compete, but put themselves "in direct competition with the employer's best interests." <u>Id.</u> at 9 (quoting <u>Amtrak I</u>, 592 F. Supp. 2d at 95).

This Court and others have held that the fiduciary duty of loyalty may be breached when an employee participates in the bid of an employer's rival. In <u>Radio TV Reports, Inc. v. Ingersoll</u>, 742 F. Supp. 19 (D.D.C. 1990), a corporation sued its former manager after the manager's own newly created corporation won a bid on a contract that was submitted while the manager was still employed by his former corporate employer. <u>Id.</u> at 20. A former member of

this Court found that the manager had breached the duty of loyalty owed to his former employer, and assessed liability against him because "[h]ad [the] defendant not breached his duty of loyalty and bid on the contract, [the] plaintiff would have been awarded the contract." Id. at 21-22; see Abbott Redmont Thinlite Corp. v. Redmont, 475 F.2d 85, 89 (2d Cir. 1973) (determining that largely because of the "likelihood that but for [the defendant's] competition [the plaintiff] would have been awarded the contract . . . [the defendant] violated his fiduciary obligations to [the plaintiff] by submitting competing bids" (emphasis omitted)). But see Mercer, 920 F. Supp. at 233 ("[B]efore the end of [an employee's] employment, he can properly purchase a rival business and upon termination of employment immediately compete." (quoting Restatement (Second) of Agency § 393 cmt. E (1958))).

"[T]he ultimate determination of whether an employee has breached his fiduciary duties to his employer by preparing to engage in a competing enterprise must be grounded upon a thorough[] examination of the facts and circumstances of the particular case." Mercer, 920 F. Supp. at 234 (quoting Md. Metals, Inc., v. Metzner, 382 A.2d 564, 570 (Md. 1978)); see also Quality Sys., Inc. v. Warman, 132 F. Supp. 2d 349, 354 (D. Md. 2001) ("There is no set rule denoting when an employee has breached his fiduciary duty; rather, a court must examine the facts of each particular case."). Reflecting upon the facts and circumstances of this case, the employees' conduct was not so egregious that it can be said to have constituted a breach of their fiduciary duties to Amtrak as a matter of law, but neither is it so benign to entitle Veolia to summary judgment on this issue. A reasonable jury could certainly find that by participating in Veolia's bid for the Tri-Rail contract, the management-level employees were breaching the fiduciary duties they owed to Amtrak, because in doing so they were putting themselves in direct

competition with Amtrak.  See Md. Metals, 382 A.2d at 568 (noting that a "corollary of [the] general principle of loyalty is that a . . . high-echelon employee is barred from actively competing with his employer during the tenure of his employment").  Conversely, a fact-finder could reasonably conclude that the employees' participation in the rival bid was more akin to preparation rather than actual competition.  See, e.g., Crawford & Co. v. M. Hayes & Assocs. L.L.C., 13 F. App'x 174, 177 (4th Cir. 2001) (affirming fact-finder's decision that an employee's active recruitment of mid-level managers for a competing business did not constitute the breach of the employee's fiduciary duty).

Further, courts often give weight to whether an employer was given notice that an employee was competing or preparing to compete.  Compare Cudahy Co. v. Am. Labs., Inc., 313 F. Supp. 1339, 1346 (D. Neb. 1970) (noting that an employee has a duty to disclose competitive activity when it may be harmful to his employer), with Crawford, 13 F. App'x at 177 (considering the fact that the employer "was aware of the possibility that [the employee] might resign and form [its own] business" in affirming decision that no breach occurred).  Here, there is a dispute as to whether Amtrak had knowledge that its employees were being solicited to participate in Veolia's bid for the SFRTA contract.  Amtrak disclaims that it had any such knowledge, Pl.'s Supp. Facts § I ¶ 90, while Veolia claims that "Amtrak managers knew that Veolia was recruiting Amtrak personnel for the Tri-Rail procurement long before the due date for proposals," Defs.' Facts ¶ 90.  Given that the Court cannot "weigh conflicting evidence or weigh the credibility of the parties," Furmanite America, Inc. v. T.D. Williamson, Inc., 506 F. Supp. 2d 1134, 1138 (M.D. Fla. 2007), the Court must defer to the jury as the ultimate fact-finder on this question.

For the several reasons just discussed, the Court concludes that a material question of fact exists as to whether Amtrak's former employees breached their duty of loyalty by allowing their names to be used in connection with Veolia's bid for the Tri-Rail contract.  See Jet Courier Serv., 771 P.2d at 494 (reversing trial court's ruling that an employee's pre-termination conversations with the employer's customers was not a breach of loyalty as a matter of law, because it "involve[d] a question of fact to be determined by . . . a consideration of all the circumstances of the case").

    b.  <u>Refusal to Participate in Amtrak's Bid</u>

The Court also finds that there is an outstanding dispute that must be resolved by a jury as to whether Veolia induced or required the three former Amtrak employees to refrain from participating in Amtrak's bid.  Veolia does not seem to contest that such an inducement would constitute a breach of a fiduciary duty, but rather challenges Amtrak's claim that it has submitted evidence sufficient to eliminate any genuine issue of material fact on this matter.  See Defs.' Mem. at 17-21.  The Court must therefore review the evidence regarding whether Veolia instructed the three employees to refrain from being associated with Amtrak's bid.

Amtrak bases its position on the following evidence.  First, Amtrak points to Jason Steffensen's testimony that Mr. Birckett mentioned he had asked the individuals selected for Veolia's Key Management Team "not to sign up with Amtrak," and "that he suspected that Doug Stencil . . . had broken that agreement . . . ." Pl.'s Opp'n, Declaration of Eva A. Temkin in Support of Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Temkin Decl."), Ex.14 (June 4, 2008 Deposition Transcript of Jason Steffensen) ("Steffensen Dep.") at 115:5-15; Pl.'s Opp'n at 13.  Second, Amtrak suggests that Mr. Salemme's statement during his

deposition that he "was involved with [Veolia] already . . . [s]o, [he was] not going to have [his] name in two different places," allows for a reasonable inference that by signing Veolia's contingent offer Mr. Salemme understood that he was not to have his name submitted on any other bid. Pl.'s Mot., Orseck Decl. Ex. 32 (Salemme Dep.) at 76:5-20.

In response, Veolia presents affidavits by Mr. Birckett and the three former Amtrak employees denying Amtrak's allegations. See Defs.' Mem., Affidavit of Sidney N. Birckett ("Birckett Aff.") ¶ 11; Mauck Aff. ¶ 10; Affidavit of Douglas W. Stencil ("Stencil Aff.") ¶ 9; Affidavit of Victor W. Salemme ("Salemme Aff.") ¶ 7. Veolia also points to the contingent offers themselves, which do not state that they were exclusive agreements. See Pl.'s Mot., Orseck Decl., Ex. 26 (Salemme Offer), Ex. 29 (Mauck Offer), Ex. 30 (Stencil Offer). Finally, Veolia observes that Mr. Mauck applied for a position on Amtrak's Key Management Team for the Tri-Rail bid, Defs.' Mem., Mauck Aff. ¶ 8, and, moreover, that Mr. Stencil actually did participate on Amtrak's bid, Defs.' Counter Facts § I ¶ 71; Defs.' Facts ¶ 69.

To survive a summary judgment motion, Amtrak or Veolia need only produce "more than a 'mere existence of a scintilla of evidence' in support of its position," so that a "jury could reasonably find for the non-moving party." Threadgill v. Spellings, 377 F. Supp. 2d 158, 160 (D.D.C. 2005) (quoting Anderson, 477 U.S. at 252). While Veolia offers more extensive evidence relating to this issue—specifically, four affidavits and four contingent offer letters—whereas Amtrak offers only two deposition testimonial statements, it is the Court's obligation at this stage of the proceedings to "examine[] this evidence in [the] light most favorable to the [non-movant]" as to each motion. Id. at 166. Accordingly, because both parties have presented more than a scintilla of evidence, they have satisfactorily demonstrated issues of

genuine fact that make summary judgment inappropriate for either party on this element.  See Furmanite America, 506 F. Supp. 2d at 1138.

       3.      <u>Knowledge of the Breach of a Fiduciary Duty</u>

Even if the Court could reach the conclusion that the three employees breached their fiduciary duties to Amtrak, summary judgment would still be inappropriate, as Amtrak has failed to prove the non-existence of an issue of fact as to Veolia's knowledge of the alleged breach by the former Amtrak employees—the third essential element of a claim for aiding and abetting the breach of a fiduciary duty.  Veolia also fails to establish the non-existence of a genuine issue of material fact on this component of Amtrak's claim.

Veolia argues that it could not have known it was aiding the breach of a fiduciary duty for three reasons.  First, Veolia contends that when it extended contingent offers to the three former Amtrak employees, Amtrak's bidding status was indeterminate.  Defs.' Opp'n at 19.  Second, Veolia argues it could not have known that the employees "had special agency responsibilities for the Tri-Rail procurement."  <u>Id.</u>  Finally, Veolia posits that because it was following industry custom, it was unaware that its behavior was improper.  <u>Id.</u>  Amtrak responds that Veolia knew all that was necessary for it to have a general awareness of the breaches because it knew the employees were employed by Amtrak, knew these employees were signing contingent offers with Veolia, knew Amtrak would likely be bidding on the Tri-Rail contract, and knew the employees' participation with Veolia was creating a conflict of interest for the employees because of Veolia's own conflict-of-interest policy.  Pl.'s Mem. at 22-23; Pl.'s Reply at 13-17.

"A general awareness of wrongdoing on the part of the one being aided or abetted is

sufficient to show knowledge on the part of an aider and abettor." Amtrak I, 592 F. Supp. 2d at 96 (citing Halberstam, 705 F.2d at 487-88). To establish aiding and abetting liability, "[t]he requisite intent and knowledge may be shown by circumstantial evidence." Aetna Cas. & Sur. Co. v. Leahey Constr. Co., 219 F.3d 519, 535 (6th Cir. 2000) (quoting Metge v. Baehler, 762 F.2d 621, 625 (8th Cir. 1985)) (internal quotation marks omitted); see also Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir. 1978). Ultimately, "the exact level of knowledge necessary for liability remains flexible and must be decided on a case-by-case basis." Aetna, 219 F.3d at 535 (quoting Camp v. Dema, 948 F.2d 455, 459 (8th Cir. 1991)) (internal quotation marks and modifications omitted).

In Aetna, the Sixth Circuit, in determining whether a bank knew a customer to whom it had extended a loan was engaging in tortious conduct, considered the duration of the parties' relationship, the timing of financial transactions, the speed with which the loans were paid off, and the specialized knowledge banks possess. 219 F.3d at 535-36. The court ultimately determined that it would not be unreasonable to conclude that the bank had knowledge of the conduct. Id. In particular, the court rejected the argument that just because short-term loans were "commonplace," it was prevented from inferring knowledge of misconduct based on the "context" in which the loan in question was made. Id. at 536.

On the record in this case, summary judgment for either party would be inappropriate because both Veolia and Amtrak contest many of the facts central to whether Veolia had knowledge of the alleged breach by Amtrak's former employees. For example, Jason Steffensen testified that "[Mr. Birckett] had asked . . . his key employees . . . not to sign up with Amtrak." Pl.'s Opp'n, Temkin Decl., Ex. 14 (Steffensen Dep.) at 115:10-12. If a jury were to credit this

testimony, rather than Veolia's account, see, e.g., Defs.' Mem., Birckett Aff. ¶ 11 ("Neither I nor anyone else at Veolia as far as I am aware ever requested or directed Messrs. Salemme, Stencil, or Mauck to not participate in or support Amtrak's bid . . . ."), then it could also reasonably infer that Veolia knew it was engaging in improper behavior. Alternatively, a jury might agree that Veolia was acting in accordance with industry custom, as evidenced by similar behavior having occurred on at least one prior occasion, see Defs.' Facts ¶ 104 (providing an example of another transportation services company including an employee of a competitor in its bid for a contract), and thus had no reason to know that it was engaging in wrongdoing. Finally, there is conflicting evidence as to the certainty with which Veolia should have known Amtrak would be bidding for the Tri-Rail contract. Although Amtrak's final decision to submit a bid was not made until December 2006 or early January 2007, Defs.' Facts ¶ 193, Amtrak did begin advertising on its website for its Key Management Team positions as early as November 2, 2006, id. ¶ 110, its representatives attended a pre-proposal conference, Pl.'s Facts ¶ 19; Defs.' Counter Facts § I ¶ 19, and it is one of the primary providers of railway services in this country, Pl.'s Mot., Orseck Decl., Ex. 5 (Expert Report of Lonnie E. Blaydes on Behalf of Veolia Transportation Services, Inc. Submitted Sept. 8, 2008) ("Blayde Rep."), Attach. II at 5 ("the 'Big Three' of Amtrak, Herzog, and Veolia"). A reasonable jury could choose to credit either parties' position, and therefore could accept or reject the defendants' denial of knowledge.

      4.     <u>Substantial Assistance or Encouragement of the Wrongdoing</u>

Having demonstrated that genuine issues of fact exist regarding whether its three former employees breached their fiduciary duties owed to Amtrak and whether Veolia had knowledge of the purported breaches, in order to avoid summary judgment being awarded to Veolia, Amtrak

must also demonstrate either one of the following: that there are genuine issues of material fact as to whether Veolia's conduct amounted to substantial assistance or encouragement of the wrongdoing, or that there are no genuine issues of material fact on this issue and Veolia's conduct did in fact constitute substantial assistance or encouragement.

Veolia argues that its conduct did not amount to substantial assistance or encouragement, relying on many of the same arguments it has advanced already. See Defs.' Opp'n at 21 (that its conduct "conform[ed] to industry standards[,]" that the former Amtrak employees' actions were "beyond the scope of [their] employment[,]" that the "employees [were] free to prepare to compete[,]" and that it had "no knowledge" that it was aiding and abetting the breach of any fiduciary duty by Amtrak's former employees). Amtrak responds by pointing out that it was Veolia that approached the three former Amtrak employees, it was Veolia that extended contingent offers to them, and it was Veolia that signed the Key Employee Certification forms on behalf of the three employees. Pl.'s Reply at 13-14.

As noted earlier, "in order to establish aiding and abetting liability, a plaintiff must prove that the defendant provided 'substantial assistance or encouragement to the primary party in carrying out the tortious act.'" Aetna, 219 F.3d at 537 (quoting Andonian v. A.C. & S., Inc., 647 N.E.2d 190, 192 (Ohio Ct. App. 1994)) (internal quotation marks omitted). In other words, a plaintiff must show that the defendant proximately caused the violation or was a substantial factor in causing the tort. K & S P'ship v. Cont'l Bank, N.A., 952 F.2d 971, 979 (8th Cir. 1991) (citing Metge, 762 F.2d at 624). Facts to consider in determining whether substantial assistance or encouragement was provided in an aiding and abetting claim include, "[t]he nature of the act encouraged[;] the amount [and kind] of assistance given; the defendant's absence or presence at

the time of the [alleged] tort; [the defendant's] relation to the tortious actor; and the defendant's state of mind." <u>Amtrak I</u>, 592 F. Supp. 2d at 96 (quoting <u>Halberstam</u>, 705 F.2d at 483-84).

Based on the current record in this case, it is undisputed that Veolia extended contingent offers to the three former Amtrak employees. Defs.' Facts ¶¶ 56, 68, 83. It is also undisputed that Veolia submitted with their bid proposal Key Employee Certification forms signed by these former employees. Defs.' Mem., Mauck Aff. ¶ 7; Stencil Aff. ¶ 6; Salemme Aff. ¶ 5. However, there are genuine issues of material fact as to whether Veolia participated in a tortious act, i.e., aiding and abetting breach of a fiduciary duty, <u>see</u> <u>supra</u> Part III.B.2., and thus whether Veolia gave substantial assistance or encouragement "in carrying out the tortious act," <u>Aetna</u>, 219 F.3d at 537. Therefore, a finding in Amtrak's favor as to the fourth element of the aiding and abetting claim is precluded.

Thus, while the Court has determined that the three former Amtrak employees owed a general duty of loyalty to Amtrak, genuine issues of material fact preclude the issuance of summary judgment for either party on the remaining three elements of the plaintiff's aiding and abetting the breach of a fiduciary duty claim. Therefore, the Court finds that neither party is entitled to summary judgment on Count I of the plaintiff's Complaint.[22]

C.  The Plaintiff's Tortious Interference with an Economic Advantage Claim (Count II)[23]

Veolia also moves for summary judgment on Count II of the Complaint, which alleges

---

[22] The mere filing of cross-motions for summary judgment does not require the Court to grant the requested relief to one of the parties where there are genuine issues of fact throughout the record, which preclude summary judgment in favor of either party. <u>See</u> 11 James Wm. Moore et al., Moore's Federal Practice § 56.10[6] (3d ed. 2004) (explaining that "denial of one cross-motion does not imply the grant of the opponent's cross-motion").

[23] As noted above, <u>see</u> <u>supra</u> note 18, the Court will examine Amtrak's claim of tortious interference with an economic advantage in accordance with District of Columbia law.

tortious interference with Amtrak's business expectancy associated with the Tri-Rail contract. Defs.' Mot. at 1-2; Defs.' Mem. at 29. Veolia argues that Amtrak did not have a valid expectancy in winning the SFRTA contract because: (1) Veolia's competitive activity was "privileged," Defs.' Mem. at 31; (2) there is a per se rule against any business expectancy by an unsuccessful bidder for a government contract, id. at 31-33; and (3) Amtrak's expectation of winning the contract was not commercially reasonable, id. at 34-35. Veolia goes on to argue that it had neither the necessary knowledge of Amtrak's expectancy nor the intent to interfere with it. Id. at 35-37. Veolia further asserts that its actions did not cause Amtrak to lose the SFRTA contract and directs the Court's attention to the point differential between Amtrak's and Veolia's bids as support, arguing that Veolia would have been able to submit a successful bid regardless of the three employees' cooperation, and that Amtrak would not have been awarded the contract even if it had been the sole bidder. Id. at 40-41; Defendants' Reply Memorandum of Points and Authorities in Further Support of Their Motion for Summary Judgment ("Defs.' Reply") at 21-22, 24-25.

Amtrak responds that there exists neither a "privilege of competition" nor a "per se no expectancy rule," and also disputes that its expectation was unreasonable. Pl.'s Opp'n at 19, 22, 24. Further, Amtrak maintains that the knowledge element is satisfied because Veolia knew Amtrak was a likely bidder. Id. at 26-28. Finally, Amtrak responds to Veolia's causation challenge noting that without Amtrak's three former employees Veolia would not have been able to submit a bid and, as a consequence, Amtrak would have been awarded the contract. Id. at 29, 32.

As this Court noted in Amtrak I, the requisite elements to a successful claim of tortious

interference with a prospective economic advantage are "(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage." 592 F. Supp. 2d at 98 (quoting Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002)).  The Court will consider each element in turn.

1.    Existence of Valid Business Relationship or Expectancy

Veolia proffers three reasons as to why it believes Amtrak did not have a valid business expectancy.  First, Veolia argues that Florida law recognizes a privilege of competition that preempts any expectancy a participant in a competitive bidding process might otherwise have.[24] Defs.' Mem. at 31.  Second, Veolia contends that the District of Columbia has adopted a "per se no expectancy rule," which precludes disappointed bidders from sustaining a tortious interference claim.  Id. at 31-32.  Third, Veolia relies on Amtrak's prior failure to submit or successfully submit bids in the competitive bidding arena to demonstrate that Amtrak did not have a reasonable business expectancy that it would acquire the SFRTA contract.  Id. at 34-35.

Amtrak responds to Veolia's assertions by arguing that the privilege of competition

_____

[24] Veolia's reliance on Florida law for its privilege of competition and the preemption of expectancy arguments does not preclude the Court from examining these arguments under District of Columbia law because the Court understands both arguments to be based on uniform principles of law. See Mfg. Research Corp. v. Greenlee Tool Co., 693 F.2d 1037, 1040 (11th Cir. 1982) ("Although businesses are accorded leeway in interfering with their competitors' business relationships, they must abide by certain 'rules of combat' and not use improper means of competition." (quoting W. Prosser, Torts 956 (4th ed. 1971))); see also Insurance Field Services, Inc. v. White & White Inspection & Audit Service, Inc., 384 So. 2d 303, 306-08 (Fla. Dist. Ct. App. 1980) (noting that the privilege of competition did not protect against an employee's unjustifiable interference in anticipation of competition); Furash & Co. v. McClave, et al., 130 F. Supp. 2d 48, 56 (D.D.C. 2001) ("Intentional interference with prospective economic advantage requires intentional and improper interference with business expectancies . . . . [T]he defendant's interference must be improper." (internal quotation marks and citations omitted)).  Therefore, the Court will examine this principle in accordance with District of Columbia law for the reason noted earlier.  See supra note 18.

protects parties only so long as they "abide by certain 'rules of combat' and not use improper means of competition." Pl.'s Opp'n at 23 (quoting <u>Mfg. Research Corp. v. Greenlee Tool Co.</u>, 693 F.2d 1037, 1040 (11th Cir. 1982)). Amtrak also argues that the cases cited by Veolia in support of a "per se no expectancy rule" actually only hold that disappointed bidders have no expectancy where they did not submit qualifying proposals in the first place. <u>Id.</u> at 24-25. Finally, Amtrak contests that the assertion that it was commercially unreasonable for it to expect to win the contract, citing contrary evidence demonstrating Amtrak's positive competitive record, its close ties to Florida, the beliefs of its own employees in Amtrak's success, and the fact that Veolia and Amtrak were the only bidders on the Tri-Rail contract. <u>Id.</u> at 19-21.

Legitimate business expectancies are those "not grounded on present contractual relationships but which are commercially reasonable to anticipate, [and] are considered to be property and therefore protected from unjustified interference." <u>Carr v. Brown</u>, 395 A.2d 79, 84 (D.C. 1978). "A legally recognizable business expectancy may include 'the opportunity of obtaining customers,'" <u>Amtrak I</u>, 592 F. Supp. 2d at 98 (quoting <u>Carr</u>, 395 A.2d at 84), that is "commercially reasonable to anticipate," <u>id.</u> (quoting <u>Whelan v. Abell</u>, 953 F.2d 663, 673 (D.C. Cir. 1992)). Disappointed bidders attempting to demonstrate a valid business expectancy must therefore show a "reasonable likelihood" of receiving a contract. <u>See</u> <u>Ellsworth Assocs., Inc. v. United States</u>, 917 F. Supp. 841, 850 (D.D.C. 1996) (citing <u>Klein v. Grynberg</u>, 44 F.3d 1497, 1506 (10th Cir. 1995)). Mere "speculative contractual expectations," <u>id.</u> (citing <u>CACI Int'l, Inc. v. Pentegen Techs. Int'l, Ltd.</u>, Nos. 94-2058, 94-2220, 1995 WL 679952, at *5 (4th Cir. Nov. 16, 1995)), or "hope" are insufficient, <u>id.</u> (citing <u>Klein</u>, 44 F.3d at 1506). "Where the ultimate decision to enter into a business relationship is a highly discretionary decision reposed within . . .

a governmental entity, it becomes more difficult for a plaintiff to prove that it had an expectancy of doing business . . . ." Mago Constr. Co. v. Anderson, Eckstein & Westrick, Inc., No. 183479, 1996 WL 33348794, at *2 (Mich. Ct. App. Nov. 8, 1996).

While Veolia asks the Court to recognize a per se no expectancy rule, none of the cases offered by Veolia support the conclusion that a disappointed bidder in a government procurement process can never establish a legitimate business expectancy.  For example, in Washington Metropolitan Area Transit Authority v. Quik Serve Foods, Inc., Nos. 04-838 (RCL), 04-687 (RCL), 2006 WL 1147933 (D.D.C. Apr. 28, 2006), the Court held that a plaintiff had "not [pleaded] sufficient facts to demonstrate the probability of [a] future business expectancy" where the plaintiff had entered into discussions to sell a piece of property it did not itself own. Id. at *6.  This, a member of this Court found, "demonstrate[d] that the future business relationship was speculative and not probable," id., but at no point did the Court suggest that a plaintiff could never establish the probability of such a future relationship.  In Houlahan v. World Wide Ass'n of Specialty Programs & Schools, No. 04-01161 (HHK), 2006 WL 785326 (D.D.C. Mar. 28, 2006), another member of this Court also found no business expectancy, but did so by analogizing the status of a freelance journalist to that of an at-will employee, vis-a-vis their employer, a relationship the District of Columbia Court of Appeals had found insufficient to create a prospective business expectancy.  Id. at *4.  Again, the Court in Houlahan did not foreclose the possibility that a plaintiff could establish a prospective business expectancy in the context of contract bidding.  In Ellsworth, the Court did not adopt a per se no expectancy rule, but instead held that a party's expectation must be shown to have been reasonable. 917 F. Supp. at 850.  Furthermore, in Carr, a real estate developer was delayed from developing his property

because the city government's transportation committee and zoning board did not give him immediate approval based on statements by the defendant, who opposed the development. 395 A.2d at 82-83. The court noted that protected expectancies arise where "there is a background of business experience on the basis of which it is possible to estimate . . . the likelihood that the plaintiff would have received [the contract's benefits] if the defendant had not interfered." Id. at 84. The court went on to conclude that Carr was not such a case because the plaintiff did not have a reason to "expect upon the basis of any experience that his application w[ould] be automatically approved within a specified period of time." Id. Similarly, in Klein, the plaintiff failed to show a prospective business advantage where he had developed a security device and the defendant interfered with his efforts to secure investors. 44 F.3d at 1505-06. The court based its holding in Klein on the plaintiff's lack of an ongoing relationship with the investors, having had only one meeting with each investor, and offering no evidence that the prospective investors were actually intending to finance his security system. Id. at 1506. Based on its analysis of these cases, the Court cannot find that a per se no expectancy rule reflects the current state of the law. In fact, another member of this Court actually found to the contrary. See Oceanic Exploration Co. v. ConocoPhillips, Inc., No. 04-332 (EGS), 2006 WL 2711527, at *1-2, 20 (D.D.C. Sept. 21, 2006) (holding that because a party lost the opportunity to bid on a contract as a result of the alleged actions of the defendant, the "plaintiffs . . . demonstrated a reasonable likelihood or probability that, but for the alleged interference . . . a contract would have resulted" and therefore had pleaded sufficient facts to assert a claim of tortious interference); see also Iconco v. Jensen Constr. Co., 622 F.2d 1291, 1300 (8th Cir. 1980) (rejecting a per se no expectancy rule because "[t]he more logical approach . . . is to put the unsuccessful bidder to its

proof; if it proves by a preponderance of the evidence that it would have received the contract award absent the successful bidder's wrongdoing, we find no persuasive reasons why recovery should be denied").

Here, Amtrak has produced evidence of its business experience from which a reasonable fact-finder could conclude that Amtrak had a reasonable business expectancy in acquiring the SFRTA contract. Specifically, Amtrak has shown that it has a strong presence in commuter rail operations. See Pl.'s Supp. Facts § II ¶ 3. Moreover, it contends that it "had outscored Veolia, head-to-head, in at least two recent bid competitions for similar commuter rail operations contracts." Id. § II ¶ 4. Finally, Veolia's own expert described Amtrak as one of "the Big Three" in providing commuter rail services. Pl.'s Mot., Orseck Decl., Ex. 5 (Blayde Rep.) Attach. II at 5. Although Veolia contends that Amtrak has not won any competitive procurement contracts since the end of 2001, Defs.' Facts ¶¶ 12, 251; Defs.' Reply Facts § I ¶ 12, Amtrak has presented more than a "scintilla" of evidence of its business expectancy, see Anderson, 477 U.S. at 252, by establishing that, unlike the plaintiff in Carr, there is evidence from which a reasonable juror could infer that Amtrak had a good possibility of securing the contract, but for Veolia's purported improper actions, see Carr, 395 A.2d at 84.

Although it will be a significant challenge for Amtrak to prove this element of its tortious interference with economic advantage claim, the Court finds that genuine issues of material fact exist concerning whether it can.[25]

_____

[25] Veolia cites International Expositions, Inc. v. City of Miami Beach, 274 So. 2d 29, 31 (Fla. Dist. Ct. App. 1973), and Ahern v. Boeing Co., 701 F.2d 142 (11th Cir. 1983), for the proposition that Florida law recognizes a privilege to interfere with a non-exclusive right. Defs.' Mem. at 31. This proposition is inapplicable to the present case, however, because the interference alleged by Amtrak concerns its exclusive right to the services of its employees. See Pl.'s Opp'n at 5. A case that more

(continued...)

## 2. Veolia's Knowledge of the Relationship or Expectancy

To satisfy the second element of a tortious interference claim, a plaintiff "must show that an interferer knew of the business expectancy." Amtrak I, 592 F. Supp. 2d at 98-99 (citing Bennett Enters., Inc. v. Domino's Pizza, Inc., 45 F.3d 493, 499 (D.C. Cir. 1995); Smith v. Ocean State Bank, 335 So. 2d 641, 643 (Fla. Dist. Ct. App. 1976)).  A party need not be shown to have had actual awareness of a business expectancy, but may be found to have knowledge of the expectancy provided that "a person believes that it is probable that something is a fact, but deliberately shuts his or her eyes or avoids making reasonable inquiry with a conscious purpose to avoid learning the truth." Prudential Real Estate Affiliates, Inc. v. Long & Foster Real Estate, Inc., No. 99-1357, 2000 WL  248170, at *5 (4th Cir. Mar. 6, 2000).

Veolia argues that it could not have known that its actions would interfere with Amtrak's business expectancy because it did not know how many bidders would participate in the procurement process, whether Amtrak would be one of them, or whether any of the bidders were more likely than others to be awarded the Tri-Rail contract.  Defs.' Mem. at 35-37.  Amtrak answers that "Veolia's senior management obviously was aware that Amtrak would likely be a

---

[25](...continued)
accurately reflects the facts of this case is Insurance Field Services, 384 So. 2d 303, where the court found the privilege of competition insufficient to immunize an independent contractor who had acted disloyally in an employee-employer context from liability on a charge of interference with a business relationship. Id. at 307-08.  In Insurance Field Services, the court stated that whether intentional interference was unjustifiable "depends upon a balancing of the importance, social and private, of the objective advanced by the interference against the importance of the interest interfered with, considering all circumstances among which the methods and means used and the relation of the parties are important." Id. at 306-07 (citing Restatement (Second) of Torts § 767 (1979)).  As in that case, Veolia is charged with inducing disloyal behavior on the part of Amtrak's former employees, an act not protected under either Florida or District of Columbia law.  See id. at 307-08 (holding that the privilege of competition did not protect an employee from liability for engaging in disloyal behavior in anticipation of competing with his employer during the course of his employment); Furash & Co. v. McClave, 130 F. Supp. 2d 48, 56 (D.D.C. 2001) (holding that genuine issues of material facts existed as to whether the defendant "improperly solicited clients for her personal benefit in order to interfere with [the plaintiff's] business relationships").

competitor," Pl.'s Opp'n at 27, because although Amtrak did not make a final decision to bid on

the contract until late December 2006 or early January 2007, Defs.' Facts ¶ 193; Pl.'s Supp.

Facts § I ¶ 193, among other things, "Amtrak advertised on its public website for all of the Key

Management Team positions" as early as November 2, 2006, Defs.' Facts ¶ 110; Pl.'s Supp.

Facts § I ¶ 110.

      In <u>Tuxedo Contractors, Inc. v. Swindell-Dressler Co.</u>, 613 F.2d 1159 (D.C. Cir. 1979),

the defendants allegedly induced a general contractor into withdrawing from its agreement to use

the plaintiff's services and instead to use the services of the defendants. <u>Id.</u> at 1161. The court

found for the defendants, noting that although the defendants "suspected" that a contract existed

between the plaintiff and the general contractor, based on the defendants' responses to

interrogatories and their "manifested awareness" of the contract during meetings between them

and the general contractor, the defendants could not be considered to have had the requisite

knowledge necessary for a tortious interference claim because they were entitled to rely on the

assurances provided by the general contractor that there would be no contractual conflicts. <u>Id.</u> at

1163-64. In contrast, Veolia approached Amtrak "very early in the process" about forming a

partnership for the SFRTA contract, but was informed by Amtrak that "[t]hey weren't sure they

were going to go after it." Pl.'s Mot., Orseck Decl., Ex. 20 (May 21, 2008 Deposition Transcript

of Ronald J. Hartman) ("Hartman Dep.") at 78:10-14, 79:7-12. While this clearly reflected

uncertainty by Amtrak, it did not convey the firm assurance the defendants received from the

general contractor in <u>Tuxedo</u>, 613 F.2d at 1163-64, and thus, is insufficient to support a

definitive finding that Veolia did not have knowledge of Amtrak's business expectancy. In any

event, even if Amtrak had given Veolia a firm assurance regarding its intentions with respect to

bid proposals at that time, this Court would still have to consider whether there is any "independent evidence" in the record from which a jury could nonetheless infer that Veolia knew that Amtrak would submit a competitive bid. See id. at 1164 (citing Hunter Vending Co. v. D.C. Vending Co., 345 A.2d 142, 144 (D.C. 1975); Deoudes v. G.B. Macke Corp., 153 A.2d 309, 311 (D.C. 1951)) .

Although Amtrak did not finalize its decision to bid on the Tri-Rail contract until late December, 2006 or early January, 2007, Defs.' Facts ¶ 193, as noted it did start advertising for its Key Management Team positions on its public website as early as November 2, 2006, id. ¶ 110. Moreover, there is evidence that Veolia was aware of the postings. See Pl.'s Mot., Orseck Decl., Ex. 18 (May 6, 2008 Deposition Transcript of Sidney N. Birckett) ("Birkett Dep.") at 119-20 (Mr. Birckett admits that Mr. Salemme said to him that "I hear Amtrak is bidding [on the Tri-Rail project]"). Finally, Veolia saw Amtrak representatives at a pre-bid conference in October 2006, almost three months before Veolia submitted its bid. Pl.'s Facts ¶ 19. From this evidence, a reasonable jury could find, regardless of when Amtrak made its final decision to make a bid, that Veolia was aware that Amtrak was recruiting for the purpose of submitting a bid. Beyond merely knowing that Amtrak was going to, or likely would, submit a bid, Veolia also knew, according to Amtrak, that Amtrak had previously prevailed over it in securing competitive contracts on other projects, Pl.'s Supp. Facts § II ¶ 4, and thus would have known that Amtrak was a competitive threat. The Court therefore disagrees with Veolia's contention that it could not have known that Amtrak was likely to submit a competitive bid, thus creating another genuine issue of material fact concerning the knowledge element of Amtrak's tortious interference of business expectancy claim.

3.      Intentional Interference By Inducing or Causing a Termination of the Expectancy

The third element of a claim of tortious interference is an "intentional interference inducing or causing a breach or termination of the relationship or expectancy." Amtrak I, 592 F. Supp. 2d at 98 (quoting Browning, 292 F.3d at 242). "[A] general intent to interfere or knowledge that conduct will injure the plaintiff's business dealings is insufficient to impose liability," but rather a "strong showing of intent to disrupt ongoing business relationships" is necessary. Bennett, 45 F.3d at 499 (quoting Genetic Sys. Corp. v. Abbott Labs., 691 F. Supp. 407, 423 (D.D.C. 1988)) (internal quotation marks omitted). "[T]he conduct at issue must involve egregious conduct such as libel, slander, physical coercion, fraud, misrepresentation, or disparagement." PM Servs. Co. v. Odoi Assocs., Inc., No. Civ. A. 03-1810 (CKK), 2006 WL 20382, at *35 (D.D.C. Jan. 4, 2006) (quoting Sheppard v. Dickstein, Shapiro, Morin & Oshinsky, 59 F. Supp. 2d 27, 34 (D.D.C. 1999)) (internal quotation marks omitted). Because this element requires demonstrating both an "intentional interference" and that this interference "induc[ed] or caus[ed] a breach or termination," Browning, 292 F.3d at 242, the Court must assess whether there is evidence in the record of both intent and causation.

a.      Intent

In Bennett, a pizza store franchisee demonstrated that his franchisor disclosed damaging, but truthful information, about the state of the franchisee's financial situation to potential buyers of the franchisee's business, contributing to the franchisee's failure to sell the business at the high price he wished to acquire. 45 F.3d at 496, 499. The Bennett court held that, without additional evidence, the plaintiff's evidence of "ill motive or intent" on the franchisor's part "to disrupt [the franchisee's] economic advantage" was based on nothing more than pure

"speculation." Id. at 499. Here, Amtrak's evidence raises a factual question of whether Veolia's contingent offers were intended to harm Amtrak.[26] There is no evidence that Veolia knew Amtrak had identified Stencil and Salemme as possible members of its own Key Management Team for its bid on the Tri-Rail contract prior to Veolia extending its contingent offers to them. It is also uncontested that Veolia itself considered multiple candidates for its Key Management Team positions, Pl.'s Supp. Facts § I ¶¶ 45, 59, 71, suggesting that Veolia's only intention was to compete fairly for the Tri-Rail contract.

Veolia's position is further strengthened by evidence that it was acting in accordance with industry custom and not intending to disrupt Amtrak's business operations, although this assertion is highly disputed by Amtrak. See Defs.' Mem. at 24-25; Pl.s' Opp'n at 14-16. Veolia supports its position by demonstrating that making the kind of contingent offers tendered in this case has occurred on at least one occasion in the past. Defs.' Facts ¶ 104.[27] Veolia's actions may also prove unremarkable considering that one of the members of the SFRTA's evaluation team found that Stencil's appearance on two bids "didn't really matter," even though the Evaluation Committee had the résumés of all the employees and would have been able to see that Stencil was at that time still employed by Amtrak. Defs.' Mem., Rauch Decl., Ex. 66 (May

---

[26] Amtrak contends that Veolia must have been aware that it was acting improperly because Veolia's own "Conflict of Interest" policy prohibited the behavior Veolia committed. See Pl.'s Reply at 15. Veolia's conflict-of-interest policy language relied upon by Amtrak prevents Veolia's employees from "appropriat[ing] or divert[ing] to any other person or entity a business or financial opportunity that the employee . . . knows or should know [Veolia] might want to pursue." Pl.'s Mot., Orseck Decl., Ex. 49 (Veolia Conflict of Interest Policy) at 10. This language does not definitively prove Amtrak's position, and therefore a fact-finder, not the Court as a matter of law, must determine whether the acceptance of contingent offers by employees of a rival bidder qualifies as "appropriating or diverting" a business or financial opportunity.

[27] While Amtrak has pointed out that the example Veolia references is the only example Veolia has presented, Pl.'s Supp. Facts § I ¶ 104, Amtrak has produced no evidence showing that this example is atypical of a wider practice.

27, 2008 Deposition Transcript of Ed Woods) ("Woods Dep.") at 53:8-25. Finally, the fact that Amtrak extended offers to Herzog employees when it had not been definitively established that Herzog would not be seeking renewal of the Tri-Rail contract provides peripheral support for Veolia's belief that its conduct did not amount to interference with Amtrak's bid. See Pl.'s Mot., Orseck Decl., Ex. 15 (Arnold Dep.) at 54:24-55:11, Ex. 16 (Steffensen Dep.) at 55:8-56:1; Pl.'s Opp'n, Temkin Decl., Ex. 4 (May 23, Deposition Transcript of Joseph T. Yannuzzi) ("Yannuzzi Dep.") at 149:10-151:7. All of these facts lend support for Veolia's claim that its intent was merely to submit a competitive bid and not to hijack Amtrak's business expectancy.

Despite what may ultimately prove to be mere preparation rather than actual competition by Amtrak's three former employees, Amtrak's claim that Veolia sought to prevent Amtrak's own employees from participating in Amtrak's bid cannot be overlooked and raises a genuine factual dispute over whether this was, in fact, Veolia's intent. See supra Part III.B.2. In PM Services, the court identified two alleged actions by the defendants as sufficient "to meet the requirement of egregious conduct sufficient to establish intentional interference." 2006 WL 20382, at *36 (internal quotation marks omitted). These actions were one defendant's misappropriation of confidential information and knowing use of "his position and relationship . . . to divert business opportunities away from his employer," and the other defendant's misrepresentation of information in company brochures. Id. Amtrak's claim here is similar because, based on the record in this case, a reasonable jury could find that the three employees breached their duties of loyalty to Amtrak, and that there is a genuine factual dispute over whether or not Veolia knew it was assisting them in perpetrating the breaches by encouraging them, or even requesting, that they refrain from being associated with Amtrak's bid. See supra

Part III.B.3. A fact-finder could conclude that extracting such an agreement from Amtrak's former employees is "a strong showing of intent," Bennett, 45 F.3d at 499, to undermine Amtrak's bid. The fact that the record supports such a finding weighs against Veolia being entitled to summary judgment on Amtrak's tortious interference claim. Furthermore, "when there is room for different views, the determination of whether [an] interference was improper or not is ordinarily left to the jury." Restatement (Second) of Torts § 767 cmt. l (1979).

### b. Causation

The Court also finds that a genuine issue of material fact exists on the question of causation. Veolia argues that even if it had not engaged in the conduct challenged by Amtrak, it still would have been able to submit "a qualifying bid." Defs.' Reply at 21-23. First, Veolia points out that it had qualified alternative candidates for all of its Key Management Team positions. Id. at 22-23; Defs.' Mem. at 40-41. Moreover, Veolia argues that Amtrak cannot demonstrate causation because the SFRTA was free to reject all bids submitted to it, Defs.' Reply at 24-25, and that is likely the course it would have taken if Veolia had not submitted a qualifying bid, due to the high cost of Amtrak's proposal, which greatly exceeded that of Veolia's proposal, Defs.' Reply at 24; see also Defs.' Mem. at 40. Amtrak argues in response that causation has been established because if Veolia had not acted as it did, then Veolia would not have been able to submit a bid at all, and Amtrak would have been awarded the contract by default. Pl.'s Reply at 19.[28] Amtrak therefore disputes that Veolia's alternative candidates

---

[28] Veolia also argues that Amtrak cannot prove causation because of the vast disparity between the final scores awarded to Amtrak's and Veolia's bid proposals. Defs.' Mem. at 39-40. The Court finds this argument inapplicable to Amtrak's theory of causation, which essentially states that Veolia would not have been able to submit a competitive bid without the use of Amtrak's three former employees, thus, resulting in Amtrak having been awarded the SFRTA contract as the only bidder. See Pl.'s Reply at 19.

would have allowed it to submit a successful bid. Pl.'s Opp'n at 30-32. Finally, Amtrak argues that the SFRTA would have had no realistic alternative but to accept Amtrak's bid, had Amtrak been the only bidder, because "neither Herzog nor [the] SFRTA wanted Herzog to continue as the contractor" and the timing of the expected expiration of that relationship would not have afforded the SFRTA time to initiate another round of proposals. Id. at 32-33.

Veolia could prevail on its summary judgment motion so far as the causation component of Amtrak's tortious interference claim is concerned under either of two circumstances. First, if Veolia can demonstrate that there is no genuine factual dispute regarding its ability to have submitted a winning bid without including the three former Amtrak employees as part of its bid, then Veolia's actions, even if improper, could not have caused Amtrak any harm. Alternatively, if the SFRTA would have rejected Amtrak's bid even if Amtrak's bid was the only suitable option, then Veolia's actions also could not have deprived Amtrak of any business expectancy since, independent of what Veolia had done, Amtrak would not have been awarded the contract. The Court will consider each of these alternatives in turn.

Amtrak argues that there is a genuine issue of material fact as to whether Veolia would have been able to submit a bid at all without including its three former employees. Pl.'s Opp'n at 29, 31. Amtrak proffers an argument similar to the argument advanced in Industrial Door Contractors, Inc. v. United States, 79 Fed. Cl. 413 (Fed. Cl. 2007), where the court refused to award lost profits to a disappointed bidder because that bidder's proposal did not satisfy all of the product needs of the government. Id. at 424. Here, the SFRTA's Request for Proposals warned that "[p]roposals [would] be rejected if found to be conditional, irregular or not in conformance with the requirements and instructions contained herein." Pl.'s Mot., Orseck Decl.,

48

Ex. 8 (RFP) § 1.10.2 at AMTH 003678. The Request for Proposals required that members of the Key Management Team "must possess a minimum of 3 years of recent experience (i.e., within the past 5 years) as the operator of a passenger railroad service . . . ." Id., Orseck Decl., Ex. 8 (RFP) § 3.1 at AMTH 003718. Additionally, "[o]nly those Technical Proposals determined by the Evaluation Committee to be responsible and responsive (determined to be complete and in full and total compliance with all stated requirements), at [the SFRTA's] discretion [would] be considered." Id., Orseck Decl., Ex. 8 (RFP) § 1.13 at AMTH 003682. And, the SFRTA has in the past rejected proposals for being nonresponsive. Defs.' Mem., Rauch Decl., Ex. 101 (May 28, 2008 Deposition Transcript of Brad Barkman) ("Barkman Dep.") at 38:2-16. Because Amtrak alleges that without its three former Amtrak employees, Veolia would not have been able to identify members of its Key Management Team who met the requirements of the Request for Proposals, the Court must consider whether the positions could have been filled by qualified alternative candidates.

Based on the record evidence, a reasonable fact-finder could conclude that Veolia would not have been able to submit a successful bid absent the commitments it secured from the three former Amtrak employees. For example, while Veolia's bid may not have been found to be unresponsive for failing to meet the requirements as to only one member of its Key Management Team,[29] see Pl.'s Mot., Orseck Decl., Ex. 8 (RFP) § 1.10.2 at AMTH 003678 ("A responsive Proposal is an offer which complies with and conforms to the requirements of the RFP. Proposals which, in the opinion of [the] SFRTA, are non-responsive will be rejected."); id.,

---

[29] The Court notes that Amtrak's proposed Key Management Team included one member, Angel Torress, that lacked the required 3 years of recent railroad service experience. Defs.' Reply Facts § III ¶¶ 41, 43, 44.

Orseck Decl., Ex. 8 (RFP) § 3.1 at AMTH 003718 ("[E]ach member of the . . . Key Management Team must possess a minimum of 3 years of recent experience (i.e. within the past 5 years) as the operator of a passenger railroad service."), that may not have been the conclusion had Veolia failed to identify two or more members of the team who had the necessary qualifications as Amtrak asserts would have been the case had Veolia not improperly solicited Amtrak's employees. There also exists the possibility that Veolia would have forgone even submitting a bid if it felt it would have been unable to submit a responsive proposal. However, it is the task of the fact-finder to weigh these possibilities, not this Court. Anderson, 477 U.S. at 250, 255. Therefore, because the adequacy of the alternate candidates creates a genuine issue of material fact, this too cuts against Veolia being entitled to summary judgment on Amtrak's tortious interference claim.

Even if no question of fact existed as to whether Veolia would have been able to submit a winning bid without the three former Amtrak employees, a factual question on lack of causation would still exist if Amtrak can demonstrate that it would have been awarded the contract despite the higher costs of its bid. Admittedly, Veolia has demonstrated that the SFRTA was free to reject all proposals at its discretion, including because it failed to receive a reasonably priced proposal. Defs.' Facts ¶¶ 28, 256. Veolia argues that it was not reasonably likely that Amtrak's bid would have been successful under any circumstances due to the disparity between Amtrak's bid price of $162,639,724, Defs.' Facts ¶ 198, and the SFRTA's own estimate of only $81,200,000 to perform the contract, id. ¶ 258. Indeed, Amtrak's own employees thought Amtrak's bid might not be competitive, Temkin Decl., Ex. 5 (June 3, 2008 Deposition Transcript of Thomas Moritz) ("Moritz Dep.") at 60:8-61:5 ("There was concern, general concern that our

total cost package might be higher than the competitors' . . . ."); see also id., Ex. 8 (December

16, 2008 Deposition Transcript of Nancy Miller) ("Miller Dep.") at 214:12-22 (testifying "that

raising the management fee from 10 to 20 percent would have impacted our chances to win the

bid in the pricing category"). However, Amtrak has offered expert testimony that refutes the

claim that its bid was unreasonable. Defs.' Mem., Rauch Decl., Ex. 50 (Expert Report of Joseph

T. Yannuzzi) ("Yannuzzi Rep.") at 7 ("[I]t is my opinion that Amtrak's proposal contained costs

for services that were logical, reasonable, and were accurate estimates of the costs Amtrak would

have incurred as the successful bidder."). Amtrak has also suggested that the alternatives to

accepting its bid, i.e., re-initiating the procurement process or extending the expiring contract

with Herzog, were unfeasible because "the agency [(SFRTA)] and Herzog did not have a good

relationship, [and] neither one was interested in pursuing additional contracts [with each other]."

Pl.'s Mot., Orseck Decl., Ex. 16 (Steffensen Dep.) at 55:20-56:1.

In Iconco v. Jensen Construction Co., 622 F.2d 1291, the court was faced with a dispute

arising out of a situation in which one company had prevailed over another by submitting a

lower-priced bid. Id. at 1293-94. The successful bidder subsequently completed the contract

before it was discovered that it was not a small business, which if known earlier would have

disqualified the company from bidding on the contract. Id. at 1294. The disappointed bidder,

which had submitted the next lowest bid, filed suit against the successful bidder to recover its

lost profits, arguing that it would have been awarded the contract had the defendant not engaged

in its fraudulent behavior. Id. at 1294, 1300-01. The disappointed bidder relied on testimony by

the procurement officer who stated that if the lowest bidder had been found unqualified to

receive the contract, then it would have been awarded to the next lowest bidder whose proposal

was reasonably priced.  <u>Id.</u> at 1300-01.  The court concluded that this testimony was sufficient for the jury to conclude that the award would have gone to the disappointed bidder had it not been awarded to the defendant.  <u>Id.</u> at 1301.  Here, although Amtrak's price proposal far exceeded both Veolia's proposal and the SFRTA's own estimation, Defs.' Facts ¶ 203; Pl.'s Supp. Facts ¶ 203, as noted earlier Amtrak's expert testified that "Amtrak's proposal contained costs for services that were logical, reasonable, and were accurate estimates of the costs Amtrak would have incurred . . . ." Defs.' Mem., Rauch Decl., Ex. 50 (Yannuzzi Rep.) at 7.  Similar to the testimony in <u>Iconco</u>, Amtrak's proffer is sufficient to create a question of fact as to the reasonableness of Amtrak's proposed price and whether it would have been rejected despite its amount.  <u>See</u> <u>Iconco</u>, 622 F.2d at 1300-01.

Even if the Court could conclude that Amtrak's price was unreasonable, it could not award summary judgment to Veolia on Amtrak's tortious interference claim because a fact-finder could nonetheless reasonably conclude that the SFRTA, under the circumstances it would have confronted, would have  nevertheless accepted Amtrak's bid absent any other alternatives. The Court makes this finding because assuming Herzog would not have agreed to extend its contract—an assumption the Court makes in interpreting the facts in the light most favorable to Amtrak—it is not clear whether the SFRTA would have been able to re-start the procurement process in an effort to find alternate bidders, while in the interim continuing to provide services for Southern Florida's commuters.  <u>See</u> Pl.'s Opp'n at 32-33.  Summary judgment is not a proper tool for addressing this hypothetical question.  <u>See</u> <u>Anderson</u>, 477 U.S. at 255 ("[T]he drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . .").

4.      Resultant Damages

        In support of its damages estimate, including lost profits, Amtrak proffers expert

testimony.  See Defs.' Facts ¶ 247.  Veolia argues, however, that lost profits in the government

contracts context are "speculative per se" and that Amtrak's estimated damages should therefore

be rejected.  Defs.' Mem. at 43.  Amtrak responds that its proposal for the SFRTA contract was a

"fixed-price contract," paid in an agreed "amount for each year of the contract," with a "built-in

profit margin, over and above Amtrak's expected fixed and indirect costs."  Pl.'s Opp'n at 36.

Veolia disputes Amtrak's expected-costs theory and points out that Amtrak's unexpected high

labor settlement agreement would have reduced any profit Amtrak would have realized.  See

Defs.' Facts ¶ 243.  Amtrak answers that even if Veolia's position has merit, the higher labor

costs would have amounted to an unexpected expenditure of the kind that would have entitled

Amtrak to renegotiate the Operations Contract with the SFRTA.  See Pl.'s Supp. Facts § I ¶ 243.

        "[R]esultant damage[s]" are the final element of a claim for tortious interference.  Amtrak

I, 592 F. Supp. 2d at 98 (quoting Browning, 292 F.3d at 242).  Such damages include "the

pecuniary loss of the benefits of the . . . prospective relation . . . [and] consequential losses for

which the interference is the legal cause."  Id. at 100 (quoting Restatement (Second) of Torts §

774A) (alterations in original and internal quotation marks omitted).  All damages must be

demonstrated with reasonable certainty, NCRIC, Inc. v. Columbia Hosp. for Women Med. Ctr.,

Inc., 957 A.2d 890, 902 (D.C. 2008) (quoting Edmund J. Flynn Co. v. LaVay, 431 A.2d 543,

549-50 (D.C. 1981)), and they cannot be based on mere speculation or guesswork, id., although

mathematical precision is not required, id. at 902-03 (quoting Affordable Elegance Travel, Inc.

v. Worldspan, L.P., 774 A.2d 320, 329 (D.C. 2001)).  Moreover, "where the tort itself . . .

preclude[s] the ascertainment of the amount of damages with certainty, . . . a plaintiff seeking to recover lost profits . . . [can] prove . . . the amount of damages . . . based on a reasonable estimate." Tri County Indus., Inc. v. District of Columbia, 200 F.3d 836, 841 (D.C. Cir. 2000) (quoting Samaritan Inns Inc. v. District of Columbia, 114 F.3d 1227, 1234-35 (D.C. Cir. 1997)).

In Tri County, the plaintiffs produced evidence concerning the estimation of its damages based on testimony by eight witnesses, as well as expert testimony and projections of profitability by an economist. Id. at 841-42. The court found that while the estimates might be "uncertain or inexact," they "were sufficiently well founded to avoid characterization as mere speculation or guess." Id. at 841-42 (internal quotation marks and citations omitted). In contrast to what occurred in Tri County, where the defendant did not seriously challenge the plaintiff's estimated damages, id. at 841, here, Veolia puts Amtrak's estimate in doubt, as a number of government-sponsored reports have called into question the accuracy of Amtrak's cost-accounting practices, see Defs.' Mem., Rauch Decl., Ex. 47 (October 2005 GAO Report, GAO-06-145) at 6-7 ("Amtrak's knowledge and information systems related to procurement are fragmented and have limited ability to produce useful spending information."), Ex. 48 (April 2006 GAO Report, GAO-06-470) at 22 ("Amtrak officials acknowledged that the methods for assigning its costs are not exact."). Moreover, Veolia notes that Amtrak's profit margin quite likely would have been reduced due to the fact that Amtrak's bid only "included a 9% additive to account for the pending settlements between Amtrak and its labor unions," while the final wage settlements resulted in actual wage increases of between 18% and 25%. Defs.' Facts ¶ 241. And according to Amtrak's expert, "Amtrak would have had to eat the difference between the actual and the estimated costs." Defs.' Mem., Rauch Decl., Ex. 13 (Miller Dep.) at 121:12-15.

Although this evidence demonstrates that Amtrak's damage estimate might be uncertain or inexact, it is insufficient to show that Amtrak's damages are the product of pure speculation or guesswork. To the contrary, Amtrak has clearly articulated the basis for its estimate, namely, a 9% increase in labor costs, which could be adjusted based on evidence presented at trial, including Veolia's contention that the actual increase was between 18% to 25%. See Defs.' Facts ¶ 241. And, it is for a jury to determine whether inaccuracies in Amtrak's labor cost projections would have denied Amtrak any profit it might have realized, or whether the SFRTA would have renegotiated with Amtrak if it had been awarded the contract.

Regardless of the actual amount Amtrak may ultimately be able to recover, Veolia relies on the proposition that "government contract lost profit damages a[re] speculative per se," Defs.' Mem. at 43, and it cites Northland Equities, Inc. v. Gateway Center Corp., 441 F. Supp. 259, 264 (E.D. Pa. 1977) and George D. Newman & Sons, Inc. v. Washington Suburban Sanitary Commission, 696 F. Supp. 160, 162 (D. Md. 1988) in support of this position, id. at 43-44. Neither case, however, has applicability to the case at bar. In George D. Newman, the court found that a disappointed bidder was not entitled to an award of any damages based on its "ill-defined" claim, first, because the claim was brought against a state agency that enjoyed sovereign immunity and, second, because the bidder was not claiming an entitlement to the rejection of its bid, but rather was only seeking the opportunity to rebid on a contract. 696 F. Supp. at 162. Although Northland Equities is more on point, it is also distinguishable. There, a disappointed bidder on a government contract attempted to recover its lost profits. 441 F. Supp. at 261. The court found that "[i]t would be improper to award [the] plaintiff lost profits because the contract under which [the] plaintiff arguably would have made such profits never actually

came into existence.  The solicitation by [the government] was for leasehold offers which it could accept or reject as it pleased." Id. at 264.  The court then concluded, "[p]ure speculation being the basis of the claim for lost profits, [the] plaintiff fails to state a common law claim for which relief may be granted." Id. at 265.  Although like in Northland Equities, the SFRTA had the right to "reject any or all [p]roposals," Pl.'s Mot., Orseck Decl., Ex. 8 (RFP) § 1.10.1 at AMTH 003678, Amtrak argues that this was not a realistic course the SFRTA would have taken, Pl.'s Opp'n at 32-33.  As noted previously, Amtrak has also, through expert testimony, created a genuine factual dispute as to whether the SFRTA would have accepted its proposal in the event Veolia had not placed a bid, or its bid had been made without associating itself with Amtrak's prior employees.  See supra Part III.C.3.b.  As the District of Columbia Circuit has observed, "[w]here the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person," Tri County, 200 F.3d at 841 (quoting Samaritan Inns, 114 F.3d at 1234-35).  Accordingly, the Court cannot agree that a disappointed bidder on a government contract is absolutely barred from recovering lost profits where it was not awarded a contract due to another bidder's alleged improper conduct.  Veolia has, therefore, failed to demonstrate its entitlement to summary judgment based on the fourth element of a tortious interference claim.

For all of the reasons discussed above, Veolia's motion for summary judgment on Count II of Amtrak's Complaint is denied.[30]

---

[30] Veolia also argues that Amtrak's "factual allegations, in whatever veneer," in support of its lost profits damages claims is an assertion that the "names and credentials of Stencil, Salemme, and Mauck were proprietary business assets of Amtrak" and "that a benefit (the SFRTA Operations contract) was conferred upon Veolia when those credentials were used . . . in the proposal of [its] Key Management Team." Defs.' Mem. at 42.  Considered in this light, Veolia contends that both of Amtrak's claims are

(continued...)

(...continued)
precluded because they are claims by a disappointed bidder for unjust enrichment. Id. at 42-44 (citing
John C. Holland Enters., Inc. v. J.P. Mascaro & Sons, Inc., 653 F. Supp 1242, 1247 (E.D. Va. 1987),
aff'd, 829 F.2d 1120 (4th Cir. 1987); Oceanic Exploration, 2006 WL 2711527, at *21; Ellsworth, 917 F.
Supp. at 848-49). Amtrak responds that far from asserting that it conferred a benefit on Veolia, it is
asserting that Veolia "stole the benefit it wanted." Pl.'s Opp'n at 34. Amtrak also refers the Court to the
Court's prior decision in this case in which the Court held that Amtrak had sufficiently pleaded the
elements of both its tortious interference and aiding and abetting claims. Id.

"[U]njust enrichment provides a party with a remedy 'to unwind entanglements' that may have
arisen from a failed agreement . . . ." Vila v. Inter-American Inv., Corp., 570 F.3d 274, 280 (D.C. Cir.
2009) (citation omitted). "[T]he fundamental characteristic of unjust enrichment is 'that the defendant has
been unjustly enriched by receiving something . . . that properly belongs to the plaintiff[, thereby] forcing
restoration to the plaintiff.'" Rapaport v. U.S. Dep't of Treasury, Office of Thrift Supervision, 59 F.3d
212, 217 (D.C. Cir. 1995) (quoting Dobbs, Law of Remedies § 4.1(2) (2d ed. 1993) (alterations in the
original). A claim for unjust enrichment requires proof that "(1) the plaintiff conferred a benefit on the
defendant; (2) the defendant retain[ed] the benefit; and (3) under the circumstances, the defendant's
retention of the benefit is unjust." Vila v. Inter-American Inv., Corp., 536 F. Supp. 2d 41, 51 (D.D.C.
2008) (quoting New World Commc'ns, Inc. v. Thompsen, 878 A.2d 1218, 1223 (D.C. 2005)).

In Ellsworth, a disappointed bidder failed to satisfy the elements of a claim for unjust enrichment
because "nowhere [did] the plaintiffs allege that any benefit ha[d] been conferred on the . . . defendants
by the plaintiffs." 917 F. Supp. at 848. The court added that there had been "no showing that the
plaintiffs had any right to the benefit." Id. In Oceanic Exploration, the court held that plaintiffs, also
disappointed bidders, had sufficiently alleged a claim for tortious interference, but failed to state a claim
for unjust enrichment because "they . . . failed to allege that they ha[d] conferred a benefit on the
defendants." 2006 WL 2711527, at *20-21. The court added that "a disappointed bidder for a
government contract cannot maintain an unjust enrichment cause of action against a successful bidder for
the value of that contract." Id. at *21 (citing Ellsworth, 917 F. Supp. at 848-49).

Veolia asks the Court to interpret Amtrak's claim for lost profits as one for unjust enrichment and
to reject it, and both counts of the Complaint, for that reason. Defs.' Mem. at 42. The Court agrees that
Amtrak fails to state a claim for unjust enrichment, as Amtrak does not allege that it conferred a benefit to
Veolia, but rather that the benefit was "stole[n]." Pl.'s Opp'n at 34. This allegation is insufficient reason
for the Court to reinterpret Amtrak's claim for damages as one for unjust enrichment. Although Veolia
suggests that Amtrak construes its three former employees' credentials as a benefit that was conferred
upon Veolia, Defs.' Mem. at 42, the record is devoid of any indication that Amtrak seeks to recover the
value of a benefit it conferred to Veolia. As one example of what Amtrak is asserting, it represents that
the three employees were fired not for misusing Amtrak's proprietary property, Pl.'s Opp'n at 9, but for
engaging in conduct that amounted to "conflict[s] of interest[s]," see Pl.'s Supp. Facts § I ¶ 232.

The court also rejects Veolia's attempt to define every tortious interference claim of the nature
alleged here as one for unjust enrichment. While the court in Ellsworth dismissed both plaintiffs' unjust
enrichment and tortious interference claims, noting that "[a]s discussed . . . in connection with the
plaintiffs['] unjust enrichment claim, the plaintiffs do not and cannot allege any expectancy that Ellsworth
Associates would have received the . . . [c]ontract," 917 F. Supp. at 850, as this Court pointed out earlier,
see supra Part III.C.1, the dismissals of the tortious interference claims in the cases cited by the Ellsworth
court were based on a failure by disappointed bidders to demonstrate a reasonable likelihood that they
would have been awarded contracts, rather than on the theory that such claims were barred for the same

**IV. Conclusion**

To be sure, Amtrak's road to success at trial on both counts of its Complaint will be a significant challenge. Nevertheless, for the reasons outlined above it's a challenge the Court must permit Amtrak to pursue. Accordingly, Amtrak's motion for partial summary judgment as to Count I is denied and Veolia's motion for summary judgment as to Counts I and II is also denied.

---

[30](...continued)
reason unjust enrichment claims could not be maintained. See Ellsworth, 917 F. Supp. at 850; Oceanic Exploration, 2006 WL 2711527, at *20-21 (interpreting Ellsworth along same lines). Therefore, Ellsworth, and the cases it relies on, do not support Veolia's position.

For all of these reasons, the Court rejects Veolia's contention that Amtrak's claims should be dismissed because they are actually unjust enrichment claims.

**SO ORDERED**.[31]


REGGIE B. WALTON
United States District Judge

---

[31] An Order consistent with this Memorandum Opinion was issued on September 30, 2010.